## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

CRYSTAL PEÑA,

   Plaintiff,

vs.            No. CIV 12-0710 JB/WDS

DALE GREFFET and CARLOS VALLEJOS,
in their individual capacities, ARLENE
HICKSON in her individual and official
capacity & CORRECTIONS
CORPORATION OF AMERICA,

   Defendants.

### MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the CCA, Hickson and Vallejos' Motion to

Dismiss, filed Sept. 24, 2012 (Doc. 10)("Motion to Dismiss").  The Court held a hearing on

November 27, 2012. The primary issues are: (i) whether the Defendant Dale Greffet, a corrections

officer at the New Mexico Women's Correctional Facility ("NMWCF") in Grants, New Mexico,

was acting under color of state law when he allegedly violated Plaintiff Crystal Peña's

constitutional rights by sexually assaulting her; (ii) whether Peña alleges sufficient factual

allegations to make plausible Defendants Corrections Corporation of America's and Arlene

Hickson's personal involvement in practices and customs of suppressing inmate reports of sexual

assault at NMWCF in violation of Peña's constitutional rights; (iii) whether Peña's allegations

make plausible that CCA, owner and operator of the NMWCF, and Hickson, the NMWCF warden,

violated her First Amendment rights by placing her in segregated confinement in retaliation for

reporting Greffet's sexual assault and the alleged violations of her constitutional rights by

Defendant Carlos Vallejos, CCA Chief of Security; (iv) whether Peña states a claim against

Vallejos under 42 U.S.C. § 1983 or for the intentional tort of battery under New Mexico law when he allegedly grabbed her and slammed her into a wall in the hallway at NMWCF; and (v) whether Peña's Complaint states a plausible claim under New Mexico law that CCA is vicariously liable for Greffet's alleged sexual assaults of Peña, because his conduct was in the scope of his employment with CCA or he was acting pursuant to his implied authority as a CCA employee. The Court will grant in part and deny in part the Motion to Dismiss.  Peña fails to provide sufficient factual allegations to support her argument that Greffet's alleged sexual assault of her in Alamogordo, New Mexico, around Labor Day weekend, 2009, was done under color of state law, as she does not plausibly allege that Greffet used his position as a CCA corrections officer to improperly entice her to meet him at a motel room.  Peña's allegations that CCA and Hickson engaged in customs and practices suppressing reporting of inmate's sexual assaults lead to the reasonable inference that both CCA and Hickson participated in conduct that caused Greffet's violation of her Eighth Amendment rights.  Because Peña alleges that her treatment in segregation, including being kept in segregation for eight months, was retaliation for her reporting Greffet's alleged sexual abuse and/or Vallejos' alleged battery of her, her allegations plausibly state a claim for retaliation in violation of her First Amendment Rights.  Peña fails to make plausible her claims against Vallejos, because she fails to provide the Court with sufficient factual allegations to support her allegations of Vallejos' violation of her civil rights and battery of her, providing only conclusory statements of the elements of those causes of action.  Because Peña's Complaint for Civil Rights Violations and Common Law Torts, filed June 29, 2012 (Doc. 1)("Complaint"), does not adequately allege that Greffet's alleged sexual abuse of her at NMWCF is a basis on which she seeks to impose vicarious liability on CCA, she fails to adequately plead those claim against CCA.  Because Greffet's other alleged sexual assaults of Peña were at times

when she was not an inmate subject to CCA's authority and at times in which she could not have reasonably believed that Greffet was acting pursuant CCA's authority, she fails to state a plausible theory for holding CCA liable for these acts.

The Court will grant Peña's request to amend and grant her leave to amend her Complaint. As Peña stated at the hearing that she might have further factual allegations regarding whether Greffet improperly used his state-derived authority to coerce Peña to meet him at the motel in Alamogordo to show that he was acting under color of law, the Court will grant Peña's request for leave to amend her pleadings to add such additional facts for this theory. The Court will also grant leave to Peña to amend her causes of action against Vallejos so that she may be able to provide sufficient factual allegations beyond her conclusory restatements of the elements of a § 1983 cause of action for an Eighth Amendment Violation and the intentional tort of battery. Finally, because Peña provides additional factual allegations elsewhere in the Complaint regarding Greffet's alleged sexual assault at NMWCF, the Court will grant Peña's request to amend her pleadings as to CCA's vicarious liability under New Mexico law for the assault at the NMWCF.

## FACTUAL BACKGROUND

In July, 2009, Peña was a post-conviction prisoner at NMWCF.  <u>See</u> Complaint ¶ 3, at 1-2. At all times material to Peña's allegations, CCA operated and maintained NMWCF pursuant to a contract with the State of New Mexico, and was bound to comply with certain New Mexico Corrections Department ("NMCD") policies.  Complaint ¶ 4, at 2.  CCA employed Hickson as NMWCF warden, and as such she was the head supervisor of the facility.  <u>See</u> Complaint ¶ 5, at 2. During portions of the time in which the underlying conduct took place, CCA employed Greffet and Vallejos as corrections officers at NMWCF.  <u>See</u> Complaint ¶ 6, at 2.

Peña's mother's boyfriend raped Peña when she was a young child on two separate

occasions.   See Complaint ¶ 7, at 2.   Peña, at a time before her allegations arose, was diagnosed with debilitating mental illnesses.   See Complaint ¶ 8, at 2.   In the spring of 2009, while Peña was isolated in NMWCF's segregation unit, she was befriended by Greffet, who initiated, cultivated, and encouraged an intimate relationship with her contrary to CCA's and NMCD's policies and procedures.   See Complaint ¶ 9, at 2.   The claims alleged in Peña's Complaint arise from five distinct incidences of conduct: (i) Greffet's alleged sexual abuse at NMWCF in July/August 2009; (ii) Greffet's alleged sexual abuse in Alamogordo, around Labor Day weekend, 2009; (iii) Greffet's alleged sexual abuse in Albuquerque, New Mexico, around August, 2010; (iv) Vallejos' alleged assault and battery in a hallway at NMWCF in June 2011; and (v) Peña's being placed and kept in segregation following her sexual abuse report in 2011.

### 1.   The July/August, 2009, Alleged Sexual Abuse at NMWCF.

Beginning in July of 2009, Greffet began to make advances and sexual comments to Peña about her physical appearance, which, for a period of time, Peña resisted.   See Complaint ¶¶ 10-11, at 3.   In July and August of 2009, Greffet began to sexually fondle[1] Peña.   See id. ¶ 12, at 3.   During the same time frame, Greffet made numerous false statements to Peña, including expressing his intent to enter into a committed relationship with her and his desire that they raise children together after her release from custody.   See Complaint ¶ 13, at 3.   Peña, relying on these statements, came to believe that Greffet was committed to a monogamous relationship with her in which the two of them would raise children.   See Complaint ¶ 14, at 3.   Peña was

---

[1] Throughout the factual allegations in her Complaint, Peña uses terms related to sexual abuse as they are defined in the Prison Rape Elimination Act of 2003, 42 U.S.C. §§ 15601-15609 ("PREA").   Peña is not, however, contending that the PREA applies to her claims in this case. Section 15609(11) of Title 42 of the United States Code provides: "The term 'sexual fondling' means the touching of the private body parts of another person (including the genitalia, anus, groin, breast, inner thigh, or buttocks) for the purpose of sexual gratification."   42 U.S.C. § 15609(11).

particularly susceptible to these advances, because of her history of sexual victimization, her diagnosed mental illnesses, and her aspiration to live a life of love and normalcy.   See Complaint ¶ 15, at 3.   At some point during late July or early August of 2009, Greffet called Peña into the an office of the commanding officer in front of the master control area of NMWCF, and, sitting at the desk, revealed his erect penis to Peña, and told her to look and see the effect that she had on him. See Complaint ¶¶ 16-17, at 3.   With Peña under the desk, Greffet orally sodomized her.   See Complaint ¶ 18, at 3.

### 2.    The Labor Day weekend, 2009, Alleged Sexual Abuse in Alamogordo.

On or about late August of 2009, Peña paroled to Ruidoso, New Mexico, from NMWCF. See Complaint ¶ 19, at 4.   After Peña paroled, Greffet obtained Peña's telephone number from Peña's aunt, who was incarcerated at NMWCF.   Greffet contacted Peña and pressured her to meet him.   On Labor Day Weekend of 2009, just before Peña entered into an in-patient treatment program in Alamogordo as a condition of her probation, Greffet rented a motel room for the two of them.   See Complaint ¶ 21, at 4.   During their stay in the motel room, Greffet raped[2] Peña on four occasions.   See Complaint ¶ 22, at 4.   In the motel room, Peña resisted Greffet's efforts to

---

[2] The PREA, 42 U.S.C. § 15609(9), defines rape as:

**(A)** the carnal knowledge, oral sodomy, sexual assault with an object, or sexual fondling of a person, forcibly or against that person's will;

**(B)** the carnal knowledge, oral sodomy, sexual assault with an object, or sexual fondling of a person not forcibly or against the person's will, where the victim is incapable of giving consent because of his or her youth or his or her temporary or permanent mental or physical incapacity; or

**(C)** the carnal knowledge, oral sodomy, sexual assault with an object, or sexual fondling of a person achieved through the exploitation of the fear or threat of physical violence or bodily injury.

42 U.S.C. § 15609(9).

orally and anally sodomize her, but relented when Greffet persisted.   See id. ¶ 23, at 4.

On or about October of 2009, Peña's parole was revoked, and she returned to NMWCF, where Greffet continued to work.   See Complaint ¶ 24, at 4.   After returning from parole, Greffet continued to falsely state his commitment to Peña and his intent to raise children with her, to make sexual advances toward her, and to sexually fondle her.   See Complaint ¶ 25, at 4.   On or around April of 2010, Greffet left his position at NMWCF.   Before he left, however, Greffet again expressed his plans to live with Peña and raise children with her.   See Complaint ¶ 26, at 4.

### 3.     The August, 2010, Alleged Sexual Abuse in Albuquerque.

On or about August of 2010, Peña was again released from NMWCF on probation.   A condition of her probation was that she enroll in an in-patient treatment program for her mental health as a condition of her release.   See Complaint ¶ 27, at 4.   Peña reported to and tried to qualify for the Maya's Place treatment program in Albuquerque.   See Complaint ¶ 28, at 5. During this time frame, Greffet raped Peña on three occasions, again notwithstanding her resistance to anal sodomy.   Greffet conceived a child with Peña during this time frame.   See Complaint ¶ 29, at 5.   Eventually, Maya's Place rejected Peña because, as she suffered from mental illness rather than drug dependence, she did not fit the criteria for admittance at the program. See Complaint ¶ 30, at 5.

Because she was unable to enter a treatment program and thereby satisfy her condition of probation, Peña turned herself into law enforcement in September of 2010.   See Complaint ¶ 31, at 5.   As she was surrendering to authorities, Peña fainted, was taken to the emergency room, and learned for the first time that she was pregnant.   See Complaint ¶ 33, at 5.   Greffet promised to bond her out from Doña Ana County Detention Center in Las Cruces, New Mexico, where she would be held, but never did so.   See Complaint ¶¶ 32, 36, at 5.   The next day, from jail, Peña

told Greffet that she was pregnant.   See Complaint ¶ 34, at 5.   Greffet thought that aborting the baby was the best option, and, accordingly, Peña and the Doña Ana County Detention Center made arrangements for the abortion.   Peña could not go through with the abortion, however, and returned to jail with the baby still *in utero*.   See Complaint ¶¶ 34-35, at 5.   Eventually, Peña realized that Greffet was not going to bond her and that she was going to have to deliver the child while in jail.   She discussed with Greffet how to care for the child during the child's first months of life, when she would still be incarcerated.   See Complaint ¶ 36, at 5-6.   Greffet said he would not care for the baby and that adoption was the best option.  See Complaint ¶ 37, at 6.   Before giving birth, and in large part because of her inability to find someone to care for the baby while she remained in prison, Peña felt compelled to relinquish her parental rights.   See Complaint ¶ 38, at 6.   She gave birth to her son on May 2, 2011, while incarcerated at NMWCF.   See Complaint ¶ 39, at 6.

### 4.   Vallejos' Alleged Assault and Battery.

On or around early June of 2011, Peña was suffering from postpartum depression, in addition to her other mental illnesses, and was grieving her estrangement from her son in NMWCF hallway.   See Complaint ¶ 40, at 6.   When she failed to respond to a question by Vallejos, he grabbed her and slammed her against the wall of the hallway, causing bruising to her arms, and triggering severe symptoms of Peña's chronic Post-Traumatic Stress Disorder.   See Complaint ¶ 41, at 6.   Because of Vallejos' battery of Peña and his mistreatment of other inmates at the facility, CCA removed him from his position at NMWCF.   See Complaint ¶ 42, at 6.

### 5.   The Alleged Retaliation Against Peña.

CCA and Hickson placed Peña in isolated/segregated confinement in response to the incident with Vallejos.   See Complaint ¶ 43, at 7.   While Peña was in segregation at NMWCF,

CCA and Hickson came to know that she was alleging that Greffet had raped her, and pressured her to provide them with a statement about the incident.   See Complaint ¶ 44, at 7.   When Peña refused to provide them with a statement about Greffet, and when it became clear she was alleging that Vallejos had assaulted and battered her, CCA and Hickson kept her in varying levels of segregated confinement for a period of approximately eight months in violation of CCA's and NMCD's policies.   See Complaint ¶ 45, at 7.   Her placement in segregated confinement severely aggravated her fragile mental condition, prevented her from contacting the outside world, including her mother and her son's adoptive parents, and caused her to lose good time and to remain incarcerated for a longer period of time, resulting in severe mental and emotional distress. See Complaint ¶ 46, at 7.

## PROCEDURAL BACKGROUND

Peña brings this action against Greffet and Vallejos in their individual capacities, against Hickson in her individual and official capacity, and against CCA pursuant to 42 U.S.C. § 1983, for their alleged violation of her civil rights arising under the Fourth, Eighth, and Fourteenth Amendments to United States Constitution.   See Complaint at 1.   Peña, in Count I, alleges that Greffet sexually fondled her while she was incarcerated in NMWCF, and orally sodomized her in NMWCF, in violation of her Eighth Amendment right to be free from cruel and unusual punishment, "including the right to be secure in her bodily integrity and free from sexual advances, sexual fondling, sexual intercourse, anal sodomy, and oral sodomy by prison personnel." Complaint ¶ 48, at 7.   Included within Count I is Greffet's alleged rape of Peña in an Alamogordo hotel room while she was on parole -- "on or about September 5-7 of 2009" -- which she alleges "extended the pattern of sexually victimizing Plaintiff that began [when Greffet was] her captor in the NMWCF . . . . [and were done while] Greffet was acting under color of law . . . ."   Complaint

- 8 -

¶¶ 51-53, at 8.   Peña alleges that Greffet's sexual fondling, sodomy, and rapes proximately caused her damages and injuries, and she requests the Court grant "compensatory and punitive damages against Defendant Greffet, together with all costs and attorney's fees."   Complaint ¶ 63, at 10.   In Count II, Peña alleges that Vallejos' conduct in "grabbing Plaintiff and slamming her against a wall" violated her Eighth Amendment right to be free from cruel and unusual punishment, and to be free from "unreasonable, unnecessary, and excessive force . . . ."   Complaint ¶¶ 65-66, at 10. Peña asserts that Vallejos' use of "unreasonable, unnecessary, and excessive force against Plaintiff was intentional, malicious, sadistic, willful, wanton, obdurate, and in gross and reckless disregard for Plaintiff's constitutional rights."   Complaint ¶ 67, at 10.

In Count III, Peña alleges that CCA and Hickson violated her Eighth and Fourteenth Amendment rights to be free from exposure to "unreasonable risks of harm or from exercising deliberate indifference toward her safety, security, and constitutional rights," because CCA and Hickson "engaged in a custom of suppressing, denying or disregarding incidents of prison rape . . . ."   Complaint ¶ 71-72, at 11.   The incidents of rape are alleged to include: placing inmates who reported sexual or other staff misconduct in segregation, or otherwise retaliating against them; violating internal and NMCD policies by failing to report allegations of prison rape to outside law enforcement; failing to conduct adequate internal investigations of rape allegations; and offering financial incentives for non-reporting.   See Complaint ¶ 72, at 11.   Count IV alleges that CCA and Hickson violated Peña's First Amendment right to be free from retaliation for reporting sexual or physical assaults by prison officers, her Eighth Amendment right to be free from cruel and unusual punishment, and her Fourteenth Amendment right to procedural due process, and CCA and NMCD policies, when they placed and kept Peña in "segregated confinement following her reporting of Defendant Greffet's rapes and Carlos Vallejos' assault."   Complaint ¶¶ 76-77, ¶ 79,

at 12, 13.

In Count V, Peña alleges that Greffet is liable for the intentional torts of battery and rape for his rapes of Peña in Alamogordo and in Albuquerque when she "lacked the capacity to consent thereto. [And] [i]n any case, [] did not consent to the sex."   Complaint ¶¶ 82-83, at 13.   Peña alleges that CCA is legally liable under New Mexico law for Greffet's tortious conduct under the doctrine of *respondeat superior*, as Peña "was directly informed and/or had reason to believe that Defendant Greffet was an agent and employee of the Corporation at all times material." Complaint ¶¶ 85-86.   Count VI alleges that Vallejos, in "violently grabbing [Peña] and slamming her against the wall," committed an intentional offensive touching to Peña's person, and Vallejos is thus liable for the intentional tort of battery.   Complaint ¶¶ 88-91, at 14.   Peña alleges that CCA is also liable for this intentional tort of Vallejos under the *respondeat superior* theory, as he was acting as an agent and employee of CCA at all material times.   See Complaint ¶¶ 92-93, at 14.

On September 24, 2012, CCA, Hickson, and Vallejos (collectively "CCA Defendants") filed the Motion to Dismiss, asking the Court to dismiss Peña's Complaint as to them, and asserting that the "Plaintiff's Complaint seeks to extend liability to an employer and supervisor, far further than any case has ever held."   Motion to Dismiss at 1.   The CCA Defendants argue that Peña, in seeking to hold CCA and Hickson liable under a *respondeat superior* theory and under § 1983 for actions that occurred while Peña was not incarcerated, "seeks to create a completely new form of strict liability law related to employers and employees . . . ."   Motion to Dismiss at 1. They assert: "Plaintiff's theories are not supported by any case law, some of them bordering on frivolous, and should not be endorsed by this Court."   Motion to Dismiss at 1.   Further, CCA Defendants contend that Peña's allegations are insufficient to satisfy the federal standard required to state a claim as the Supreme Court of the United States articulated the standard in Ashcroft v.

Iqbal, 556 U.S. 662 (2009).

The CCA Defendants note that, although CCA owns and operates NMWCF, where Peña was incarcerated post-conviction, "CCA does not perform supervision duties, such as those that might be required by probation, once an inmate is released from NMWCF. Those duties are exclusively reserved to the State of New Mexico." Motion to Dismiss at 2. They point out that, after Peña's second incarceration at NMWCF, from January, 2009, to August 18, 2009, she was paroled to Ruidoso/Alamogordo, which they note is approximately 260 miles from the NMWCF in Grants, New Mexico. See Motion to Dismiss at 2. The CCA Defendants state that Peña alleges that it was during this time, over Labor Day weekend, 2009, that Greffet sexually assaulted her in an Alamogordo motel room, on which she bases her § 1983 claims against Greffet, her § 1983 claims against CCA and Hickson for deliberate indifference and failure to protect, and her intentional tort claims against Greffet and against CCA under a *respondeat superior* theory. See Motion to Dismiss at 3. CCA Defendants note that Peña does not allege that, when she returned to NMWCF in October of 2009, she notified anyone at NMWCF that Greffet assaulted her while she was out of custody. See Motion to Dismiss at 3. As to Peña's allegations that she was sexually assaulted a second time in Albuquerque in August of 2010, the CCA Defendants point out that Greffet had not been employed by CCA for between three and four months at that time. See Motion to Dismiss at 3.

The CCA Defendants argue that the Court should dismiss Peña's Count III, because it fails to satisfy Ashcroft v. Iqbal's requirements. See Motion to Dismiss at 5. They assert that CCA may be sued pursuant to 42 U.S.C. § 1983

> only where 'the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers' or visited pursuant to governmental 'custom' even though such custom has not received formal approval through the body's

official decision making channels.

Motion to Dismiss at 5 (citing Monell v. New York City Dept. of Soc. Servs., 436 U.S. 658, 689 (1978); Herrera v. Cnty. Of Santa Fe, 213 F. Supp. 2d 1288 (D.N.M. 2002)(Black, J.)).   The CCA Defendants contend that, for Peña to state a valid claim, she must allege the specific policy or custom that was the moving force behind the constitutional violations of which she complains. See Motion to Dismiss at 5.   The CCA Defendants argue that, for a prison claim specifically, "the complaint must also address Turner v. [Safley, 482 U.S. 78 (1987)]'s core holding, relative to whether a challenged prison policy or regulation is 'reasonably related to penalogical interest.'" Motion to Dismiss at 6 (quoting Al-Owhali v. Holder, 687 F.3d 1236, 1240 (10th Cir. 2012)). The CCA Defendants assert that Peña's Complaint fails to meet these pleading requirements, because it "presents only limited meaningful information relative to the sexual assault allegations at issue."   Motion to Dismiss at 6.   They point out that, "[w]ith respect to claims of assault allegedly occurring while Plaintiff was incarcerated, there is no information regarding where or what time of day the alleged incidents occurred.   Indeed, there is not even a way to determine exactly how many incidents Plaintiff complains of."   Motion to Dismiss at 6-7.   The CCA Defendants argue that, without these facts, their liability cannot be determined.   See Motion to Dismiss at 7.   The CCA Defendants also contend that, because Peña uses the term rape as it is defined in the PREA, rather than "the common definition of rape found in the criminal statute," it is confusing "at best."   Motion to Dismiss at 7.   They assert that, as "[t]he PREA definitions are fundamentally different from and far broader than these commonly used definitions," this lack of specificity fails to meet Ashcroft v. Iqbal's standards.

The CCA Defendants assert that Peña "continues by making conclusory allegations, unsupported by facts, relative to alleged policies and customs at NMWCF, which are actually

contradicted by some of the 'factual background' of Plaintiff's Complaint."   Motion to Dismiss at 7.   They point out that Peña concedes that CCA and NMCD had policies in place prohibiting staff sexual misconduct with inmates, which they contend defeat any "custom or policy type claim." Motion to Dismiss at 7-8 (citing Complaint ¶ 9, at 2).   They note that Peña does not allege that her allegations were not reported to law enforcement officers, because CCA did report her allegations. See Motion to Dismiss at 8.

The CCA Defendants also argue that, in light of there not being supervisory liability under § 1983, Peña has failed to state a federal law claim against Hickson for failure to protect, because she does not adequately allege in her complaint that any "deliberate, intentional act" of Hickson's caused a violation of her rights.   Motion to Dismiss at 9 (quoting Woodward v. City of Worland, 977 F.2d 1392, 1399 (10th Cir. 1992)).   They assert that for Hickson, as a prison official, to be liable for failure to protect, Peña must show "that the entity's officials had knowledge of prior incidents of misconduct and deliberately failed to take remedial action."   Motion to Dismiss at 9 (citing Barney v. Pulsipher, 143 F.3d 1299 (10th Cir. 1998); Beers-Capital v. Whetzel, 256 F.3d 120 (3d Cir. 2001)).   The CCA Defendants contend that, because Peña has not alleged Hickson's personal involvement in any conduct violating her civil rights, and because she has failed to plead facts related to Hickson's knowledge or notice of constitutional violations, the Court should dismiss her Complaint against Hickson.   They point out that many of the alleged unconstitutional acts of which Peña complains -- the rapes that allegedly occurred after April 2010 -- occurred when Greffet was no longer a CCA employee, and thus, as a matter of law, she cannot be liable as a supervisor as she did not have any supervisory authority over a non-employee.   See Motion to Dismiss at 10.   They assert: "Likewise, while Warden Hickson could be considered Greffet's supervisor in a general sense, she had no constitutional duty to supervise him when he was off

duty." Motion to Dismiss at 10.

The CCA Defendants argue that, to the extent Peña's § 1983 claims stem from Greffet's conduct while he was off-duty or no longer a CCA employee, or while Peña was not an inmate, the Court should dismiss the Complaint, because Greffet was not, as a matter of law, acting under color of law. See Motion to Dismiss at 10. They assert: "Plaintiff is attempting to turn § 1983 into a form of strict and unending liability. This must be rejected as it is not the law and has dangerous implications for other cases." Motion to Dismiss at 10. The CCA Defendants contend that an essential component of a § 1983 claim is that the defendant was acting under color of law, and that this component is met only "if the defendant acted in an official capacity as a public employee or exercised responsibilities that were conferred under state law." Motion to Dismiss at 11 (quoting West v. Atkins, 487 U.S. 42, 49-50 (1988)). They assert:

> Relevant to this inquiry is whether the defendant was on-duty or off-duty at the time of the alleged conduct. Actions taken by an individual to advance their personal pursuits, however, are plainly excluded from the definition of "under color of law." Whether a defendant acted under color of state law is a question of law for the court.

Motion to Dismiss at 11 (internal citations omitted)(quoting Screws v. United States, 325 U.S. 91, 111 (1945))(citing Hanes v. Fisher, 82 F.3d 1503 (10th Cir. 1996)). The CCA Defendants argue that Peña's allegations preclude the Court from finding that "Greffet's alleged actions were related to the performance of any of his duties as a current off-duty, or formal corrections officer." Motion to Dismiss at 12. They assert that Greffet's status as a corrections officer does not somehow transform all of his actions into acts taken under color of law. See Motion to Dismiss at 12 (citing Hill v. Barbour, 787 F. Supp. 146, 149 (N.D. Ill. 1992)). The CCA Defendants assert that, once Greffet's employment with CCA terminated, and he was no longer a corrections officer, at that point his "actions cannot be under color of law because he has no actual authority to act in

his prior capacity."   Motion to Dismiss at 12 (citing <u>Gibson v. Chicago</u>, 910 F.2d 1510, 1516-19 (7th Cir. 1990)).  The CCA Defendants argue that, given the timeframes Peña alleges in her Complaint, compared with Peña's time incarcerated at NMWCF and Greffet's tenure as a CCA corrections officer, "there are no factual allegations that could even make such a claim [that he acted under color of law] plausible."   Motion to Dismiss at 12.

In regards to the alleged sexual abuse alleged to have occurred in Alamogordo, while Greffet was off-duty, CCA Defendants contend that, as Alamogordo is over 250 miles from NMWCF, "[t]he complete lack of geographical proximity to the facility, standing alone, makes a claim that Greffet was acting under color of law implausible."   Motion to Dismiss at 13.   They point out that, in addition to the Complaint lacking any allegations that Greffet was wearing a uniform, or made any statements feigning his invocation of any official powers, Peña admits in the Complaint that she believed Greffet had a desire to engage in a personal relationship with her and that he did so over Labor Day weekend.   <u>See</u> Motion to Dismiss at 13 (citing Complaint ¶ 13-14, 21).   The CCA Defendants argue that these facts preclude the Court from finding that Peña could have reasonably believed that he was on duty during his alleged stay with her in the Alamogordo hotel.   <u>See</u> Motion to Dismiss at 13.   The CCA Defendants contend that Peña's contention that she believes Greffet was acting under color of law when he allegedly sexually assaulted her in 2010, five months after she admits that she knew his employment with CCA had terminated, is "incredulous[]" and that "no reasonable person could ever believe that Greffet had any authority as a correctional officer when he no longer worked in that capacity."   Motion to Dismiss at 13 (citing Complaint ¶ 26).   The CCA Defendants assert that, because there are no facts that support Peña's allegations that Greffet was acting under color of law during these alleged assaults while Greffet was off duty, and because Peña could not add any additional facts to address these deficiencies

given the chance to amend her Complaint, the Court should dismiss the § 1983 claims against CCA and Hickson based on the violations during this time frame.  See Motion to Dismiss at 13-14.

CCA Defendants argue that Peña's § 1983 claims based on CCA's and Hickson's alleged violations of her Eighth and Fourteenth Amendment rights when she was not incarcerated fail to state a claim upon which relief can be granted, because it is clear that "[a] person must be in the physical custody of the government to allege acts or omissions sufficient to establish a violation." Motion to Dismiss at 14 (citing Estelle v. Gamble, 429 U.S. 97, 106 (1976); Bell v. Wolfish, 441 U.S. 520 (1979)).

The CCA Defendants contend that Peña's retaliation claim fails to satisfy the pleading standard set forth in Ashcroft v. Iqbal, because it fails to adequately plead a First Amendment retaliation claim's five elements for the prison context: "(1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal."  Motion to Dismiss at 14 (quoting Rhodes v. Robinson, 408 F.3d 559, 567-68 (9th Cir. 2005)).  They assert that Peña's Complaint fails to show that the "alleged retaliation was a 'substantial' or 'motivating' factor in the decision resulting in the adverse action," Motion to Dismiss at 14 (quoting Sorrano's Gasco, Inc. v. Morgan, 874 F.2d 1310, 1315 (9th Cir. 1989)), because she fails to allege sufficient facts for the Court to determine whether her placement in segregation was retaliatory, rather than appropriate under Turner v. Safley.   The CCA Defendants note that, as there is no respondeat superior theory of liability under § 1983, CCA and Hickson can be held liable only for an unconstitutional policy or custom.  See Motion to Dismiss at 15 n.7.  They point out that Peña fails to support her

- 16 -

allegations that CCA and Hickson violated CCA and NMCD policies by referring the Court to any specific policies or facts about how they violated these policies.   See Motion to Dismiss at 15. With regard to Hickson specifically, the CCA Defendants contend that Peña has failed to plead any facts connecting her personally to Peña's alleged retaliation, and she thus cannot be liable for Vallejos' alleged segregation of Peña as retaliation for exercising her First Amendment rights. See Motion to Dismiss at 15 n.7.   The CCA Defendants argue that the timing of Peña's alleged report of Greffet to the prison officials is "critically important.   She alleges that she did not report Greffet until after she was placed in segregation relative to the Vallejos incident.   Thus, she could not have been placed in segregation for making a report against Greffet because she was already in segregation."   Motion to Dismiss at 17.   They assert that, as Greffet's employment with CCA had terminated over a year before she made the report, she cannot reasonably contend that the CCA Defendants retaliated against her.   See Motion to Dismiss at 17.

The CCA Defendants argue that Peña's § 1983 claim against Vallejos for his alleged Eighth Amendment violation fails, because Peña pleads "scant facts" relating to this incident, and they do not support her allegation of an evil intent or motive, and the majority of her allegations are legal conclusions.   Motion to Dismiss at 18.   They contend that Peña's Eight Amendment claim also fails, because she does no plead sufficient facts on which she can plausibly establish that Vallejos' use of force was anything more than *de minimis* -- e.g., a bruise on her arm -- and it is implausible to believe from the facts asserted that Vallejos' use of force was "an unnecessary and wanton affliction of pain."   Motion to Dismiss at 17-18 (citing Hudson v. McMillan, 503 U.S. 1 (1992); Whitley v. Albers, 475 U.S. 312 (1986)).

In regards to the state law claims, the CCA Defendants argue that Peña's complaint lacks the requisite facts to state a claim for battery, because Peña's allegations consist of "legal

- 17 -

conclusions relative to Vallejos' interaction with her, [] not facts."  Motion to Dismiss at 19. They assert that, although there is insufficient law in New Mexico on the intentional tort of assault and battery, the contact must at least be without justification, and, because Peña admits that she did not respond to Vallejo's' statement to her, she fails to plead sufficient facts to determine whether she was willfully refusing to follow an order.  See Motion to Dismiss at 19-20.  The CCA Defendants assert that the Court should therefore find the Complaint fails to state a claim for the intentional tort of assault and battery.  See Motion to Dismiss at 20.  Further, the CCA Defendants argue that Peña's claims against CCA for Greffet's alleged intentional tort based upon *respondeat superior* also fail to state a claim upon which the Court can grant her relief, because, as Greffet was either off-duty or not employed by CCA during the alleged commissions of the torts, CCA cannot, as a matter of law, be liable for Greffet's actions.  See Motion to Dismiss at 20 (citing Miera v. George, 55 N.M. 535, 540, 237 P.2d 102, 107 (1951); U.J.I. Civ. 13-406 and 13-407, N.M.R.A.).  They assert that "the test announced in this jurisdiction requires an employment relationship," and thus CCA cannot, as a matter of law, be liable for Greffet's conduct any time after Greffet's employment ended.  Motion to Dismiss at 22 (citing Madsen v. Scott, 128 N.M. 255 (1988); Cain v. Champion Window Co. of Albuquerque, LLC, 2007-NMCA-085, 142 N.M. 209, 164 P.3d 90).  The CCA Defendants point out that all of the alleged wrongful conduct occurred while Peña was not an inmate and assert that "CCA has no business related to the supervision of inmates who are no longer incarcerated at NMWCF."  Motion to Dismiss at 21. They assert that there are no facts pled on which CCA can be liable to Peña for any of Greffet's intentional torts, because CCA employees have no official duties related to non-inmates, and because Peña does not allege that CCA authorized Greffet to commit any of the alleged acts of sexual assaults.  See Motion to Dismiss at 21-22.  The CCA Defendants also contend that, as

there are no facts to support any finding other than that Greffet was off-duty during the Alamogordo incident, CCA cannot be liable for Greffet's acts at such a time.   See Motion to Dismiss at 22.   As to Peña's allegation that CCA is liable under *respondeat superior* for Vallejos' alleged commission of the intentional tort of battery against Peña, the CCA Defendants assert that the Complaint fails to plead sufficient facts upon which the Court can make the required determination "that CCA authorized, commanded, or committed the act itself."   Motion to Dismiss at 23 (citing Martin-Martinez v. 6001, Inc., 1998-NMCA-179, 126 N.M. 319, 968 P.2d 1182).

On October 11, 2012, Peña filed her Plaintiff's Response in Opposition to the CCA Defendants' Motion to Dismiss.   See Doc. 16 ("MTD Response").   Peña asserts that "she is entitled to relief from a pattern of sexual abuse that she suffered beginning while she was an inmate . . . . [and that] continued while Plaintiff went out from and back into prison . . . ."   MTD Response at 1.   She "claims that sexual abuse was caused in part by specific practices that the [CCA] and Warden Hickson implemented in order to suppress the reporting of sexual abuse within the prison."   MTD Response at 1.   This suppression of her reports of prison, Peña contends, constituted CCA's and Hickson's deliberate indifference to the known problem of sexual abuse ongoing at NMWCF.   See MTD Response at 1-2.   Peña contends: "The Motion to Dismiss represents a regressive approach toward prison rape and relies on an extreme reading of Ashcroft v. Iqbal."   MTD Response at 2.   Peña notes that because a district court ruling on a motion to dismiss "'may only consider the facts alleged within the complaint' . . . . [she] does not respond to the superfluous factual assertions contained in the Motion's 'factual background' regarding Mr. Greffet, Defendant CCA's duties, or Plaintiff's history of incarceration."   MTD Response at 2 (quoting Cnty. of Santa Fe v. Pub. Serv. Co. of N.M., 311 F.3d 1031, 1035 (10th Cir. 2002)).

- 19 -

Peña points out that her Complaint alleges three different occasions on which Greffet abused her: (i) when she was incarcerated at NMWCF "and Mr. Greffet was employed by the [CCA] and 'on-duty'" in the July-August 2009, time frame; (ii) in Alamogordo around Labor Day weekend, 2009, when Peña was out of NMWCF and Greffet was still a CCA employee, "but not 'on-duty'"; and (ii) around August 2010, when Peña was out of NMWCF and Greffet was note employed by CCA.   MTD Response at 2-3.

> Peña asserts:

> It is odd that Defendants object to Plaintiff's reliance on the Prison Rape Elimination Act of 2003 . . . as source for the definitions [of the term rape and other sex acts] since it is this very law with which the [CCA] must comply in effectuating a legal duty of exhibiting "zero tolerance" for prison sexual abuse.

MTD Response at 3.   She contends that no matter what term it is given, sex between prison inmates and prison guards is contrary to the PREA and the Constitution.   See MTD Response at 3 (citing Farmer v. Brennan, 511 U.S. 825, 857-58 (1994)).   Peña argues that CCA Defendants' contention that she admits that she consented to sexual acts with Greffet in her Complaint "is frivolous and wrong for three reasons."   MTD response at 3.   Peña points out that, first, the Complaint specifically alleges that she did not consent.   See MTD Response at 3-4 (quoting Complaint ¶¶ 49, 54, 59)(alleging, with regard to all three alleged sexual abuse acts, that Peña "could not and did not consent").   She argues, second, that, as a matter of law, it is impossible for Peña, as an inmate, to consent to sex "with her captor in a jail or prison."   MTD Response at 4 (citing N.M.S.A. 1978, § 30-9-11(E)(2)("Criminal sexual penetration in the second degree consists of all criminal sexual penetration perpetrated . . . on an inmate confined in a correctional facility or jail when the perpetrator is in a position of authority over the inmate . . . ."); 28 C.F.R. Part 115).

Peña asserts that her Complaint satisfies the Ashcroft v. Iqbal plausibility standard.   See

- 20 -

MTD Response at 4.   She argues that, while CCA Defendants attempt to construe <u>Ashcroft v.</u> <u>Iqbal</u> and <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007), as a "blunt [] instrument" and to "require complaints to contain surplusage," the "cumulative impact of <u>Twombly</u> and <u>Iqbal</u> has been to install a plausibility standard by which courts evaluating a motion to dismiss must grade the sufficiency of factual allegations contained in the complaint."   MTD Response at 4.   She asserts that, "[i]n applying <u>Iqbal</u>'s plausibility standard, the Tenth Circuit 'assume[s] the factual allegations are true and ask[s] whether it is plausible that the plaintiff is entitled to relief."   MTD Response at 5 (quoting <u>Gallagher v. Shelton</u>, 587 F.3d 1063, 1068 (10th Cir. 2009)).   Peña contends that the allegations against Greffet in the Complaint regarding the course of in-custody sexual abuse "would plausibly satisfy two of the three constitutional claims alleged . . . ."   MTD Response at 6.   In regard to the July/August, 2009, alleged rape, Peña quotes paragraphs nine through eighteen, and twenty-four through twenty five, and asserts:

> Plainly, accepting as true Plaintiff's allegations that Mr. Greffet made sexual comments to her, sexually fondled her, and then orally sodomized her while at the prison, on duty in his capacity as a corrections officer and employee of the Corporation, her claim that Mr. Greffet sexually abused her in violation of her Eighth Amendment rights is plausible.

MTD Response at 7.   As to the Labor Day weekend, 2009, allegations, Peña quotes ¶¶ 19-23 and responds to CCA Defendants' argument that, because Greffet was off-duty, he could not, as a matter of law, have acted under color of law, by pointing out the United States Court of Appeals for the Eleventh Circuit has held that "[a] state actor acts under color of law when he utilizes his authority to create the opportunity to facilitate the rape or sexual assault."   MTD Response at 8 (quoting <u>Griffin v. City of Opa-Locka</u>, 261 F.3d 1295, 1306 (11th Cir. 2001)).   Peña asserts that, "[h]ere, because Mr. Greffet was still employed by the [CCA] and was utilizing his authority to create an ongoing opportunity to sexually abuse Plaintiff, it is plausible that the [] Labor Day 2009

Abuse was committed under color of law . . . ."   MTD Response at 8.   Peña concedes that the alleged August 2010 assault, when Greffet was no longer a CCA employee, "do[es] not, as Defendants rightfully argue, make a plausible claim that Mr. Greffet's misconduct was undertaken under color of law . . . . [and] do not plausibly establish a stand-alone claim under § 1983 . . . ." MTD Response at 9.   Peña contends, however, that these allegations are relevant and admissible against them at trial "as damages proximately caused by the initial in-prison sexual abuse."   MTD Response at 9.

Peña argues that the Complaint lays out sufficient facts and specific practices that plausibly constitute deliberate indifference by CCA and Hickson to prison sexual abuse.   See MTD at 9. Peña refers the Court to specific allegations at paragraph 72 in her Complaint, in which she describes CCA and Hickson engaging in a custom of "'suppressing, denying, or disregarding,' prison rape" and in which she lists four specific practices of which this custom consists: placing the inmates in segregation; failing to report sexual abuse allegations to outside law enforcement; failing to conduct adequate investigations of rape allegations; and offering financial incentives for non-reporting.   MTD Response at 10.   Such policies and practices, she contends, make a plausible claim against CCA and Hickson for engaging in official custom, policy, or practice of deliberate indifference toward the safety of female inmates from sexual abuse in prison.   See MTD Response at 11.

Peña points out that CCA Defendants' argument that Hickson cannot be liable as a supervisor "is moot because the Complaint does not include a claim of supervisory liability against Hickson."   MTD Response at 11.   Rather, Peña's allegations against Hickson are based on her personal participation in the deliberate indifference toward the safety of female inmates from sexual abuse in prison and her participation in retaliating against Peña for exercising her First

Amendment right to report her sexual abuse.   See MTD Response at 11.

Peña contends that she does not bear the burden to prove that, in addition to the CCA Defendants' actions being deliberately indifferent or retaliatory, they were unrelated to a legitimate penalogical interest.   See MTD Response at 11.   She argues that the case upon which CCA Defendants rely for this proposition, Al-Owhali v. Holder, does not apply to her case, because the challenge in Al-Owhali v. Holder was to a regulation imposed at the prison, whereas Peña's challenge is to CCA's and Hickson's unconstitutional policies or practices.   See MTD Response at 11-12.   Peña also asserts that CCA Defendants' argument "the Complaint's acknowledgement that the [CCA] and the NMCD promulgated policies prohibiting sexual abuse in the prison somehow undermines Plaintiff's deliberate indifference claims . . . is unsupported by case law and it defies reason."   MTD Response at 12.   Peña notes that a corporation defying its policy cannot somehow be insulated from liability merely because the policy exists.   See MTD Response at 12.

Peña also contends that the allegations against Vallejos are sufficiently pled to state a plausible claim for battery and excessive force, because, if Vallejos "grabbed Plaintiff and slammed her against the wall . . . . with one or more of the *mens rea* specifically alleged in the Complaint, namely 'malicious,'" then, in addition to the tort of battery, he violated her right to be free from excessive force.   MTD Response at 13 (quoting Complaint ¶ 67).   She argues that CCA Defendants' "logically untenable argument that bruising is de minimus injury misstates the standard," because, although generally a de minimus use of force is not unconstitutional, in the Tenth Circuit, whether the use of force was excessive and in violation of the Eighth Amendment does not require that she suffer "a certain level or type of injury."   MTD Response at 13 (quoting United States v. LaVallee, 439 F.3d 670, 688 (10th Cir. 2006)).

Taken as true, Peña asserts, her allegation that CCA, through and including Hickson, placed her in segregation because she reported Vallejos' alleged battery or because she refused to speak to CCA about the abuse, states a plausible claim for retaliation.   See MTD Response at 13. Peña contends:

> If, as the Complaint specifically alleges, the Corporation and Defendant Hickson segregated Plaintiff immediately after she was assaulted by Mr. Vallejos and because Plaintiff reported the battery and the rape by Mr. Greffet, and if the Defendants violated applicable segregation policy at that time, or thereafter, it would be plausible that the segregation was retaliatory.

MTD Response at 14 (citing Lipton v. Cnty. of Orange, N.Y., 315 F. Supp. 2d 434, 451 (S.D.N.Y. 2004)).

In response to CCA Defendants' argument that the Complaint does not provide sufficient facts upon which the Court can plausibly find that CCA is liable under *respondeat superior*, Peña points to her allegations that Greffet first orally sodomized her in 2009, in an office at NMWCF, and that Vallejos' conduct of slamming her into the wall happened inside NMWCF's hallway. See MTD Response at 15.   Peña refers the Court to the Supreme Court of Oregon's decision in Fearing v. Bucher, 977 P.2d 1163 (1999), wherein the Supreme Court of Oregon rejected the argument that, because the alleged sexual abuse could not reasonably have furthered the employer's interests, it could not have been in the scope of the employee's duties.   See MTD Response at 16 (citing Fearing v. Bucher, 977 P.2d at 1163 (Gilette, J.)).   She asserts that, at the motion to dismiss stage, she has made out a plausible claim where

> the question should be whether the Complaint alleges conduct by Mr. Greffet and Mr. Vallejos that could plausibly be described as being "done while the employee was engaged in the employer's business with the view of furthering the employer's interest" rather than arising from the employee's "external, independent and personal motive."

MTD Response at 16 (quoting U.J.I. Civ. 13-407 N.M.R.A. (2012)).   Peña notes that, because

rule 15(a) of the Federal Rules of Civil Procedure directs that the Court should grant leave to amend where justice requires, she will move to amend and seek the opportunity to add "any yet-unarticulated details that support the claim."   MTD Response at 16-17.   For these reasons, Peña ask the Court to deny the Motion to Dismiss.

On October 24, 2012, CCA Defendants filed their CCA, Hickson and Vallejos' Reply in Support of Their Motion to Dismiss.   See Doc. 17 ("MTD Reply").   CCA Defendants assert that Peña's MTD Response, like her Complaint, "is internally inconsistent, contradictory, and is based upon conclusory assertions, unsupported by facts, which are in conflict with the status of the law related to the claims she attempts to make."   MTD Reply at 1.   They initially point out that Peña concedes that her § 1983 claims based on alleged August, 2010, conduct -- when she was not an inmate and Greffet was no longer a CCA employee -- lack merit.   See MTD Reply at 2.   They argue that Peña's persistence in her argument that Greffet was acting under color of law during the Labor Day weekend, 2009, conduct in Alamogordo "implausibly concludes that Greffet was acting under color of law because he used some unknown 'authority' to create the opportunity to facilitate . . . the alleged misconduct."   MTD Reply at 3.   CCA Defendants note that Peña fails to point to any precedent with facts similar to her case and holding that such conduct was performed under color of law, and they assert that this failure stems from it being "unknown how Plaintiff can plausibly believe that Greffet had any 'authority' when she was not an inmate. Or, how any 'policies and procedures' alleged to have been in place at NMWCF, could apply to Plaintiff as a released citizen . . . ."   MTD Reply at 3.

The CCA Defendants argue that Peña's reliance on the PREA and New Mexico criminal law to support her definition of rape and her allegation that Peña was unable to consent to the sexual encounter with Greffet, is without a sound basis in the law or the facts of her case.   See

MTD Reply at 4.   They assert:

> There is not, however, an independent right for an individual to seek redress under PREA . . . . Plaintiff cites no case supporting such a proposition. Further, Plaintiff's utilization of the definition of "rape" set forth in PREA to describe the conduct alleged in her Complaint, leads to confusion and undermines <u>Ashcroft v. Iqbal</u>'s holding. Additionally, this is not a criminal case, where Plaintiff can rely upon the provisions of the criminal statutes. There was no criminal prosecution of Defendant Greffet. Neither PREA, nor criminal law, apply where Plaintiff was not an inmate, or when Defendant Greffet was not a corrections officer.

> PREA and criminal law simply have no application to the determination of whether Plaintiffs' allegations are viable, or whether they are barred by factual allegations relating to consent.

MTD Reply at 4.   The CCA Defendants argue that Peña's Complaint fails to articulate "particular CCA policies and customs, supported by <u>facts</u>, which demonstrate that the constitutional violation at issue was the result of those alleged deficient policies and customs and was not reasonably related to legitimate penological interests."   MTD Reply at 5-6.   They also assert that the Tenth Circuit's requirement in <u>Al-Owhali v. Holder</u>, that a prisoner also show that any custom or policy is not reasonably related to a penological interest, applies to Peña's case, because they contend the Tenth Circuit imposed the burden whether the defendant was challenging a regulatory restriction or other conditions of confinement.   <u>See</u> MTD Reply at 6 n.4.   They contend that the broad date ranges and the conclusory allegations make her claims that CCA Defendants are liable for a policy or custom that was the moving force behind her constitutional violation "are woefully insufficient," and the Court should thus dismiss any such claims.   MTD Reply at 7.

The CCA Defendants argue that Peña has not articulated a plausible claim for retaliation under <u>Ashcroft v. Iqbal</u>, because she fails to account for how CCA and/or Hickson can be liable for retaliating by placing her in segregation, when she concedes in her Complaint that she was in segregation at the time that she reported Greffet's actions, and when Greffet was no longer an employee at the time.   <u>See</u> MTD Reply at 7.   Additionally, they contend that there are reasonable

- 26 -

penological reasons for placing an inmate in segregation, including maintenance of order and discipline, and that Peña has not plead sufficient facts to allow the Court to determine whether her being placed there furthered one of these legitimate goals.   See MTD Reply at 7-8.   The CCA Defendants assert that, because her Complaint omits such basic facts, the Court should dismiss her retaliation claim.   See MTD Reply at 8.   In regard to her excessive force and battery claims against Vallejos, they assert that Peña rests her claims "upon the conclusion that the force was wrongful and excessive," but fails to present facts from which it can be determined whether Vallejos' use of such force was in good faith.   MTD Reply at 8 (emphasis in original).   They contend that Peña's argument that a bruise is not *de minimis* use of force is without support in case law and is without factual support in her Complaint.   See MTD Reply at 9.   Additionally, in regard to Peña's *respondeat superior* claims against CCA based on Greffet's conduct in Alamogordo and in Albuquerque, CCA Defendants argue that Peña fails to address their arguments whether an employer can be liable under *respondeat superior* for alleged acts occurring between a non-inmate and an off-duty or non-employee, which they assert "should be deemed as waiver."   MTD Reply at 9.   They assert that, rather than addressing their argument that Peña has waived her argument that the CCA is liable for Greffet's alleged 2009 sexual assault at the NMWCF for failure to articulate that theory, Peña argues that dismissal is not appropriate based on Greffet's conduct pertaining to allegations occurring when she was an inmate, which, they contend, is not found in or reasonably inferred from her Complaint.   See MTD Reply at 10.   As to the Complaint, the CCA Defendants reiterate their argument that there is no law to support that CCA can be liable under *respondeat superior* for conduct that allegedly occurred when Greffet was off-duty and/or when Peña was not an inmate.   See MTD Reply at 10.

The CCA Defendants argue that Peña's allegations that CCA is liable for Vallejos' alleged

intentional tort also must fail as a matter of law, because Peña cannot point to sufficient facts set forth in the Complaint on which the Court can find that CCA authorized, commanded, or committed the tortious act.  See MTD Reply at 10.  They assert that Peña's argument that she need only prove that Vallejos' conduct was done in the course and scope of his employment fails, because the argument is based upon case law that is no longer good law.  See MTD Reply at 10.  The CCA Defendants therefore ask the Court to dismiss "these deficiently plead or legally insufficient claims . . . ."  MTD Reply at 10.

At the November 27, 2012, hearing on the CCA Defendants' Motion to Dismiss, the Court asked whether the CCA Defendants agreed that there are three alleged wrongful incidents of conduct regarding Greffet, and whether they would agree that, if the Court draws a hard line that when Peña was not an inmate there is no state action, many of her allegations fail to plausibly allege state action sufficient for a § 1983 action.  See Transcript of Hearing at 3:12-6:8 (taken Nov. 27, 2012)(Court, Retts)("Tr.").[3]  The CCA Defendants agreed that, should the Court make that distinction, Peña appears to be alleging three incidents, and there is not sufficient state action where Peña is not an inmate, and/or where Greffet is off-duty or not a CCA employee.  See Tr. at 6:9 (Retts).  Peña stated that the Court's understanding as to the three separate incidents is correct. See Tr. at 6:25 (Fine).  Peña asserted that, should the Court find that either of the two incidents that they argue are actionable under § 1983 do not plausibly show sufficient state action, and that the third incident, after CCA no longer employed Greffet, is not actionable under § 1983, which they concede, Peña will argue that the incident or incidents in which the Court finds sufficient state action exists proximately caused the damages of the third incident.  See Tr. at 7:1-15 (Fine,

---

[3] The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version.   Any final transcript may contain slightly different page and/or line numbers.

Court).   In response to the Court's inquiry whether Peña was drawing a bright line that, when she

was out of prison or when Greffet was not employed by CCA, there was insufficient state action

and that all the conduct during those times goes to damages, she responded that she was not

drawing that line.   See Tr. at 7:17-8:14 (Court, Fine).   Peña responded that, rather, her argument

is that, as to the Alamogordo incident that took place around Labor Day weekend, 2009, Greffet

was acting under color of law, because he used his authority as a prison official "to create the []

opportunity to facilitate the rape or sexual assault."   Tr. at 8:17-22 (Fine).   In response, the Court

asked Peña whether there are any additional facts that the Court should take into consideration in

deciding whether state action was present during the Labor Day conduct.   See Tr. at 9:9-14

(Court).   Peña's attorney, Mark Fine, responded that that Peña believes the facts need to be

developed on the matter, and that to dismiss the claim is thus inappropriate, because, based on

conversations which Mr. Fine was not comfortable disclosing in light of attorney-client privilege,

Peña believed that she would return shortly to CCA custody, and so she still felt like she was in a

vulnerable or subservient position to Greffet as a CCA prison officer.   See Tr. at 9:15-12:1 (Fine,

Court).   In response to the Court's questioning Peña whether she conceded that the third incident,

the August, 2010, incident, had insufficient state action for a § 1983 claim, she stated that she

concedes insufficient state action and will use that incident for damages purposes only.   See Tr. at

12:12:4-8 (Court, Fine).

     The Court asked Peña, in regards to the color-of-law argument for the Labor Day weekend

incident, what her best precedent cases are to which she would refer the Court in support of her

argument.   See Tr. at 12:9-13 (Court).   Peña responded that she could not find a case that was on

point with her situation.   See Tr. at Tr. at 12:13-19 (Fine).   The Court then asked, if the fact that

she believed she might return to CCA's custody were set aside, and all the facts were that she was

released from custody, whether in that situation she believed she would still have sufficient state action to support her § 1983 claim.   See Tr. at 12:20-13:2 (Court).   Peña responded that it is a very close question; on the one hand, she thinks there is sufficient state action, because unique to her facts is Greffet's leveraging his authority as a CCA officer when CCA had custody of Peña to create the opportunity that led to the subsequent sexual assaults; on the other hand, however, she believes that her belief that she was going to return to CCA's custody shortly likely influenced her willingness to meet Greffet.   See Tr. at 13:3-22 (Fine, Court).

The CCA Defendants asserted that Peña's subjective belief regarding her returning to CCA's custody is irrelevant, because whether there was state action turns on whether Greffet could have reasonably been acting pursuant to any state authority or official policy, and him being off-duty and over two-hundred and fifty miles away, and Peña's lack of any allegations to the opposite, make such a claim implausible at best.   See Tr. at 14:3-10 (Retts).   They asserted that, regardless of Greffet's alleged past wrongful conduct, once Peña was released and free to take or not to take Greffet's calls, she was no longer subject to his control or authority, and thus there was no state action in any alleged subsequent conduct.   See Tr. at 15:6-25 (Retts).

CCA Defendants argued that, while they cannot tell from the Complaint on what theory the § 1983 claim against Hickson relies, whatever theory she may be asserting, the Complaint fails to articulate sufficient specific facts from which the Court can find that Hickson was the moving force behind any alleged constitutional violation.   See Tr. at 17:12-24 (Retts).   The Court asked whether CCA Defendants were reading Peña's claims not to be based on a specific CCA policy, but rather on their omission of policies or practices to report, or to prevent alleged sexual abuse. See Tr. at 18:18-22 (Court, Retts).   CCA Defendants responded that the pleading is inconsistent, because it seems to be alleging both that there are policies in place that Greffet violated and that

there are retaliation policies in place that the CCA Defendants allegedly violated, but the pleading does not specifically state any such policies.   See Tr. at 18:23-19:20 (Retts).

The Court then asked CCA Defendants whether, in their opinion, they believe that Ashcroft v. Iqbal "made a substantive change or just pleading change on respondeat superior in the [§] 1983 context."   Tr. at 19:21-25 (Court).   They responded that they believe there is language to support the proposition that Ashcroft v. Iqbal made a substantive change, and both the Tenth Circuit and the United States Court of Appeals for the Eighth Circuit have suggested that Ashcroft v. Iqbal fundamentally changes the substantive law, but that they could not refer the Court to a specific opinion so holding.   See Tr. at 20:2-12 (Retts).   They contended that, regardless whether there is a substantive change, under the well-established change to pleading requirements, Peña's pleadings fail to state a claim for CCA or Hickson's liability under Monell v. New York City Dept. of Soc. Servs., 436 U.S. at 658.   See Tr. at 20:13-17 (Retts).   In response to the same question, Peña responded that, although she had not thoroughly reviewed the Ashcroft v. Iqbal analysis regarding supervisory liability, her understanding what that, while the Supreme Court did not eliminate it, the Supreme Court heightened the requirement so that a supervisor is liable only if the supervisor took some affirmative action personally with regard to the alleged unconstitutional conduct.   See Tr. at 21:4-20 (Fine).   In regard to her supervisor liability claim, Peña stated it is her position, and her allegation in the Complaint explicitly states, that CCA and Hickson "engaged in a custom of deliberate indifference and that this custom came in the form of suppressing, denying, or disregarding incidents of prison rape at the facility."   Tr. at 22:6-12 (Fine). She notes that the Complaint identifies a number of officers and ways in which CCA and Hickson carried out this custom, and that the Complaint pleads the claim with adequate specificity as it defines the claim, defines categorically what she believes to be the custom, and then identifies the practices in

the facility that define the custom.   See Tr. at 22:13-23:5 (Fine).   Peña added that Mr. Fine was

engaged in a trial in late October or early November of 2012, in which CCA was a party, and, in

that case, testimony came out "that supports at least two of these practices that we're alleging."

Tr. at 23:9-13 (Fine).   The Court asked, because Peña may amend her Complaint, what the facts

were that came out in that trial that strengthen her arguments in this case.   See Tr. at 25:7-9

(Court).   Peña stated that a former NMWCF warden testified that, before 2006, seventy-five

percent of women who reported sexual abuse by staff members were placed in segregation.

Additionally, the chief psychologist at the facility testified that, after 2006, she began, as a matter

of course, to tell women who reported to her incidences of sexual abuse by staff members that, if

they were to report it to prison officials, because she was required to keep their reports to her

confidential and thus could not disclose their reports to support them, they would be subject to

retaliation.   See Tr. at 25:13-26:6 (Fine).   Peña added that the staff members' widespread

knowledge, without Hickson taking any action to stop such a custom, encouraged the activity, and

that the lack of reporting caused the sexual abuse to continue and to increase.   See Tr. at

27:23-28:3 (Fine, Court).   Peña stated that additional evidence during the trial was that, as the

number of written reports of sexual abuse at the facility decreased, the bonuses for administration

would increase, creating an incentive to suppress reporting these incidences.   See Tr. at 29:18-20

(Fine).   In response to the Court's inquiry whether she feels like she needs to amend the

Complaint to add these facts, Peña responded that she feels that the Complaint suffices to state a

claim under Ashcroft v. Iqbal as it stands now, but, if the Court disagrees, she would add the

additional facts.   See Tr. at 30:2-17 (Court, Fine).   The Court then asked Peña what are her

allegations that make up the claim under Monell v. New York City Dept. of Soc. Servs. for the

second alleged incident around Labor Day 2009.   See Tr. at 30:21-23 (Court).   Peña responded

that she concedes that she has a supervisory liability argument pursuant to <u>Monell v. New York City Dept. of Soc. Servs.</u> as to the first incident only, and intends to use the second and third incidences as evidence to establish damages at trial.   <u>See</u> Tr. at 31:1-19 (Court, Fine).

CCA Defendants responded to Peña's statements by noting that they disagreed with her characterization of some of the facts from the October-November trial and added that the appropriate means to offer such facts would be to amend the Complaint.   <u>See</u> Tr. at 33:7-9 (Retts). The Court stated that it agreed, but that it wanted to get an idea of the facts that Peña contends exist, so that if the Court finds that the current Complaint pleads inadequate facts, the Court will have an idea whether to grant leave for Peña to amend.   <u>See</u> Tr. at 33:10-14 (Court).   The Court asked CCA Defendants why they believe that the four categories of practices, policies, and customs that Peña identified fail to state a claim under <u>Monell v. New York City Dept. of Soc. Servs.</u>   <u>See</u> Tr. at 33:23-34:2 (Court).   They responded that "[w]hat's missing from that [allegations in the pleading] is vital information about facts that support those conclusions."   Tr. at 34:6-8 (Retts).   The Court asked, taking the first custom by itself, placing inmates in segregation after they report sexual abuse, if that practice is what is taking place, whether it is logical that custom would repress supporting sexual assaults, and perhaps encourage sexual assaults, and lead to more incidences of sexual abuse.   <u>See</u> Tr. at 34:18-23 (Court).   The CCA Defendants responded that they contend that Peña is required to allege the "vital information of who, what, when, and where . . . ."   Tr. at 34:34-24 (Retts).   The Court asked Peña whether she would be able and willing to fill in those gaps if the Court granted her leave to amend her complaint, to which she responded that she would be able and willing to fill in that information. <u>See</u> Tr. at 35:14-36:2 (Court, Fine).   The Court then asked the CCA Defendants why they contend the custom Peña alleges of NMWCF not passing on the reported abuse incidences to law

enforcement is insufficient to state a plausible claim pursuant to <u>Monell v. New York City Dept. of Soc. Servs.</u>   <u>See</u> Tr. at 37:18-20 (Court).   The CCA Defendants stated that they believe "that is belied by the allegations in the complaint that her -- hers were reported to outside law enforcement," because, that the police were called when she reported that her alleged battery by Vallejos was linked to the incidents with Greffet shows that CCA reports to law enforcement.   Tr. at 37:25-38:10 (Retts).   In regard to the third custom -- that CCA fails to conduct an adequate investigation -- CCA Defendants assert that, as with the second custom, that Peña admits in her allegations that CCA and NMWCF tried to follow up with her regarding her incidences of abuse undercuts her allegation.   <u>See</u> Tr. at 38:24-39:7 (Retts).   For the fourth alleged custom -- the number of sexual abuse reports being attached to, or influenced by, bonuses -- CCA Defendants asserted that they dispute this fact, and believe that to make the allegation plausible requires additional facts, including "[w]hat specific financial incentives" she believes are provided for causing inmates not to report sexual abuse.   Tr. at 39:22-23 (Retts).

CCA Defendants stated that, with regard to the retaliation allegations against CCA and Hickson, Peña's Complaint is inconsistent, as it alleges in some places that she was placed in segregation for the Vallejos incident before she reported the alleged abuses, and if she was placed in segregation for an alleged incident with a corrections officer, her Complaint cannot plausibly meet her burden to prove that her segregation was not reasonably related to a penological interest. <u>See</u> Tr. at 41:8-22 (Retts).   Peña clarified that, while she concedes that the timing as the Complaint is drafted might be inconsistent or misleading, she believes that, even before the incident with Vallejos, it had become knowledge in the facility that Peña was pregnant with Greffet's child, and that knowledge was at least part of the reason that Greffet left his employment with CCA.   <u>See</u> Tr. at 42:3-20 (Fine).   Peña stated that, for purposes of construing the Complaint,

she believes the fairest way to read it is to "read out the sequencing of the knowledge of CCA with regard to the relationship between Mr. Greffet and Ms. Peña . . . ." Tr. at 43:2-8 (Fine).   She asserted, however, that her argument for retaliation does not end at her being placed in segregation, but it extends to the fact that she was kept in segregation for eight months, and she contends that she was kept there for that long by CCA and Hickson because she had reported the alleged sexual abuse.   See Tr. at 43:9-21 (Fine).   Peña stated that she believes her being kept in segregation relates to and ties into her Monell v. New York City Dept. of Soc. Servs. allegations that they placed inmates that reported sexual abuse in segregation, and that "this is also . . . a very document intensive sort of claim, and we need discovery in order to prove it frankly."   Tr. at 43:23-44:7 (Fine).   The CCA Defendants pointed out that they were discussing during the hearing for the first time many of Peña's asserted facts, including her allegedly being kept in segregation, and that, notwithstanding Peña's contention that these facts would likely be provable in discovery, because these are facts could have been obtained via a request through NMDC, they should be in Peña's Complaint.   See Tr. at 45:13-23 (Retts).

The CCA Defendants then stated that, as to Peña's final federal claim, her allegations against Vallejos for allegedly using excessive force in violation of the Eighth Amendment, the allegations fail to plead sufficient specific facts upon which the Court could come to the conclusion that his actions violated her constitutional rights.   See Tr. at 46:10-13 (Retts).   They reiterated the argument in their briefs that the Complaint fails to plead sufficient facts on which the Court could determine that Vallejos' use of force was unrelated to legitimate penological goals. See Tr. at 46:12-19 (Retts).   Peña began by pointing out that "it's clear that defendants and plaintiff[] have very different view of the . . . pleading requirements set forth in Iqbal, and that seems to pervade . . . the arguments . . . ."   Tr. at 47:2-6 (Fine).   She noted that she is relying on

Robbins v. Oklahoma's interpretation of the Ashcroft v. Iqbal pleading standard, which she contends finds claims implausible only where the scope of the allegations is so general that they encompass a large amount of what is constitutional conduct.   See Tr. at 47:7-18 (Fine).   She contends that her Complaint, because it alleges the factual circumstances of Vallejos' use of force, that she was unreasonably, unnecessarily, and excessively attacked, makes a plausible § 1983 claim sufficient to avoid dismissal.   See Tr. at 47:23-18:10 (Fine).   The CCA Defendants pointed out that the Tenth Circuit decided Robbins v. Oklahoma in 2008, before the Supreme Court decided Ashcroft v. Iqbal in 2009.   See Tr. at 48:13-16 (Retts).   They contended that Peña's allegations "are the exact type of legal conclusion that need not be accepted as true without the facts." Tr. at 47:18-20 (Retts).

In regard to Peña's state law tort claims, CCA Defendants asserted that the *respondeat superior* theory asserted against CCA and Hickson for Greffet's actions relies on the Albuquerque and Alamogordo -- the August, 2010, and Labor Day weekend, 2009 -- incidents, and not to the first August, 2009, incident, which is the only incident in which Greffet is alleged to have been on-duty.   See Tr. at 49:6-14 (Retts).   They stated that the allegations in the Complaint support finding that Greffet's conduct underlying the tort claims was performed outside the course and scope of his employment.   See Tr. at 49:16-50:1 (Retts).   Peña responded that her Complaint alleges that CCA and Hickson are liable under *respondeat superior* for all three of Greffet's sexual abuse incidents; however, as she now concedes that neither CCA nor Hickson are liable for Greffet's actions when CCA no longer employed him, she is now pursuing the allegations against them for the first two incidents only.   See Tr. at 50:9-17 (Fine).   In response to the Court's inquiry whether Peña is relying on New Mexico law as support for her theory that CCA and Hickson may be liable for Greffet's conduct in the Labor Day weekend, 2009, incident in

Alamogordo, when he was off-duty, Peña stated that, while New Mexico law ultimately applies in this case, she believes the bounds of the scope of employment are still up for debate in New Mexico courts, and in both federal and state courts across the country.  See Tr. at 50:17-51:12 (Court, Fine).   In response to the Court's question to the CCA Defendants as to what they believe is their strongest case for the proposition that Greffet was acting outside the scope of his employment for the second incident, CCA Defendants responded that the Court should look to Rivera v. New Mexico Highway and Transp. Dept., 115 N.M. 562, 564, 855 P.2d 136, 138 (Ct. App. 1993), Los Ranchitos vs. Tierra Grande, Inc., 116 N.M. 222, 861 P.2d 263 (Ct. App. 1993), and Spurlock v. Townes, No. CIV 09-0786 WJ/DJS, a case in which the Honorable William P. Johnson, United States District Court Judge for the District of New Mexico, opined on the precise issue whether a CCA employee was acting within the scope of employment in sexually assaulting an inmate.  See Tr. at 52:3-25 (Court, Retts).   Peña stated: "I would ask that you read no New Mexico case law . . . . I acknowledge that the cases and the Court of appeals at this point favor the defendants' position on the subject."  Tr. at 53:22-54:1 (Fine).   She asserted that her position is that respondeat superior depends upon a reading of the New Mexico jury instructions different from the reading that the New Mexico courts have given them, and analogous to the modern construction that Oregon, Minnesota, and California courts have given to the scope of employment.  See Tr. at 54:4-12 (Fine).   In response to the Court's inquiry whether there are any more recent cases, or whether the Supreme Court of New Mexico has opined on the issue, Peña responded that, to her knowledge, the Supreme Court of New Mexico has not ruled on the scope of employment for purposes of respondeat superior.  See Tr. at 54:13-21 (Court, Fine).   CCA Defendants responded that the Spurlock v. Townes case is on appeal, as CCA is defending that case also, but that the precise issue whether CCA employee was acting in the scope of employment

- 37 -

for *respondeat superior* purposes is not being appealed.   See Tr. at 55:20-21 (Retts).

## LAW REGARDING RULE(12)(b)(6)

Rule 12(b)(6) authorizes a court to dismiss a complaint for "failure to state a claim upon which relief can be granted."   Fed. R. Civ. P. 12(b)(6).   "The nature of a Rule 12(b)(6) motion tests the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true."   Mobley v. McCormick, 40 F.3d 337, 340 (10th Cir. 1994).   The sufficiency of a complaint is a question of law, and when considering a rule 12(b)(6) motion, a court must accept as true all well-pleaded factual allegations in the complaint, view those allegations in the light most favorable to the non-moving party, and draw all reasonable inferences in the plaintiff's favor.   See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007)("[O]nly if a reasonable person could not draw . . . an inference [of plausibility] from the alleged facts would the defendant prevail on a motion to dismiss.");   Smith v. United States, 561 F.3d 1090, 1098 (10th Cir. 2009)("[F]or purposes of resolving a Rule 12(b)(6) motion, we accept as true all well-pleaded factual allegations in a complaint and view these allegations in the light most favorable to the plaintiff.")(quoting Moore v. Guthrie, 438 F.3d 1036, 1039 (10th Cir. 2006)).

A complaint need not set forth detailed factual allegations, yet a "pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action" is insufficient. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)(citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007).   "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."   Ashcroft v. Iqbal, 556 U.S. at 678.   "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."   Bell Atl. Corp v. Twombly, 550 U.S. at 555 (citation omitted).

- 38 -

To survive a motion to dismiss, a plaintiff's complaint must contain sufficient facts that, if assumed to be true, state a claim to relief that is plausible on its face.  See Bell Atl. Corp. v. Twombly, 550 U.S. at 570; Mink v. Knox, 613 F.3d 995, 1000 (10th Cir. 2010)("To determine whether a motion to dismiss was properly granted, we apply a plausibility standard to ascertain whether the complaint includes enough facts that, if assumed to be true, state a claim to relief that is plausible on its face.").   "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. at 678 (citing Bell Atl. Corp. v. Twombly, 550 U.S. at 556).   "Thus, the mere metaphysical possibility that some plaintiff could prove some set of facts in support of the pleaded claims is insufficient; the complainant must give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual support for these claims."   Ridge at Red Hawk, LLC v. Schneider, 493 F.3d 1174, 1177 (10th Cir. 2007)(emphasis omitted).

The Tenth Circuit has held that "Iqbal establishes the importance of context to a plausibility determination."   Gee v. Pacheco, 627 F.3d 1178, 1185 (10th Cir. 2010).

> "[P]lausibility" in th[e general pleading] context must refer to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs "have not nudged their claims across the line from conceivable to plausible."   The allegations must be enough that, if assumed to be true, the plaintiff plausibly (not just speculatively) has a claim for relief.

Robbins v. Oklahoma, 519 F.3d 1242, 1247 (10th Cir. 2008)(quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 570)(internal citations omitted).   The prison context, however, the Tenth Circuit has recognized is unique.   To nudge a claim to plausible likely requires pleading facts that might otherwise be unnecessary:

> Nowhere in the law does context have greater relevance to the validity of a claim than prisoner civil-rights claims. Prisons are a unique environment, and the Supreme Court has repeatedly recognized that the role of the Constitution within

their walls is quite limited. Government conduct that would be unacceptable, even outrageous, in another setting may be acceptable, even necessary, in a prison. Consequently, a prisoner claim will often not be plausible unless it recites facts that might well be unnecessary in other contexts. For example, as we will discuss more fully below, a prisoner claim may not be plausible unless it alleges facts that explain why the usual justifications for the complained-of acts do not apply.

Gee v. Pacheco, 627 F.3d at 1185. The Tenth Circuit thus requires that a plaintiff "include sufficient facts to indicate the plausibility that the actions of which [the plaintiff] complains were not reasonably related to penological interests." Gee v. Pacheco, 627 F.3d at 1188 (emphasis omitted). Accord Al-Owhali v. Holder, 687 F.3d 1236, 1240 (10th Cir. 2012)("But in ruling on a motion to dismiss, a court need only assess, as a general matter, whether a prison regulation is 'reasonably related to a penalogical interest.'"). Thus, while an inmate need not "identify every potential legitimate interest and plead against it . . . . he is required to recite facts that might well be unnecessary in other contexts to surmount a motion to dismiss under Fed. R. Civ. P. 23(b)(6)." Al-Owhali v. Holder, 687 F.3d at 1240.

## RELEVANT LAW REGARDING LIABILITY FOR CONSTITUTIONAL VIOLATIONS UNDER 42 U.S.C. § 1983

Section 1983 of Title 42 of the United States Code provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

42 U.S.C. § 1983. "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged

deprivation was committed by a person acting under color of state law."   West v. Atkins, 487 U.S. 42, 48 (1988).   Individual, non-supervisory defendants may be liable if they knew or reasonably should have known that their conduct would lead to the deprivation of a plaintiff's constitutional rights by others, and an unforeseeable intervening act has not terminated their liability.   See Martinez v. Carson, 697 F.3d 1252, 1255 (10th Cir. 2012)( "The requisite causal connection is satisfied if [Defendants] set in motion a series of events that [Defendants] knew or reasonably should have known would cause others to deprive [Plaintiffs] of [their] constitutional rights.")(quoting Trask v. Franco, 446 F.3d 1036, 1046 (10th Cir. 2006)).   The Supreme Court has made clear that there is no *respondeat superior* liability under 42 U.S.C. § 1983.   See Ashcroft v. Iqbal, 556 U.S. at 675 ("Because vicarious liability is inapplicable to Bivens and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."); Bd. of Cnty. Comm'rs v. Brown, 520 U.S. 397, 403 (1997).   "An entity cannot be held liable solely on the basis of the existence of an employer-employee relationship with an alleged tortfeasor."   Garcia v. Casuas, No. CIV 11-0011 JB/RHS, 2011 WL 7444745, at *25 (D.N.M. Dec. 8, 2011)(Browning, J.)(citing Monell v. City of New York City Dept. of Soc. Servs.).   Supervisors can be held liable only for their own unconstitutional or illegal policies, and not for the employees' tortious acts.   See Barney v. Pulsipher, 143 F.3d 1299, 1307-08 (10th Cir. 1998).

**1.**     **Color of State Law.**

"Under Section 1983, liability attaches only to conduct occurring 'under color of law.'" Gallagher v. Neil Young Freedom Concert, 49 F.3d 1442, 1447 (10th Cir. 1995).   The under color of state law requirement is a "jurisdictional requisite for a § 1983 action, which . . . furthers the fundamental goals of preserving an area of individual freedom by limiting the reach of federal law

. . . and avoiding imposing on the state, its agencies or officials, responsibility for conduct for which they cannot fairly be blamed." Jojola v. Chavez, 55 F.3d 488, 492 (10th Cir. 1995). "The traditional definition of acting under color of state law requires that the defendant in a § 1983 action have exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" West v. Atkins, 487 U.S. at 49 (United States v. Classic, 313 U.S. 299, 326 (1941)). "The authority with which the defendant is allegedly 'clothed' may be either actual or apparent." Jojola v. Chavez, 55 F.3d at 493. Accordingly, at a base level, to find that an action was taken under color of state law, the court must find that "'the conduct allegedly causing the deprivation of a federal right' must be 'fairly attributable to the State.'" Gallagher v. Neil Young Freedom Concert, 49 F.3d at 1447 (quoting Lugar v. Edmonson Oil Co., 457 U.S. 922, 937 (1982)).

In the context of a public employee, the Tenth Circuit has directed that, while "'state employment is generally sufficient to render the defendant a state actor . . . . [,]' at the same time, it is 'well settled that an otherwise private tort is not committed under color of law simply because the tortfeasor is an employee of the state.'" Jojola v. Chavez, 55 F.3d at 493 ((quoting Lugar v. Edmonson Oil Co., 457 U.S. at 935-36 n.18; Mark v. Borough of Hatboro, 51 F.3d 1137, 1150 (3d Cir. 1995)). Thus, "before conduct may be fairly attributed to the state because it constitutes action 'under color of state law,' there must be 'a real nexus' between the employee's use or misuse of their authority as a public employee, and the violation allegedly committed by the defendant." Jojola v. Chavez, 55 F.3d at 493. What constitutes the required real nexus, however, is not completely clear. As the Tenth Circuit has stated, whether there is a real nexus in a particular case depends on the circumstances:

The under color of law determination rarely depends on a single, easily identifiable fact, such as the officer's attire, the location of the act, or whether or not the officer

- 42 -

acts in accordance with his or her duty. Instead one must examine "the nature and circumstances of the officer's conduct and the relationship of that conduct to the performance of his official duties."

David v. City & Cnty. of Denver, 101 F.3d 1344, 1353 (10th Cir. 1996)(internal citations omitted)(quoting Martinez v. Colon, 54 F.3d 980, 986 (1st. Cir. 1995)).

      2.    **Individual Liability.**

Under § 1983, "Defendants are liable for the harm proximately caused by their conduct." Martinez v. Carson, 697 F.3d at 1255. Thus, a government actor may be liable for the constitutional violations that another committed, if the actor "set in motion a series of events that the defendant knew or reasonably should have known would cause others to deprive the plaintiff of her constitutional rights," thus establishing the "requisite causal connection" between the government actor's conduct and a plaintiff's constitutional deprivations. Trask v. Franco, 446 F.3d 1036, 1046 (10th Cir. 2006). The Tenth Circuit has explained that § 1983 liability should be "'read against the background of tort liability that makes a man responsible for the natural consequences of his actions.'" Martinez v. Carson, 697 F.3d at 1255 (quoting Monroe v. Pape, 365 U.S. 167, 187 (1961)). "Thus, Defendants are liable for the harm proximately caused by their conduct." Martinez v. Carson, 697 F.3d at 1255 (citing Trask v. Franco, 446 F.3d at 1046). As the Court has previously concluded: "[A] plaintiff who establishes liability for deprivations of constitutional rights actionable under 42 U.S.C. § 1983 is entitled to recover compensatory damages for all injuries suffered as a consequence of those deprivations. The recovery should be guided by common-law tort principles -- including principles of causation . . . ." Train v. City of Albuquerque, 629 F. Supp. 2d 1243, 1251 (D.N.M. 2009)(Browning, J.).

The Tenth Circuit has applied liability for those defendants who proximately caused an injury complained-of under § 1983, and the "conduct of other people may have concurrently

caused the harm does not change the outcome as to [the defendant]," so long as there was not a superseding-intervening cause of a plaintiff's harm.   Lippoldt v. Cole, 468 F.3d 1204, 1220 (10th Cir. 2006).

> Even if a factfinder concludes that the residential search was unlawful, the officers only "would be liable for the harm 'proximately' or 'legally' caused by their tortious conduct."   Bodine v. Warwick, 72 F.3d 393, 400 (3d Cir. 1995).   "They would not, however, necessarily be liable for all of the harm caused in the 'philosophic' or but-for sense by the illegal entry."   Id.   In civil rights cases, a superseding cause, as we traditionally understand it in tort law, relieves a defendant of liability.   See, e.g., Warner v. Orange County Dep't of Prob., 115 F.3d 1068, 1071 (2d Cir. 1997); Springer v. Seaman, 821 F.2d 871, 877 (1st Cir. 1987), abrogated on other grounds by Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701 . . . (1989).

Trask v. Franco, 446 F.3d at 1046.   Thus, in the context of a Fourth Amendment claim, the Tenth Circuit has held that government actors "may be held liable if the further unlawful detention and arrest would not have occurred but for their conduct and if there were no unforeseeable intervening acts superseding their liability."   Martinez v. Carson, 697 F.3d at 1255.   The Tenth Circuit gave an example of a superseding intervening cause, quoting the Honorable Samuel J. Alito, now-associate Justice for the Supreme Court of the United States, while he was sitting on the Third Circuit:

> Suppose that three police officers go to a suspect's house to execute an arrest warrant and that they improperly enter without knocking and announcing their presence. Once inside, they encounter the suspect, identify themselves, show him the warrant, and tell him that they are placing him under arrest. The suspect, however, breaks away, shoots and kills two of the officers, and is preparing to shoot the third officer when that officer disarms the suspect and in the process injures him. Is the third officer necessarily liable for the harm caused to the suspect on the theory that the illegal entry without knocking and announcing rendered any subsequent use of force unlawful? The obvious answer is "no." The suspect's conduct would constitute a "superseding" cause, see Restatement (Second) of Torts § 442 (1965), that would limit the officer's liability. See id. § 440.

Trask v. Franco, 446 F.3d at 104 (quoting Bodine, 72 F.3d at 400).   Additionally, "[f]oreseeable intervening forces are within the scope of the original risk, and . . . will not supersede the

defendant's responsibility." Trask v. Franco, 446 F.3d at 1047 (quoting William Lloyd Prosser et al., Prosser and Keeton on Torts § 44, at 303-04 (5th ed.1984)).   If

> the reasonable foreseeability of an intervening act's occurrence is a factor in determining whether the intervening act relieves the actor from liability for his antecedent wrongful act, and under the undisputed facts there is room for reasonable difference of opinion as to whether such act was wrongful or foreseeable, the question should be left for the jury.

Trask v. Franco, 446 F.3d at 1047 (citing Restatement (Second) of Torts § 453 cmt. b (1965)).

### 3.   **Supervisory Liability.**

The Tenth Circuit has held that supervisors are not liable under 42 U.S.C. § 1983 unless there is "an affirmative link between the constitutional deprivation and either the supervisor's personal participation, [] exercise of control or direction, or [] failure to supervise." Gallagher v. Shelton, 587 F.3d 1063, 1069 (10th Cir. 2009)(quoting Green v. Branson, 108 F.3d 1296, 1302 (10th Cir. 1997))(internal alterations omitted).   Because supervisors can be held liable only for their own constitutional or illegal policies, and not for the torts that their employees commit, supervisory liability requires a showing that such policies were a "deliberate or conscious choice." Barney v. Pulsipher, 143 F.3d 1299, 1307-08 (10th Cir. 1998)(citations omitted)(internal quotation marks omitted).   Cf. Bd. of Cnty. Comm'rs v. Brown, 502 U.S. at 404 ("[I]t is not enough for a § 1983 plaintiff merely to identify conduct properly attributable to the municipality. The plaintiff must also demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged." (emphasis in original)).

The Tenth Circuit has recognized that Ashcroft v. Iqbal limited, but did not eliminate, supervisory liability for government officials based on an employee's or subordinate's constitutional violations.   See Garcia v. Casuas, 2011 WL 7444745, at **25-26 (citing Dodds v. Richardson, 614 F.3d 1185 (10th Cir. 2010)).   The language that may have altered the landscape

for supervisory liability in Ashcroft v. Iqbal is as follows: "Because vicarious liability is inapplicable to Bivens and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."   556 U.S. at 676.   The Tenth Circuit in Dodds v. Richardson held:

> Whatever else can be said about Iqbal, and certainly much can be said, we conclude the following basis of § 1983 liability survived it and ultimately resolves this case: § 1983 allows a plaintiff to impose liability upon a defendant-supervisor who creates, promulgates, implements, or in some other way possesses responsibility for the continued operation of a policy the enforcement (by the defendant-supervisor or her subordinates) of which "subjects, or causes to be subjected" that plaintiff "to the deprivation of any rights . . . secured by the Constitution . . . ."

614 F.3d at 1199.   The Tenth Circuit noted that Ashcroft v. Iqbal "does not purport to overrule existing Supreme Court precedent," but stated that "Iqbal may very well have abrogated § 1983 supervisory liability as we previously understood it in this circuit in ways we do not need to address to resolve this case."   Dodds v. Richardson, 614 F.3d at 1200.   It concluded that Ashcroft v. Iqbal did not alter "the Supreme Court's previously enunciated § 1983 causation and personal involvement analysis."   Dodds v. Richardson, 614 F.3d at 1200.   The Tenth Circuit, based on this conclusion, set forth a test for supervisory liability under § 1983 after Aschroft v. Iqbal:

> A plaintiff may [] succeed in a § 1983 suit against a defendant-supervisor by demonstrating: (1) the defendant promulgated, created, implemented or possessed responsibility for the continued operation of a policy that (2) caused the complained of constitutional harm, and (3) acted with the state of mind required to establish the alleged constitutional deprivation.

Dodds v. Richardson, 614 F.3d at 1199-1200 (citing Summum v. City of Ogden, 297 F.3d 995, 1000 (10th Cir. 2002)).   The Tenth Circuit noted, however: "We do not mean to imply that these are distinct analytical prongs, never to be intertwined."   614 F.3d at 1200 n.8.   Relying on the Supreme Court's opinion in Bd. of Cnty. Comm'rs v. Brown, the Tenth Circuit reasoned that two of the prongs often, if not always, are sufficient proof the third prong has been met also:

- 46 -

Where a plaintiff claims that a particular municipal action itself violates federal law, or directs an employee to do so, resolving these issues of fault and causation is straightforward. Section 1983 itself contains no state-of-mind requirement independent of that necessary to state a violation of the underlying federal right. In any § 1983 suit, however, the plaintiff must establish the state of mind required to prove the underlying violation. Accordingly, proof that a municipality's legislative body or authorized decisionmaker has intentionally deprived a plaintiff of a federally protected right necessarily establishes that the municipality acted culpably. Similarly, the conclusion that the action taken or directed by the municipality or its authorized decisionmaker itself violates federal law will also determine that the municipal action was the moving force behind the injury of which the plaintiff complains.

Dodds v. Richardson, 614 F.3d at 1200 n.8 (quoting Bd. of Cnty. Comm'rs v. Brown, 520 U.S. at 404-05)(internal quotations omitted).   The Tenth Circuit noted that "[w]e think the same logic applies when the plaintiff sues a defendant-supervisor who promulgated, created, implemented or possessed responsibility for the continued operation of a policy that itself violates federal law." 614 F.3d at 1200 n.8.   Thus, the Tenth Circuit reduced the test to what can be seen as a two-part test for supervisor liability, requiring the plaintiff to prove "an 'affirmative' link . . . between the unconstitutional acts by their subordinates and their 'adoption of any plan or policy . . . -- express or otherwise -- showing their authorization or approval of such misconduct.'"   614 F.3d at 1200-01 (quoting Rizzo v. Goode, 423 U.S. 362, 371 (1976)).

## LAW REGARDING FIRST AMENDMENT RETALIATION CLAIMS

"Official reprisal for protected speech 'offends the Constitution [because] it threatens to inhibit exercise of the protected right.'"   Hartman v. Moore, 547 U.S. 250, 256 (2006)(quoting Crawford-El v. Britton, 523 U.S. 574, 588 n.10 (1988)).   It is therefore "settled that as a general matter, the First Amendment prohibits government officials from subjecting an individual to retaliatory actions . . . for speaking out."   Hartman v. Moore, 547 U.S. at 256 (internal citation omitted).   In addition to prohibitive laws, the Constitution also proscribes "[g]overnment retaliation . . . in as much as retaliatory actions tend to chill individuals' exercise of constitutional

- 47 -

rights." How v. City of Baxter Springs, 217 F. App'x 787, 797 (10th Cir. Feb. 22, 2007)(unpublished).[4]   In line with Hartman v. Moore, to establish a claim of retaliation for exercising the right to associate guaranteed under the First Amendment, the Tenth Circuit has required a plaintiff establish three elements:

> (1) that the plaintiff was engaged in constitutionally protected activity; (2) that the defendant's actions caused the plaintiff to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity; and (3) that the defendant's adverse action was substantially motivated as a response to the plaintiff's exercise of constitutionally protected conduct.  Worrell v. Henry, 219 F.3d 1197, 1212 (10th Cir. 2000).

Klen v. City of Loveland, Colo., 661 F.3d 498, 508 (10th Cir. 2011).  See Gee v. Pacheco, 627 F.3d at 1189 (same); Shero v. City of Grove, 510 F.3d 1196, 1203 (10th Cir. 2007)(same); Perez v. Ellington, 421 F.3d 1128, 1131-32 (10th Cir. 2005)(same).   When analyzing whether a defendant's actions would have a chilling effect, a court is to "focus, of course, . . . upon whether a person of ordinary firmness would be chilled, rather than whether the particular plaintiff is chilled," thus conducting an objective, and not subjective inquiry.   Smith v. Plati, 258 F. 3d 1167, 1177 (10th Cir. 2001).

In the First Amendment context, the Supreme Court has acknowledged that "federal courts must take cognizance of the valid constitutional claims of prison inmates.  Prison walls do not form a barrier separating prison inmates from the protections of the Constitution." Turner v.

---

    [4] How v. City of Baxter Springs is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it.   See 10th Cir. R. 32.1(A), 28 U.S.C. ("Unpublished opinions are not precedential, but may be cited for their persuasive value."). The Tenth Circuit has stated: "In this circuit, unpublished orders are not binding precedent, . . . and . . . citation to unpublished opinions is not favored . . . .   However, if an unpublished opinion . . .  has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision."   United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005).   The Court finds that How v. City of Baxter Springs, and the other unpublished 10th Circuit opinions on which it relies have persuasive value with respect to a material issue, and will assist the Court in its disposition of this memorandum opinion and order.

Safley, 482 U.S. 78, 84 (1987).   Further, it is well-settled that prison officials may not retaliate

against or harass an inmate because of the exercise of the inmate's First Amendment rights.   See

Gee v. Pacheco, 627 F.3d at 1189 ("It is well-settled that '[p]rison officials may not retaliate

against or harass an inmate because of the inmate's exercise of his right of access to the

courts.'")(quoting Smith v. Maschner, 899 F.2 940, 947 (1990)).   Retaliation against an inmate

for exercise of his or her constitutional rights is actionable under 42 U.S.C. § 1983 even if the act

would otherwise "have been proper."   Smith v. Maschner, 899 F.2 at 948 (quoting Buise v.

Hudkins, 584 F.2d 223, 229 (7th Cir. 1978)).   The Supreme Court has also recognized, however,

that "courts are ill equipped to deal with the increasingly urgent problems of prison administration

and reform."   Turner v. Safley, 482 U.S. at 84.   "Accordingly, prisoners' rights may be restricted

in ways that would raise grave First Amendment concerns outside the prison context.   In

particular, when a prison regulation impinges on inmates' constitutional rights, the regulation is

valid if it is reasonably related to legitimate penological interests."   Gee v. Pacheco, 627 F.3d at

1187 (internal quotations and citations omitted)(quoting Thornburgh v. Abbott, 490 U.S. 401, 407

(1989); Turner v. Safley, 482 U.S. at 89).

## LAW REGARDING THE EIGHTH AMENDMENT

The Supreme Court has held that "a prison official's 'deliberate indifference' to a

substantial risk of serious harm" implicates the Eighth Amendment.   Farmer v. Brennan, 511 U.S.

825, 828 (1994).   "[N]either prison officials nor municipalities can absolutely guarantee the

safety of their prisoners," but "[t]hey are . . . responsible for taking reasonable measures to insure

the safety of inmates."   Lopez v. LeMaster, 172 F.3d 756, 759 (10th Cir. 1999).   An official

violates the Eighth Amendment when two elements are met: (i) the official causes an injury that,

objectively, is "sufficiently serious," i.e., an injury that equates to the "denial of the minimal

civilized measure of life's necessities"; and (ii) the official has a "sufficiently culpable state of mind." Farmer v. Brennan, 511 U.S. at 834 (internal quotation marks omitted). The second condition represents the functional application of the deliberate indifference standard. See Smith v. Cummings, 445 F.3d 1254, 1258 (10th Cir. 2006)("To establish a cognizable Eighth Amendment claim for failure to protect [an inmate from harm], the plaintiff must show that he is incarcerated under conditions posing a substantial risk of serious harm[,] the objective component, and that the prison official was deliberately indifferent to his safety, the subjective component." (quoting Verdecia v. Adams, 327 F.3d 1171, 1175 (10th Cir. 2003)).

Analyzing whether the plaintiff has satisfied the first element, the objective element, "requires more than a scientific and statistical inquiry into the seriousness of the potential harm and the likelihood that such an injury to health will actually be caused." Helling v. McKinney, 509 U.S. 25, 36 (1993). Courts should also consider "whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose anyone unwillingly to such a risk." Helling v. McKinney, 509 U.S. at 36 (emphasis in original). "In other words, the prisoner must show that the risk of which he complains is not one that today's society chooses to tolerate." Helling v. McKinney, 509 U.S. at 36. The Eighth Amendment does not protect against "de minimis uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." Hudson v. McMillian, 503 U.S. 1, 9-10 (1992)(internal quotation marks omitted)("That is not to say that every malevolent touch by a prison guard gives rise to a federal cause of action."). The Tenth Circuit has noted that, "in Hudson, the Supreme Court evidenced its 'commit[ment] to an Eighth Amendment which protects against cruel and unusual force, not merely cruel and unusual force that results in sufficient injury.'" United States v. LaVallee, 439 F.3d 670, 688 (10th Cir. 2006). Were it otherwise, the

Tenth Circuit reasoned, "a prisoner could constitutionally be attacked for the sole purpose of causing pain as long as the blows were inflicted in a manner that resulted in visible (or palpable or diagnosable) injuries that were de minimis." United States v. LaVallee, 439 F.3d at 688.  See also Hudson v. McMillian, 503 U.S. at 13 (Blackmun, J., concurring)("The Court today appropriately puts to rest a seriously misguided view that pain inflicted by an excessive use of force is actionable under the Eighth Amendment only when coupled with 'significant injury,' e.g., injury that requires medical attention or leaves permanent marks.").   Thus, to establish excessive force in violation of the Eight Amendment, the plaintiff need not establish that he or she "suffered a certain level or type of injury."   United States v. LaVallee, 439 F.3d at 688.

Where a security measure involving the use of force is undertaken to resolve a prison disturbance, the Supreme Court has held that, "the question whether the measure taken inflicted unnecessary and wanton pain and suffering [in violation of the Eighth Amendment] ultimately turns on 'whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.'"   Whitley v. Albers, 475 U.S. 312, 320-21 (1986)(quoting Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir. 1973)).   In a court's inquiry whether the use of force to resolve the disturbance violates the Eighth Amendment under this standard, "such factors as the need for the application of force, the relationship between the need and the amount of force that was used, and the extent of injury inflicted, are relevant to that ultimate determination."   Whitley v. Albers, 475 U.S. at 321 (internal alterations and quotations omitted)(quoting Albers v. Whitley, 546 F. Supp. 786, 733 (D. Or. 1982)).   These factors may be used to draw inferences whether the use of force "could plausibly have been thought necessary, or instead evinced such wantonness with respect to unjustified infliction of harm as is tantamount to a knowing willingness that it occur."   Whitley v. Albers, 475 U.S. at 321.

The second element regarding the government official's state of mind is a subjective inquiry. See Wilson v. Seiter, 501 U.S. 294, 298 (1991). Courts apply this subjective inquiry whether the allegations are that a "short-term" or "one-time" violation occurred, or that "continuing" or "systemic" violations occurred. Wilson v. Seiter, 501 U.S. at 299. The Supreme Court has stated: "With deliberate indifference lying somewhere between the poles of negligence at one end and purpose or knowledge at the other, the Courts of Appeals have routinely equated deliberate indifference with recklessness." Farmer v. Brennan, 511 U.S. at 836. The Supreme Court provided the following test for determining when this subjective element is met:

> [A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

Farmer v. Brennan, 511 U.S. at 837. For the purpose of Eighth Amendment analysis, the Tenth Circuit has equated deliberate indifference with recklessness. See Belcher v. United States, 216 F. App'x 821, 823-24 (10th Cir. 2007)(unpublished)(quoting Smith v. Cummings, 445 F.3d 1258).

## LAW REGARDING SUBSTANTIVE DUE-PROCESS CLAIMS

The Fourteenth Amendment's Due Process Clause provides that "no State shall . . . deprive any person of life, liberty, or property without due process of law." U.S. Const. amend. XIV, § 1. In general, state actors may be held liable under § 1983 only for their own affirmative acts that violate a plaintiff's due process rights and not for third parties' acts. See Robbins v. Oklahoma, 519 F.3d at 1251(citing DeShaney v. Winnebago County of Dep't of Soc. Servs., 489 U.S. 189, 197 (1989)). "[N]othing in the language of the Due Process Clause itself requires the State to protect the life, liberty and property of its citizens against invasion by private actors." DeShaney

v. Winnebago County Dep't of Soc. Servs., 489 U.S. at 195.  The Due Process Clause is not a guarantee of a minimal level of safety and security.  See DeShaney v. Winnebago County Dep't of Soc. Servs., 489 U.S. at 195.  "As a general matter, . . . a state's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." DeShaney v. Winnebago County Dep't of Soc. Servs., 489 U.S. at 197.  See Rost ex rel. K.C. v. Steamboat Springs RE-2 Sch. Dist., 511 F.3d 1114, 1125 (10th Cir. 2008)).  Generally, negligence does not trigger the Due Process Clause's protections.  See Davidson v. Cannon, 474 U.S. 344, 348 (1986).

### 1. Exceptions to the General Rule.

There are, however, two exceptions to this general rule.  The first exception -- the special-relationship doctrine -- arises when the state has a custodial relationship with the victim, which triggers an affirmative duty to provide protection to that individual.  See Christianson v. City of Tulsa, 332 F.3d 1270, 1280 (10th Cir. 2003); Graham v. Indep. Sch. Dist. No. 1-89, 22 F.3d 991, 994-95 (10th Cir. 1994).  The second exception -- the danger-creation theory -- provides that a state may also be liable for an individual's safety "only when 'a state actor affirmatively acts to create, or increases a plaintiff's vulnerability to, or danger from private violence.'"  Robbins v. Oklahoma, 519 F.3d at 1251 (quoting Currier v. Doran, 242 F.3d 905, 923 (10th Cir. 2001)).  "If either the special-relationship or danger-creation exception applies, the conduct of the state actor must go beyond negligence to the point of 'shocking the conscience.'"  Glover v. Gartman, No. CIV 11-0752 JB/LAM, 2012 WL 4950756, at *13 (D.N.M. Sept. 27, 2012)(Browning, J.)(citing Johnson ex rel. Estate of Cano v. Holmes, 455 F.3d 1133, 1142 (10th Cir. 2006)("The shocks the conscience standard applies to both types of suits.")).

### 2. Special-Relationship Doctrine.

The first exception to the general principle that a state's negligent failure to protect an individual cannot trigger liability under the due-process clause is the special-relationship doctrine. A plaintiff must show the government's involuntary restraint to establish a duty to protect under the special-relationship doctrine. See Liebson v. New Mexico Corr. Dep't, 73 F.3d 274, 276 (10th Cir. 1996). "A special relationship exists when the state assumes control over an individual sufficient to trigger an affirmative duty to provide protection to that individual (e.g. when the individual is a prisoner or involuntarily committed mental patient)." Uhlrig v. Harder, 64 F.3d 567, 572 (10th Cir. 1995). A pretrial detention is one such relationship. See Lopez v. LeMaster, 172 F.3d 756, 759 n.2 (10th Cir. 1999); Liebson v. New Mexico Corr. Dep't, 73 F.3d 274, 277 (10th Cir. 1996)("[I]t [is] [] clearly established that state officials had a duty to protect individuals whom they had taken involuntarily into their physical custody and control.").

### 3. **Danger-Creation Exception.**

The Due Process Clause protects against "deliberately wrongful government decisions rather than merely negligent government conduct." Uhlrig v. Harder, 64 F.3d at 573. The danger-creation exception to this rule applies only when "a state actor affirmatively acts to create, or increases a plaintiff's vulnerability to, or danger from private violence." Currier v. Doran, 242 F.3d 905, 923 (10th Cir. 2001). See Estate of B.I.C. v. Gillen, No. 11-3219, 2012 WL 6604485, at *4 (10th Cir. Dec. 19, 2012)("[S]tate officials can be liable for the acts of private parties where those officials created the very danger that caused the harm."). Under a danger-creation theory, there will be no § 1983 liability absent "an intent to harm" or "an intent to place a person unreasonably at risk of harm." Uhlrig v. Harder, 64 F.3d at 573. A plaintiff must show "sufficient[] 'affirmative conduct on the part of the state in placing the plaintiff in danger.'" Estate of B.I.C. v. Gillen, 2012 WL 6604485, at *3 (quoting Gray v. Univ. Colo. Hosp. Auth., 672

F.3d 909, 916 (10th Cir. 2012)).   To state a prima-facie case, the plaintiff must show that his or her danger-creation claim for due-process violations meets a six-part test:   (i) the state and individual actors must have created the danger or increased plaintiff's vulnerability to the danger in some way; (ii) the plaintiff must be a member of a limited and specifically definable group; (iii) the defendant's conduct must put the plaintiff at substantial risk of serious, immediate, and proximate harm; (iv) the risk must be obvious and known; (v) and the defendant must have acted recklessly in conscious disregard of that risk.   See Rost ex rel. K.C. v. Steamboat Springs RE-2 Sch. Dist., 511 F.3d 1114, 1126 (10th Cir. 2008).

The Tenth Circuit has focused on the deliberateness of the conduct in relation to the caused harm.   See Christiansen v. City of Tulsa, 332 F.3d at 1281.   The defendant must recognize the unreasonableness of the risk of the conduct and act "with an intent to place a person unreasonably at risk."   Medina v. City & Cnty. of Denver, 960 F.2d 1493, 1496 (10th Cir. 1992).   The intent to place a person unreasonably at risk is present where the defendant "is aware of a known or obvious risk" creating a high probability that serious harm will follow, and the defendant nonetheless proceeds with a "conscious and unreasonable disregard of the consequences."   Medina v. City & Cnty. of Denver, 960 F.2d at1496.

### 4.   What Shocks the Conscience.

A government actor's official conduct intended to injure in a way that cannot reasonably be justified by any government interest most likely shocks the conscience.   See Cnty. of Sacramento v. Lewis, 523 U.S. 833, 849 (1998)("[C]onduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level.").   "[A] plaintiff must do more than show that the government actor intentionally or recklessly caused injury to the plaintiff by abusing or misusing government power."   Camuglia v.

City of Albuquerque, 448 F.3d 1214, 1222 (10th Cir. 2006) (quoting Moore v. Guthrie, 438 F.3d

1036, 1040 (10th Cir. 2006)).   "The plaintiff must demonstrate a degree of outrageousness and a

magnitude of potential or actual harm that is truly conscience shocking."   Camuglia v. City of

Albuquerque, 448 F.3d at 1222-23 (quoting Uhlrig v. Harder, 64 F.3d 567, 574 (10th Cir.

1995))(internal quotations omitted).

> Establishing these limits advances "three basic principles highlighted by the
> Supreme Court in evaluating substantive due process claims: (1) the need for
> restraint in defining their scope; (2) the concern that § 1983 not replace state tort
> law; and (3) the need for deference to local policymaking bodies in making
> decisions impacting upon public safety."

Camuglia v. City of Albuquerque, 448 F.3d at 1223 (quoting Uhlrig v. Harder, 64 F.3d at 574).

Whether the conduct shocks the conscience is an objective test, based on the

circumstances, rather than a subjective test based on the government actor's knowledge.   See

James v. Chavez, 830 F. Supp. 2d 1208, 1276 (D.N.M. 2011)(Browning, J.)(finding that the use of

deadly force did not shock the conscience even if the suspect did not have intent to harm the

officer, because the officer "had sufficient facts before him to conclude that there was a threat of

serious physical harm" and the "courts must evaluate a [government actor's] conduct

objectively.").   Even where a government acts with sufficient culpability for tort liability, perhaps

warranting even punitive damages, the Court has found that the government's conduct still failed

to rise to the level of shocking the conscience.   See Schaefer v. Las Cruces Pub. Sch. Dist., 716 F.

Supp. 2d 1052, 1074-75 (D.N.M. 2010)(Browning, J.)(finding that school's failure to act after

three complaints about conduct that could "arguably be characterized as sexual assault," and then

pointing out the plaintiff as the victim at a school assembly regarding the conduct, "may be worthy

of remedy under tort law, and perhaps worthy of punishment in the form of punitive damages," but

did not shock the conscience.)   The Court has previously found that, where a government actor

acts with deliberate indifference to the rights of a pretrial detainee, "such deliberately indifferent

conduct must also be enough to satisfy the fault requirement for due process claims . . . ."   Glover

v. Gartman, 2012 WL 4950756, at *14 (quoting Cnty. of Sacramento v. Lewis, 523 U.S. at 850).

## NEW MEXICO LAW REGARDING THE INTENTIONAL TORT OF BATTERY

A person is liable for the intentional tort of simple battery when the person intentionally

causes bodily contact to the plaintiff in a way not justified by the plaintiff's apparent wishes or by

a privilege, and the contact is harmful or offensive to the plaintiff.   See 1 Dan B. Dobbs, The Law

of Torts § 28, at 52-53 ("The defendant is subject to liability for a simple battery when he

intentionally causes bodily contact to the plaintiff in a way not justified by the plaintiff's apparent

wishes or by a privilege, and the contact is in fact harmful or against the plaintiff's will.")(citing

Restatement (Second) of Torts § 13).

> Under New Mexico law, wherein the Restatement of Torts reigns, one commits a
> battery when (a) he acts intending to cause a harmful or offensive contact with the
> person of the other or a third person, or an imminent apprehension of such a
> contact, and (b) an offensive contact with the person of the other directly or
> indirectly results.

Sisneros v. Fisher, 685 F. Supp. 2d 1188, 1220-21 (D.N.M. 2010)(Browning, J.)(internal

quotations omitted)(quoting Desmare v. New Mexico, No. CIV 07-0199 JB/RHS, 2007 WL

5231690, at *4 (D.N.M. Aug. 14, 2007)(Browning, J.).   Accord New Mexico v. Ortega, 113 N.M.

437, 440, 827 P.2d 152, 155 (Ct. App. 1992)(noting that the "elements of civil and criminal assault

and battery are essentially identical," and comparing "[t]he elements of [N.M.S.A. § 1978,]

Section 30–22–24(A)" with Restatement (Second) of Torts § 18 (1965)).   See Restatement

(Second) of Torts § 18 ("An actor is subject to liability to another for battery if (a) he acts intending

to cause a harmful or offensive contact with the person of the other or a third person, or an

imminent apprehension of such a contact, and (b) a offensive contact  . . . results.").[5]  "An

'officer can be held liable for assault and battery if he uses excessive force.'"  Adegbuji v.

Middlesex Cnty., No. CIV A 03CV-1757 PGS, 2006 WL 2806289, at *12 (D.N.J. Sept. 28, 2006)

(quoting Mantz v. Chain, 239 F. Supp. 2d 486, 498 (D.N.J. 2002)).

As to the intent required to commit a battery, Professor Dodds notes that the Restatement

(Second) of Torts is "ambiguous" whether "the plaintiff shows intent by showing merely an intent

to touch that turned out to be offensive or harmful or whether she must show that the harm or

offense was intended."  Dodds, supra, § 30, at 58.  It is clear, however that "an intent to touch in

a way the defendant understands is not consented to is sufficient.  So is an actual intent to harm."

_____

[5]  The Court often looks to the New Mexico Civil Uniform Jury Instructions for guidance
on New Mexico state law.  See, e.g., Coffey v. United States, No. CIV 08-0588 JB/LFG, 2012
WL 5995622, at *60 n.33 (D.N.M. Nov. 25, 2012)(Browning, J.)("The Supreme Court of New
Mexico's adoption of uniform jury instructions proposed by standing committees of the Court
establishes a presumption that the instructions are correct statements of law.")(citing State of New
Mexico v. Wilson, 116 N.M. 793, 796, 867 P.2d 1175, 1178 (1994)).  The Civil Uniform Jury
Instruction for the intentional torts of assault and battery, however, states that the Committee
concluded that the New Mexico law regarding the torts was not clearly developed to warrant an
instruction.  See Civ. U.J.I. 13-1624 N.M.R.A., Committee Commentary (noting that the
Committee "spent much time over a period of several months studying the matter of intentional
torts," but ultimately "concluded that there was insufficient New Mexico law on assault and
battery to guide the committee on this subject and that too much reliance had been placed upon the
law of other jurisdictions on assault and battery to include such instructions in this work").
   The Court has carefully searched New Mexico state case law on the intentional torts of
assault and battery, and, in addition, considered the reference to Restatement (Second) of Torts §
18 in New Mexico v. Ortega.  The Court notes that the Court of Appeals of New Mexico, in
Yount v. Johnson, 1996-NMCA-046, 121 N.M. 585, 915 P.2d 341, cites to W. Page Keeton et al.,
Prosser and Keeton on the Law of Torts (5th ed. 1984) and The Restatement (Second) of Torts for
the proposition that "[c]onsent is a defense for intentional torts like assault and battery."  Yount v.
Johnson, 1996-NMCA-046, ¶ 17, 121 N.M. 585, 915 P.2d 341.  The Court has previously noted
that "New Mexico courts often look to the law as stated in the Restatement (Second) of Torts."
Coffey v. United States, 2012 WL 5995622, at *44 n. 31 (quoting Montanez v. Cass, 98 N.M. 32,
38, 546 P.2d 1195, 1201 (Ct. App. 1975)("It has long been the policy of our courts to follow in the
footsteps of the Restatement of Torts, 2d."), rev'd on other grounds sub nom, N.M. Elec. Serv. Co.
v. Montanez, 89 N.M. 278, 551 P.2d 634 (1976)).  The Court thus follows the New Mexico
courts' guidance, relying on Dodds, supra, the West Group's successor treatise to Prosser and
Keeton on the Law of Torts, discussing the Restatement (Second) of Torts' definition of battery,
for the elements of the intentional tort of battery.

Dodds, supra, § 30, at 58.   For the contact required, Professor Dodds notes that, because the intentional tort of battery rose out of the common-law action of trespass, harm is not required. Accord Selmeczki v. New Mexico Dept. of Corr., 2006-NMCA-024, ¶ 29, 139 N.M. 122, 129 P.3d 158 ("It is black-letter law that causing an offensive touching, even indirectly to another's clothing and not resulting in injury, is the tort of battery.").   Rather, "[t]he gist of battery is that the plaintiff has been touched, intentionally, in a way that she has not even apparently consented to and that is not justified by some generally recognized privilege."   Dodds, supra, § 29, at 55.   Thus, for purposes of battery, a harmful touching is sufficient, but not necessary.   Cf. Garety v. Demers, 32 N.M. 396, 407, 589 P.2d 180, 191 (1978)(in the context of whether medical malpractice is distinct from the tort of battery, the Supreme Court of New Mexico noted: "As to causation in a battery action, the tort of battery is the wrongful touching of the patient's body which by itself gives the patient a claim for substantial damages").

    In Selmeczki v. New Mexico Dept. of Corr., the Court of Appeals of New Mexico held that a disgruntled corrections department officer committed the tort of battery when the officer hit visitors to his office with a stack of coins.   See 2006-NMCA-024, ¶ 29, 139 N.M. 122, 129 P.3d 158.   The visitors' testimony was that the officer "rose up part way from a seated position behind a desk and forcefully slapped a stack of five to ten coins toward both visitors, which resulted in the coins striking them both on the legs."   2006-NMCA-024, ¶ 6, 139 N.M. 122, 129 P.3d 158.   The officer's version was quite different; he "denied slapping or striking the coins at [the visitors] but claimed that he only 'nudged or dropped' them off the desk, a gesture he admitted was probably 'not prudent.'   He denied any advance planning, claiming it was a 'spur of the moment' act." 2006-NMCA-024, ¶ 7, 139 N.M. 122, 129 P.3d 158.   The testimony elicited at trial was that "no injury or harm was likely from the coins being launched at [the visitors]."   2006-NMCA-024, ¶

29, 139 N.M. 122, 129 P.3d 158.   The Court of Appeals of New Mexico concluded that,

regardless whether "he did not 'meaningfully' commit a civil battery," he was liable, as "[i]t is

black-letter law that causing an offensive touching, even indirectly to another's clothing and not

resulting in injury, is the tort of battery."   2006-NMCA-024, ¶ 29, 139 N.M. 122, 129 P.3d 158.

## NEW MEXICO LAW REGARDING RESPONDEAT SUPERIOR

"Generally, whether an employee is acting in the course and scope of employment is a

question of fact."   Rivera v. N.M. Highway and Transp. Dept., 115 N.M. 562, 564, 855 P.2d 136,

138 (Ct. App. 1993)(citing Narney v. Daniels, 115 N.M. 41, 48, 846 P.2d 347, 354 (Ct. App.

1992)).   "However, when no reasonable trier of fact could conclude that an employee is acting in

the course and scope of employment," the conduct was not in the scope of employment as a matter

of law.   Rivera v. N.M. Highway and Transp. Dept., 115 N.M. at 564, 855 P.2d at 138 (citing

Narney v. Daniels, 115 N.M. at 49-50, 846 P.2d at 355-56). "Under basic respondeat superior

principles, an employer is liable for an employee's torts committed within the scope of his or her

employment."   Lymon v. Aramark Corp., 728 F. Supp. 2d 1222, 1271 (D.N.M. 2010)(Browning,

J.)(quoting Ocana v. Am. Furniture Co., 2004-NMSC-018, ¶ 29, 135 N.M. 539, 91 P.2d 58).

However, "an employer is not generally liable for an employee's intentional torts because an

employee who intentionally injures another individually is generally considered to be acting

outside the scope of his or her employment."   Ocana v. Am. Furniture Co., 2004-NMSC-018, ¶

29, 135 N.M. 539, 91 P.2d 58 (citing Martin-Martinez v. 6001, Inc., 1998 NMCA-179, ¶ 13, 126

N.M. 319, 968 P.2d 1182 ("In most instances, the intentional conduct of an employee injuring

another employee is not the intentional conduct of the employer.")).   New Mexico uses a

four-part test to determine whether an employee's acts were performed within the scope of

employment:

> An employee's action, although unauthorized, is considered to be in the scope of
> employment if the action (1) is the kind the employee is employed to perform; (2)
> occurs during a period reasonably connected to the authorized employment period;
> (3) occurs in an area reasonably close to the authorized area; and (4) is actuated, at
> least in part, by a purpose to serve the employer.

Lessard v. Coronado Paint & Decorating Ctr., Inc., 2007-NMCA-122, ¶ 12, 142 N.M. 583, 168

P.3d 155(citing (citing Narney v. Daniels, 115 N.M. at 49, 846 P.2d at 355; Restatement (Third) of

Agency § 7.07(2) (2006)).   The New Mexico Civil Uniform Jury Instruction on the scope of

employment provides:

> An act of an employee is within the scope of employment if:
>
> **1.**   It was something fairly and naturally incidental to the employer's business
> assigned to the employee, and
>
> **2.**   It was done while the employee was engaged in the employer's business with
> the view of furthering the employer's interest and did not arise entirely from some
> external, independent and personal motive on the part of the employee.

Civ. U.J.I. 13-407 N.M.R.A.   See Childers v. S. Pac. Co., 20 N.M. 366, 372-73, 149 P. 307, 308,

(1915)(same).

The Supreme Court of New Mexico has also recognized that New Mexico courts' adoption

of the "aided-in-agency theory of vicarious liability . . . . would [not] be a radical departure."

Ocana v. Am. Furniture Co., 2004-NMSC-018, ¶¶ 30-31, 135 N.M. 539, 91 P.2d 58.   The

Supreme Court of New Mexico stated that, under the aided-in-agency theory, "an employer may

be held liable for the intentional torts of an employee acting outside the scope of his or her

employment if the employee 'was aided in accomplishing the tort by the existence of the agency

relation [between the employer and employee].'"   Ocana v. Am. Furniture Co., 2004-NMSC-018,

¶ 30, 135 N.M. 539, 91 P.2d 58 (quoting Restatement (Second) of Agency § 219(2)(d)).

## ANALYSIS

Peña fails to provide sufficient factual allegations to support her argument that Greffet's

alleged sexual assault of her in Alamogordo, over Labor Day weekend, 2009, was done under color of state law, as she does not plausibly allege that Greffet used his position as a CCA corrections officer to improperly entice her to meet him at the motel room.   Peña's allegations that CCA and Hickson engaged in customs and practices suppressing the reporting of inmate's sexual assaults lead to the reasonable inference that both CCA and Hickson participated in conduct that caused Greffet's violation of Peña's Eighth Amendment rights while she was an inmate at the NMWCF.   Because Peña alleges that her treatment in segregation, including being kept in segregation for eight months, was retaliation for her reporting Greffet's alleged sexual abuse and/or Vallejos' alleged battery of her, her allegations plausibly state a claim for retaliation in violation of her First Amendment rights.   Peña fails to make plausible her allegations against Vallejos, because she fails to provide the Court with sufficient, non-conclusory, factual allegations to support the reasonable inference that Vallejos violated her civil rights and committed a civil battery against her.   Because Count V of Peña's Complaint does not adequately provide CCA with notice that she seeks to impose vicarious liability upon CCA for Greffet's alleged sexual abuse of her at NMWCF, she fails to adequately plead her claim against CCA on this basis. Because Greffet's other alleged sexual assaults of Peña were at times when she was not an inmate subject to CCA's authority and at times in which she could not have reasonably believed that Greffet was acting pursuant CCA's authority, she fails to state a plausible theory for holding CCA liable for these acts.

      The Court will grant Peña's request to amend and grant her leave to amend her Complaint. As Peña stated at the hearing that she might have further factual allegations regarding whether Greffet improperly used his state-derived authority to coerce Peña to meet him at the motel in Alamogordo to show that he was acting under color of law, the Court will grant Peña's request for

leave to amend her pleadings to add such additional facts for this theory.   The Court will also grant leave to Peña to amend her causes of action against Vallejos so that she may be able to provide sufficient factual allegations beyond her conclusory restatements of the elements of a § 1983 action for Eighth Amendment violations and the elements of the intentional tort of battery. Finally, because Peña provides additional factual allegations elsewhere in the Complaint regarding Greffet's alleged sexual assault at NMWCF, the Court will grant Peña's request to amend her pleadings as to CCA's liability under state law pursuant to the respondeat superior theory of liability.

**I.     GREFFET WAS NOT PLAUSIBLY ACTING UNDER COLOR OF STATE LAW DURING HIS ALLEGED SEXAUL ABUSE OF PEÑA AROUND LABOR DAY WEEKEND, 2009, IN ALAMOGORDO.**

CCA Defendants in their Motion to Dismiss contend that "the time frames set forth in [Peña]'s Complaint are vitally important to the purported legal theories in this case."   Motion to Dismiss at 2.   The CCA Defendants assert that Peña's § 1983 claims cannot, as a matter of law, be predicated upon conduct occurring when Greffet was off-duty or not employed by CCA and while plaintiff was not an inmate, because to do so would be "to turn § 1983 into a form of strict and unending liability."   Motion to Dismiss at 10.   As Peña points out, the CCA Defendants are arguing that Greffet's actions during these periods of time cannot support a § 1983 action, because his actions were not taken under color of state law.   At the hearing and in her MTD Response, Peña concedes that Greffet's third alleged sexual abuse incident -- the August, 2010, alleged sexual abuse in Albuquerque -- "do[es] not . . . make a plausible claim that that Mr. Greffet's misconduct was undertaken under color of law."   MTD Response at 9.   Similarly, the CCA Defendants do not contend that Greffet's alleged sexual abuse at the NMCWF in July/August,

2010, was under color of state law.[6]  Accordingly, the issue that remains for the Court is whether

Peña's Complaint is sufficient to allow the Court to conclude that Greffet's alleged acts of sexual

abuse around Labor Day weekend, 2009, in Alamogordo were taken under color of state law.

"To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the

Constitution and laws of the United States, and must show that the alleged deprivation was

committed by a person acting under color of state law."  West v. Atkins, 487 U.S. at 48.

Accordingly, that the alleged unconstitutional act was taken under color of state law is a

jurisdictional prerequisite for a § 1983 claim.  See Jojola v. Chavez, 55 F.3d at 492 (The "under

color of state law" requirement is "a jurisdictional requisite for a § 1983 action . . . .").  Because

the defendant's state authority "may be either actual or apparent," Jojola v. Chavez, 55 F.3d at 493,

the court must find that the conduct that allegedly caused the deprivation of a federal right is fairly

attributable to the state, see Gallagher v. Neil Young Freedom Concert, 49 F.3d at 1447.  "[I]t is

well settled that an otherwise private tort is not committed under color of law simply because the

tortfeasor is an employee of the state."  Beedle v. Wilson, 422 F.3d 1059, 1074 (10th Cir.

2005)(quoting Jojola v. Chavez, 55 F.3d at 493).  See D.T. ex rel M.T. v. Indep. Sch. Dist. No. 16,

894 F.2d 1176 (10th Cir. 1990)("Acts of a state officer in the ambit of [the state actor's] personal

_____

[6] The CCA Defendants in Section B of their Motion to Dismiss argue that Defendant Greffet was not acting under color of law "[w]hen he was Off-Duty or Not Employed by CCA." Motion to Dismiss at 13.  The CCA Defendants argue this theory as to "the first claim relating to off-duty conduct, the alleged offending contact occur[ing] in a motel room in Alamogordo," and "[w]ith respect to the claim occurring when Greffet was not an employee . . . . some four to five months . . . [after Peña] had been released [] and was living in Albuquerque."  Motion to Dismiss at 13.  The CCA Defendants did not contend, in their Motion to Dismiss, MTD Reply, or at the hearing that Greffet was off-duty or that Peña was not an inmate during the alleged July/August 2009 sexual assault at the NMWCF.  See MTD Reply at 2-3; Tr. at 4:20-24 (Retts)(contending that there is no "legal support" for the proposition that Greffet could have been acting pursuant to any state-derived authority during the period of time in which Greffet was off-duty or not an employee, or when Peña was not a NMWCF inmate).  Their color-of-law argument thus does not extend to Greffet's conduct during the first incident at the NMWCF.  Accordingly, the CCA Defendants' Motion to Dismiss is only a partial motion to dismiss.

pursuits are not acts under color of state law.")(citing Screws v. United States, 325 U.S. 91 (1945)).   Thus, "before conduct may be fairly attributed to the state because it constitutes action 'under color of state law,' there must be 'a real nexus' between the employee's use or misuse of their authority as a public employee, and the violation allegedly committed by the defendant." Jojola v. Chavez, 55 F.3d at 493.   Accord West v. Atkins, 487 U.S. at 49 ("The traditional definition of acting under color of state law requires that the defendant in a § 1983 action have exercised power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law."   (internal quotations omitted)).   The Tenth Circuit has stated that whether there is a real nexus in a particular case depends on the circumstances of the case:

> The under color of law determination rarely depends on a single, easily identifiable fact, such as the officer's attire, the location of the act, or whether or not the officer acts in accordance with his or her duty. Instead one must examine "the nature and circumstances of the officer's conduct and the relationship of that conduct to the performance of his official duties."

David v. City & Cnty. of Denver, 101 F.3d 1344, 1353 (10th Cir. 1996)(internal citations omitted)(quoting Martinez v. Colon, 54 F.3d 980, 986 (1st. Cir. 1995)).   See Griffin v. City of Opa-Locka, 261 F.3d 1295, 1303 (11th Cir. 2001)("Whether a government employee is acting under color of law is not always an easy call, and the color of law analysis inevitably requires that we engage in line drawing.").

Tenth Circuit precedent makes clear that, where a person without state authority or employment could have undertaken the same alleged unconstitutional conduct as that of which the plaintiff complains, the alleged unconstitutional conduct is not under color of state law.   See, e.g., Beedle v. Wilson, 422 F.3d at 1074-75 (holding that a nurse's aide who sexually assaulted a patient while under heavy sedation was not acting under color of state law, because, as there was

no allegation it was the aide who sedated the patient, the sexual assault "conduct [] could have been done by anyone who wandered into [the patient]'s room."); D.T. ex rel M.T. v. Indep. Sch. Dist. No. 16 of Pawnee Cnty., Okla., 894 F.2d 1176, 1182-92 (10th Cir. 1990)(holding that the defendant, who was an elementary school teacher on contract only from August to May, who sexually abused children at a non-school-sponsored summer camp over the summer, did not act under color of state law).   In Jojola v. Chavez, the plaintiff was a high school student who alleged that a state employee acting under color of state law sexually assaulted her when, in between classes, the school's janitor led her into a dark, vacant classroom where he sexually abused her. See 55 F.3d at 490.   The Tenth Circuit held that the plaintiff failed to establish the required nexus between the janitor's use or misuse of authority as a public employee, and the sexual assault, and thus that it was not performed under color of state law, because "[t]he complaint is devoid of any allegation that [the defendant] enticed [the plaintiff] into the classroom through the use or misuse of any state authority he may have possessed."   55 F.3d at 494.   The Tenth Circuit in Jojola v. Chavez provided the United States Court of Appeals for the Third Circuit's case in Mark v. Borough of Hatboro, 51 F.3d 1137 (3d Cir. 1995) as an example of a situation in which a public employee's state employment was insufficient.   See Jojola v. Chavez, 55 F.3d at 493.   In Mark v. Borough of Hatboro, the Third Circuit concluded that, where a volunteer firefighter committed arson while he was off-duty, the act of arson was not done under color of state law.   See 51 F.3d at 1151.   The Third Circuit reasoned:

> Marley[, the volunteer firefighter,] set a fire when his obligation was to put out fires. He apparently did it secretly, giving no one the impression that he was acting on behalf of Enterprise. While Mark contends that Marley lit the fire so that he could put it out, he points to no evidence in the record directly supporting that proposition. Moreover, even if the allegation is true, it is not relevant in the circumstances here, as Mark does not contend that the officers or indeed anyone else from Enterprise knew that Marley intended to start the fire. Marley clearly was pursuing his own goals and was not in any way subject to control by Enterprise

when he started the fire. Furthermore, it would be bizarre to hold that inasmuch as Enterprise was in the "business" of putting out fires, Marley furthered Enterprise's functions by providing it with an opportunity to fight a fire. In this case the defendants did not abuse their authority and Marley was a private actor when he caused the harm.

51 F.3d at 1151.

Where the defendant's state-derived authority places the defendant in a position of power over the plaintiff, however, and the defendant uses that power to improperly facilitate and commit the alleged unconstitutional conduct, the act is performed under color of state law. See Griffin v. City of Opa-Locka, 261 F3d. at 1304-05 (holding that city manager's act of raping a woman that worked for him at the city was done under color of state law, reasoning that he "intervened," with the city's police chief who had offered to give the plaintiff a ride home, thus "invoke[ing] his authority as City Manager to create the opportunity to be alone with [the plaintiff], to take her home, and then to rape her"); Whitney v. State of New Mexico, 113 F.3d 1170, 1174-75 (10th Cir. 1997). In Whitney v. State of New Mexico, the Honorable James A. Parker, United States District Court Judge for the District of New Mexico, had dismissed, for failure to show that alleged harassment was done under color of state law, a pro se plaintiff's § 1983 action based on a New Mexico Health Department employee's alleged harassment of the plaintiff while the employee was deciding whether to grant the plaintiff a state license to operate a day care. See 113 F.3d at 1172. The Tenth Circuit reversed Judge Parker, finding that, read liberally, the plaintiff adequately alleged state action, as her "complaint alleges that [the state employee] harassed her at a time that [he] had some state-derived authority over her ability to get a license." 113 F.3d at 1174 (citing West v. Atkins, 487 U.S. at 49-50). The Tenth Circuit in Whitney v. United States based its conclusion that the act was taken pursuant to state law upon the United States Court of Appeals for the Ninth Circuit's opinion in Dang Vang v. Vang Xiong X. Toyed, 944 F.2d 476 (9th

Cir. 1991).   In <u>Dang Vang v. Vang Xiong X. Toyed</u>, the plaintiffs, two refugees from Laos, sued

the defendant, a Washington State employment security office employee responsible for finding

refugees suitable employment, for allegedly sexually harassing and raping them when they sought

his assistance finding employment.   <u>See</u> 944 F.2d at 478.   The defendant would take the

plaintiffs "to a motel" where he would rape them.   944 F.2d at 478.   The defendant used his

state-derived power as an employment security office employee to create the opportunity to rape

the women, inviting the plaintiffs to ride with him to aid them in obtaining jobs and drivers'

licenses.   <u>See</u> 944 F.2d at 478.   The Ninth Circuit held that these rapes were performed under

color of state law, reasoning that "the jury reasonably could have concluded that defendant used

his government position to exert influence and physical control over these plaintiffs in order to

sexually assault them."   944 F.2d at 480.   Finally, in <u>Griffin v. City of Opa-Locka</u>, the United

States Court of Appeals for the Eleventh Circuit held that a city manager was acting under color of

state law when he raped a woman that worked for the city and for him.   261 F.3d at 1304-05.   The

Eleventh Circuit stated:

> [The city manager]'s improper sexual conduct started while he and [the plaintiff]
> were on the job at the workplace, he used his authority to sexually harass her during
> and after work hours, held her job and job benefits over her head, and he ultimately
> used his authority as City Manager and her boss to create the opportunity to be
> alone with her and to rape her.

<u>Griffin v. City of Opa-Locka</u>, 261 F.3d 1306.   The Eleventh Circuit concluded that the rape was

an act done under color of state law, as it was part of a series of acts that constituted one indivisible

occurrence done under color of state law: "[The city manager]'s official interactions with [the

plaintiff] as her boss during and after work hours, his continual sexual harassment of her during

those interactions, and the ultimate sexual assault constitute an indivisible, ongoing series of

events [under color of state law]."   261 F.3d at 1305.   The Eleventh Circuit noted that the

"conclusion that [the city manager] was acting under color of law is supported by several cases where state employees were held to be acting under color of law when they utilized their authority to create the opportunity for or to facilitate a sexual assault."   Griffin v. City of Opa-Locka, 261 F.3d at 1305-06.

The CCA Defendants' cite to Hill v. Barbour, 787 F. Supp. 146 (N.D. Ill. 1992), to support their argument that Greffet's "status as an officer does not transform all of his actions into acts under color of law."   787 F. Supp. at 149 (citing Gibson v. Chicago, 910 F.2d 1510, 1516 (7th Cir. 1990)).   In Hill v. Barbour, the plaintiff brought suit against the defendant, a deputy sheriff, based on an incident in which the sheriff, while in his pyjamas, chased an intruder out of his garage and shot him, not with his police revolver, but with "a rifle he had acquired from his deceased father." 787 F. Supp. at 148.   The intruder ran when the defendant yelled "sheriff's office," and "paused and turned toward [the defendant]" when the defendant shouted for him to stop.   787 F. Supp. at 148.   The Honorable James H. Alesia, United States District Judge for the Northern District of Illinois, concluded that the defendant was not acting under color of state law when he shot the intruder, as he "was on his own property[,] [] was using his own weapon . . . . [,] [and] was acting in his individual capacity as a citizen and property owner when he shot [the plaintiff]."   787 F. Supp. at 150.   In addition to Hill v. Barbour being a decision from the Northern District of Illinois relying on precedent from the United States Court of Appeals for the Seventh Circuit, and thus not controlling authority, the facts and analysis of Hill v. Barbour also fail to support the CCA Defendants' position.   Although here, as in Hill v. Barbour, there is no dispute that Greffet, the officer, was off-duty at the time he allegedly sexually assaulted Peña over Labor Day weekend, 2009, in Alamogordo, Greffet's position as a corrections officer at the NMCWF distinguishes this case from Hill v. Barbour.   It is almost beyond dispute -- and no party disputes -- that but for

Greffet's position as a NMCWF corrections officer, he would likely never have met Peña and invited her to the motel in Alamogordo, where he allegedly raped her.   Moreover, at the time of the alleged sexual assault in Alamogordo, not only was Greffet already acquainted with Peña, but he had allegedly sexually assaulted her only weeks or months before.   Thus, it was because of Greffet's position as a CCA corrections officer at NMWCF that he knew Peña and that they met in Alamogordo.   In Hill v. Barbour, on the other hand, there was no evidence that the defendant's state employment as a sheriff's deputy caused the incident on which the suit was based.   Notably, there was no evidence in Hill v. Barbour that the defendant or the plaintiff had met or had ever seen each other before the night on which the defendant caught the plaintiff in his garage without permission.   Although the defendant shouted "sheriff's office" when he walked in on the intruder in his garage, it is not clear that the plaintiff, an uninvited intruder in the defendant's garage, ran off only because the plaintiff yelled sheriff's office.   Moreover, as the defendant shot the plaintiff with his personal rifle and not with his state issued revolver, as Judge Alesia concluded, regardless whether the defendant was a sheriff's deputy or not, in the alleged unconstitutional conduct he "was acting in his individual capacity as a citizen and property owner when he shot [the plaintiff]." 787 F. Supp. at 150.   Thus, even though the defendant as a sheriff's deputy was an officer of the state, whether or not he was or had ever been a state employee, in shooting an intruder in his house with his personal gun, his actions were not performed under color of state law as they were private and unrelated to any state employment.   See Beedle v. Wilson, 422 F.3d at 1074 ("[I]t is well settled that an otherwise private tort is not committed under color of law simply because the tortfeasor is an employee of the state.").

Peña alleges that she met Greffet at the motel room in Alamogordo because Greffet pressured her into it when he called her after her release from NMWCF in late August 2009.   See

Complaint ¶¶ 19-20, at 4.   She also alleges that Greffet obtained her telephone number from her aunt, who was incarcerated at NMWCF.   See Complaint ¶ 20, at 4.   Although not specifically pleaded, construing the allegations in a light most favorable to Peña and making all reasonable inferences in her favor, these allegations can reasonably be inferred to assert that Greffet obtained Peña's phone number only because he was a NMCWF corrections officer.   Whereas the defendant's alleged unconstitutional arson in Mark v. Borough of Hatboro, and the defendant's shooting the intruder in Hill v. Barbour could have been perpetrated by any private citizen, regardless by whom they were employed, it is unlikely here that were Greffet not employed as a corrections officer at NMCWF that he would have met Peña.   Were he not employed as a corrections officer, he also could not likely have obtained her telephone number from her aunt and would not have had the same opportunity to allegedly sexually assault her in Alamogordo on Labor Day weekend, 2009.   There is therefore more of a nexus between Greffet's use or misuse of his employment as a NMWCF corrections officer, and the alleged unconstitutional conduct here than there was either in Mark v. Borough of Hatboro or in Hill v. Barbour.   On the other hand, that the defendant's employment gave the defendant an opportunity to perform the alleged unconstitutional act is not sufficient to constitute the real nexus that the Tenth Circuit requires for the conduct to be an act done under color of state law.   Notably, although the defendant's employment as a janitor at the plaintiff's school in Jojola v. Chavez and the defendant's employment as a nurse's aide at the state hospital in Beedle v. Wilson gave the defendants the opportunity to perform the alleged unconstitutional act, that their employment created the opportunity for the act was found insufficient to fairly attribute the acts to the state.   In both cases, the Tenth Circuit noted that any person, regardless whether employed by the state, could have performed the same acts if they were at the school or at the hospital.   In this case, while only a

corrections officer would have committed the sexual assault at NMWCF, as the people with whom an inmate can have interactions with is limited, a private citizen could have performed the alleged second assault at the motel in Alamogordo, similar to the sexual assaults in Jojola v. Chavez and Beedle v. Wilson.   The Tenth Circuit precedent indicates that, although Greffet's state authority provided him the opportunity to sexually abuse Peña in Alamogordo, because a private person without state authority could likely also have called Peña after she had been released from NMWCF custody, and met with her in the motel room in Alamogordo, that his employment created the opportunity for the alleged unconstitutional act is insufficient, without more, for the act to have been performed under color of state law.

Although there is a nexus between Greffet's employment as a NMWCF officer and his alleged sexual assault of Peña in Alamogordo, Peña's Complaint fails to plead sufficient factual allegations to make plausible that Greffet used his state-derived authority to improperly entice Peña to meet him in the motel room in Alamogordo.   On one hand, the Court finding that the alleged Alamogordo sexual assault was done under color of state law, in light of Greffet first having allegedly sexually assaulted Peña at NMWCF only weeks before, finds support in Eleventh Circuit's decision in Griffin v. City of Opa-Locka.   In addition to the alleged NMWCF sexual assault, Peña alleges that Greffet, "during the same time frame, . . . made numerous false statements to Plaintiff; in particular, [] Greffet expressed his intent to enter into a committed relationship with Plaintiff and his desire to raise children with her after her release from custody." Complaint ¶ 13, at 3.   Thus, whereas the Eleventh Circuit in Griffin v. City of Opa-Locka concluded that the rape performed at the plaintiff's home, when the city manager drove the plaintiff home after a rotary club meeting, was an act under color of state law based on it being one act in a series of indivisible acts of sexual harassment ending in the assault, Peña similarly alleges

a series of ongoing events of sexual harassment and sexual assault on which the Court may conclude that there was a similar single, indivisible ongoing act under color of law.   On the other hand, however, whereas the Eleventh Circuit stated in <u>Griffin v. City of Opa-Locka</u> that the city manager "held [the plaintiff's] job and job benefits over her head," 261 F.3d at 1306, and that he "invoked his authority as City Manager to create the opportunity to be alone with Griffin, to take her home, and then to rape her," 261 F.3d at 1304, Peña makes no such factual allegations here on which the Court may conclude that Greffet improperly used his power to entice Peña to meet him in the motel in Alamogordo.

The defendant in <u>Whitney v. State of New Mexico</u> was the employee with the power to decide whether to grant the plaintiff a license to operate a day care, and he was alleged to have sexually harassed the plaintiff while considering whether to grant her the license.   He had a certain amount of power over her at the time of the alleged unconstitutional conduct that he could have used to improperly entice her to remain silent as to the harassment.   Similarly, the plaintiffs in <u>Dang Vang v. Vang Xiong X. Toyed</u> were reliant upon the defendant's state-derived power to help them gain employment at the time the defendant allegedly raped them, and the defendant could have used the power to improperly entice them to ride with him to the motel where he raped them.   Here, while Greffet may have had state-derived power over her as a corrections officer while she was an inmate at NMWCF, at the time of the alleged unconstitutional conduct about Labor Day weekend, 2009, she had been released from custody, and Greffet did not have any state-derived power over her.   Moreover, whereas the defendant in <u>Dang Vang v. Vang Xiong X. Toyed</u> enticed the plaintiffs to ride with him under pretense that he was going to take them somewhere in furtherance of obtaining employment or a state license, which, if true would have been pursuant to his state-derived authority, Peña does not allege that Greffet enticed her to the

motel room in Alamogordo on any pretenses related to Greffet's state-derived employment. Rather, Peña's allegations are merely conclusory, alleging only that "Defendant Greffet contacted Plaintiff and pressured her to meet him."   Complaint ¶ 20, at 4.   Thus, although Greffet's status as a NMWCF officer may have been related to the alleged constitutional violation of his sexually assaulting her in Alamogordo in the but-for sense, that Peña fails to allege facts connecting his employment status to her somehow being pressured or forced into meeting him there cuts the conduct off from fairly being attributed to his state-derived power, and thus from being under color of state law.   Accord Train v. City of Albuquerque, 629 F. Supp. 2d at 1253 ("A § 1983 plaintiff might assert harms which, although related to the constitutional violation in a but-for sense, are causally too unrelated to the violation, either because they were not foreseeable or because independent intervening events cut off liability for them.").

Given that the Tenth Circuit held in Jojola v. Chavez that the plaintiff failed to state a § 1983 claim for failing to show that the unconstitutional act was performed under state law where the complaint lacked any facts sufficient to show that the defendant used the state authority to entice the plaintiff into the classroom in which he sexually assaulted her, Peña's Complaint lacks facts sufficient to make plausible her claim that Greffet used his employment as a NMCWF corrections officer to entice her to meet him in the motel room in Alamogordo where he allegedly sexually assaulted her.   Accordingly, the Court will dismiss the § 1983 claim to the extent that it relies on the alleged sexual assault on Labor Day weekend, 2009, against CCA and Hickson for failure to state a claim upon which relief can be granted.   Because, however, Peña represented at the hearing on the Motion to Dismiss that she might have additional facts relating to her beliefs whether Greffet's status as a NMCWF corrections officer pressured her, the Court will dismiss the § 1983 claims to the extent they rely on the Labor Day weekend, 2009, incident without prejudice

to Greffet's amending her Complaint with sufficient facts to state a plausible cause of action, and grant Peña leave to do so.  See Curley v. Perry, 246 F.3d 1278, 1284 (10th Cir. 2001)("We reiterate that the district court should allow a plaintiff an opportunity to cure technical errors or otherwise amend the complaint when doing so would yield a meritorious claim.").

## II. PEÑA PLEADS SUFFICIENT FACTUAL ALLEGATIONS TO MAKE PLAUSIBLE HER 42 U.S.C. § 1983 CLAIM AGAINST CCA AND HICKSON FOR THEIR PARTICIPATION IN A CUSTOM, POLICY, OR PRACTICE THAT CAUSED GREFFET'S SEXUAL ABUSE OF PEÑA AT NMWCF.

Peña seeks to hold CCA and Hickson liable under § 1983 based on a theory that their conduct of engaging in "a custom of suppressing, denying, or disregarding incidents of prison rape," which exhibited deliberate indifference to her safety, security, and constitutional rights in violation of the Eighth and Fourteenth Amendments.   Complaint ¶ 72, at 11.   CCA and Hickson contend that the Court should dismiss Peña's § 1983 claims, because her allegations fail to satisfy Bell Atl. Corp. v. Twombly's and Ashcroft v. Iqbal's pleading standards, as the "allegations . . . are nothing more than conclusory allegations, unsupported by actual facts."   Motion to Dismiss at 8. In Count III, although Peña's factual allegations do not provide specific instances of CCA's or Hickson's conduct evincing their practice of certain customs or policies, the pleaded factual content laying out four practices allows the Court, construing the allegations in her favor, to draw the reasonable inference that CCA and Hickson are liable for their direct involvement in violations of her constitutional rights.   See Ashcroft v. Iqbal, 556 U.S. at 678 (noting that a complaint is sufficient where "the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged").

### A. PEÑA, AS A PLAINTIFF ALLEGING THAT A PRISON OFFICIAL'S CONDUCT WHILE SHE WAS AN INMATE VIOLATED HER CONSTITUTIONAL RIGHTS, MUST ALLEGE FACTS FROM WHICH THE COURT MAY REASONABLY CONCLUDE THAT THE CONDUCT COMPLAINED OF WAS UNRELATED TO A LEGITIMATE

PENOLOGICAL INTEREST.

As an initial matter, Peña asserts that she "need not shoulder the additional burden of alleging that [a defendant]'s custom, policy, or practice was unrelated to a 'legitimate penological interest.'"   The Court disagrees.   The Tenth Circuit has held that "Iqbal establishes the importance of context to a plausibility determination."   Gee v. Pacheco, 627 F.3d at 1185.

> "[P]lausibility" in th[e general pleading] context must refer to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs "have not nudged their claims across the line from conceivable to plausible."   The allegations must be enough that, if assumed to be true, the plaintiff plausibly (not just speculatively) has a claim for relief.

Robbins v. Oklahoma, 519 F.3d at 1247 (quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 570)(internal citations omitted).   The Tenth Circuit has recognized that the prison context is unique; to nudge a claim to plausible likely requires pleading facts that might otherwise be unnecessary.

> Nowhere in the law does context have greater relevance to the validity of a claim than prisoner civil-rights claims. Prisons are a unique environment, and the Supreme Court has repeatedly recognized that the role of the Constitution within their walls is quite limited.   Government conduct that would be unacceptable, even outrageous, in another setting may be acceptable, even necessary, in a prison. Consequently, a prisoner claim will often not be plausible unless it recites facts that might well be unnecessary in other contexts. For example, as we will discuss more fully below, a prisoner claim may not be plausible unless it alleges facts that explain why the usual justifications for the complained-of acts do not apply.

Gee v. Pacheco, 627 F.3d at 1185.   The Tenth Circuit thus requires that a plaintiff "include sufficient facts to indicate the plausibility that the actions of which [the plaintiff] complains were not reasonably related to penological interests."   627 F.3d at 1188 (emphasis omitted).   Accord Al-Owhali v. Holder, 687 F.3d at 1240 ("But in ruling on a motion to dismiss, a court need only assess, as a general matter, whether a prison regulation is 'reasonably related to a penalogical interest.'").   Thus, while an inmate need not "identify every potential legitimate interest and plead

against it . . . . [the inmate] is required to recite facts that might well be unnecessary in other contexts to surmount a motion to dismiss under Fed.R.Civ.P. 23(b)(6)."   Al-Owhali v. Holder, 687 F.3d at 1240.

In Gee v. Pacheco, the Tenth Circuit discussed the sufficiency of an inmate's allegations for various § 1983 claims.   The inmate alleged that prison officers confiscated his "canteen items, depriving him of hygiene items for approximately 25 hours, and incarcerating him for four weeks in an isolation cell with limited outdoor recreation and lack of access to hygiene items."   627 F.3d at 1192.   The Tenth Circuit held that the allegations were possible, but not plausible for an Eighth Amendment claim, because "deprivations of possessions and privileges are consistent with reasonable penological practices."   627 F.3d at 1192.   Similarly, where the inmate "use[d] the bare term assaulted without explaining what Defendants allegedly did," the Tenth Circuit held that the allegations were insufficient to establish a plausible Eighth Amendment violation, because "'the 'assault' could have been justified by simply a need for him to move faster. In the prison context, more than the word assault is necessary to allege a plausible violation of the Eighth Amendment."   627 F.3d at 1193 (emphasis in original).   The Tenth Circuit held that some of the inmate's allegations were sufficient to state a claim, however, including the inmate's allegations that a prison officer "intentionally, and for the purpose of harassing him, confiscated and destroyed letters sent to him by persons outside the prison 'under the guise' of sticker and perfume violations."   Gee v. Pacheco, 627 F.3d at 1188.   The Tenth Circuit reasoned that, "[a]lthough prison officials may regulate the content of incoming mail and properly ban items such as stickers, there is no legitimate penological reason to restrict mail simply to harass inmates or to confiscate mail that complies with prison policy."   627 F.3d at 1188 (internal citations omitted).   Similarly, the Tenth Circuit held that the inmate's allegations that the prison officer violated his First

Amendment rights were sufficient where the officer returned his outgoing letters that had "appropriate postage affixed without reason for not sending them to the Post Office," reasoning that the officer failing to give him a reason for not sending the letters was sufficient to make plausible that there was no reasonable penological interest in not sending the letter.   627 F.3d at 1188.   The Tenth Circuit held that the inmate's allegations, that he informed the transferring officer he had not had food and water for over twenty-four hours, and that the officer responded that he did not care, restraining the inmate so that he could not access the food and water provided to other prisoners, were sufficient to make out a deliberate indifference claim, as the assertions "allege sufficient facts to establish both elements of an Eighth Amendment claim -- the objective prong of sufficiently serious deprivation and the subjective prong of deliberate indifference . . . ." 627 F.3d at 1189.

In Al-Owhali v. Holder, the Tenth Circuit held that, because Al-Owhali, the inmate, failed to address in his complaint whether there was a legitimate penalogical interest behind additional restrictions placed on him while in prison that he contended violated his First Amendment rights, or failed to provide sufficient facts to show his rights were violated, his pleadings failed to survive a 12(b)(6) motion to dismiss.   See 687 F.3d at 1236.   Al-Owhali's first allegation was that Special Administrative Measure ("SAM") regulations placed on him while he was in prison forbidding him from corresponding with his niece and nephew violated his First Amendment rights.   687 F.3d 1241.   The Tenth Circuit held that he failed to meet his "burden to demonstrate that there is no legitimate, rational basis for the increased communication restrictions," noting that "nothing in the pleadings speaks to the rationale underlying the new restrictions or the apparent concerns surrounding [] contact correspondence with his nieces and nephews."   687 F.3d 1241. The Tenth Circuit reasoned:

> In order to survive the government's 12(b)(6) motion, Al–Owhali was not required to substantively rebut the government's justifications for the new restrictions. See Gee, 627 F.3d at 1188 ("We do not intend that pro se prisoners must plead, exhaustively, in the negative in order to state a claim."). Rather, he simply needed to plead some plausible facts supporting his claim that the ban on communicating with his nieces and nephews did not serve the purpose of preventing future terrorist activity. See, e.g., Mohammed v. Holder, 07–CV–02697–MSK–BNB, 2011 WL 4501959 (D. Colo. Sept. 29, 2011) (concluding that an inmate's challenge to SAMs was plausible where his pleadings pointed to a recommendation from the warden that the inmate's privileges be expanded). Looking to his pleadings, the only supporting fact Al–Owhali offers is that he did not violate any SAMs before the new restrictions were imposed. This assertion fails to address whether the restriction was supported by a rational penal interest. Accordingly, dismissal of this claim was appropriate.

Al-Owhali v. Holder, 687 F.3d at 1241.  Similarly, where Al-Owhali alleged that a SAM preventing him from subscribing to two Arabic language newspapers violated his First Amendment rights, the Tenth Circuit held that dismissal for failure to state a claim was proper, noting that his complaint did not "address the government's logical safety rationale for limiting his access to Arabic-language media . . . ."  687 F.3d at 1242.

Because Peña's allegations against CCA, Hickson, and Vallejos are based on alleged violations of her civil rights while she was an inmate, her pleadings are subject to the Tenth Circuit's pleading requirements, including pleading sufficient facts so that the Court can conclude that the alleged unconstitutional acts are not reasonably related to legitimate penological interests. While Peña argues that Al-Owhali v. Holder does not apply to her case, because Peña is challenging actions of the defendants rather than regulations imposed upon all prisoners, the Tenth Circuit's language in inmates' cases does not support her position.  In Gee v. Pacheco specifically, the Tenth Circuit did not only analyze whether regulations that the jail imposed were reasonably related to legitimate penological interests, but rather analyzed each of the many individual instances that the plaintiff alleged violated his constitutional rights, including both alleged First and Eighth Amendment violations.  Thus, while Peña is correct that the Tenth

Circuit's analysis in Al-Owhali v. Holder is with regard to whether the SAMs or regulations serve legitimate penological interests, in light of Gee v. Pacheco requiring the same analysis for specific acts, the Tenth Circuit appears to require the Court to analyze the penological interest of any act in a prison that is alleged to be unconstitutional.   Nevertheless, the Tenth Circuit does not, as the CCA Defendants assert, go as far as to require Peña to affirmatively plead that the specific alleged unconstitutional act is unrelated to all or even any legitimate penological interest.   See Gee v. Pacheco, 627 F.3d at 1188 ("We do not intend that pro se prisoners must plead, exhaustively, in the negative in order to state a claim.").   Rather, Peña need only plead sufficient factual allegations from which the Court can assess whether the alleged act is reasonably related to a legitimate penological interest.   See Al-Owhali v. Holder, 687 F.3d at 1240 ("But in ruling on a motion to dismiss, a court need only assess, as a general matter, whether a prison regulation is 'reasonably related to a penalogical interest.'").   If Peña's allegations, taken as true and construed in the light most favorable to her as the non-movant, lead to a reasonable inference that a legitimate penal interest does not support the CCA Defendants' alleged unconstitutional acts, the pleadings are sufficient to withstand a motion to dismiss based on an argument to the contrary.

Peña's allegations here that CCA and Hickson violated her Eighth and Fourteenth Amendment rights by engaging in practices and customs suppressing the reporting of sexual assaults at NMWCF is a good example of the futility in requiring plaintiffs to affirmatively and specifically plead that the alleged unconstitutional conduct is unrelated to legitimate penological interests.   While there may conceivably be a penological interest in suppressing reports of inmates' sexual assaults, such as out of worry that inmates would fear more than necessary the possibility of being sexually assaulted, such an interest, even if legitimate, cannot reasonably be inferred from Peña's Complaint.   Peña's allegations -- that she was sexually assaulted by a

NMWCF officer, that CCA and Hickson engaged in customs and practices suppressing reporting

of such incidents, and that she personally was retaliated against for reporting Greffet's alleged

sexual abuse of her -- lead to the inference that no legitimate penal interest supported CCA's and

Hickson's practices of suppressing sexual assault reports.   As the Tenth Circuit noted in

Al-Owhali v. Holder that it was hard to imagine a legitimate penological interest supporting a

prison's denying an inmate access to a past president's book, it is hard to imagine that it would be

a good idea or otherwise legitimately related to any penological interest, under the circumstances,

to run a prison where suppressing sexual assault reports is supported as custom or policy.   Peña's

Complaint as a whole thus sets out sufficient facts for the Court to assess whether CCA's and

Hickson's alleged conduct of engaging in suppressing sexual assault reports is related to any

legitimate penological interest, and to conclude that such conduct not reasonably related to any

legitimate penological interest.

### B.   PEÑA'S ALLEGATIONS IN COUNT III, IF TRUE, PLAUSIBLY SHOW THAT CCA AND HICKSON DELIBERATELY ENGAGED IN A CUSTOM OR POLICY OF SUPPRESSING REPORTING OF SEXUAL ASSAULTS THAT VIOLATED HER EIGHTH AMENDMENT RIGHTS.

The Supreme Court has made clear that there is no *respondeat superior* liability under 42

U.S.C. § 1983.   See Ashcroft v. Iqbal, 556 U.S. at 675 ("Because vicarious liability is

inapplicable to Bivens and § 1983 suits, a plaintiff must plead that each Government-official

defendant, through the official's own individual actions, has violated the Constitution.").   An

entity cannot be held liable solely on the basis of the existence of an employer-employee

relationship with an alleged tortfeasor, see Monell v. N.Y. City Dept. of Soc. Servs., 436 U.S. at

689, and thus, supervisors can be held liable only for their own unconstitutional or illegal policies,

and not for the employees' tortious acts, see Barney v. Pulsipher, 143 F.3d at 1307-08.

Defendants, including supervisors and entities liable for their unconstitutional policies, "are liable

for the harm proximately caused by their conduct." Martinez v. Carson, 697 F.3d at 1255. Thus, a government actor may be liable for the constitutional violations that another committed, if the actor "set[s] in motion a series of events that the defendant knew or reasonably should have known would cause others to deprive the plaintiff of her constitutional rights," thus establishing the "requisite causal connection" between the government actor's conduct and a plaintiff's constitutional deprivations. Trask v. Franco, 446 F.3d at 1046. The Tenth Circuit has explained that § 1983 liability should be "'read against the background of tort liability that makes a man responsible for the natural consequences of his actions.'" Martinez v. Carson, 697 F.3d at 1255 (quoting Monroe v. Pape, 365 U.S. at 187).

The Tenth Circuit has recognized that Ashcroft v. Iqbal limited, but did not eliminate, supervisory liability for government officials based on an employee's or subordinate's constitutional violations. See Garcia v. Casuas, 2011 WL 7444745, at **25-26 (citing Dodds v. Richardson, 614 F.3d at 1185). The Tenth Circuit has set forth a test for supervisory liability under § 1983 after Aschroft v. Iqbal:

> A plaintiff may [] succeed in a § 1983 suit against a defendant-supervisor by demonstrating: (1) the defendant promulgated, created, implemented or possessed responsibility for the continued operation of a policy that (2) caused the complained of constitutional harm, and (3) acted with the state of mind required to establish the alleged constitutional deprivation.

Dodds v. Richardson, 614 F.3d at 1199-1200 (citing Summum v. City of Ogden, 297 F.3d 995, 1000 (10th Cir. 2002)). The Tenth Circuit noted, however: "We do not mean to imply that these are distinct analytical prongs, never to be intertwined." Dodds v. Richardson, 614 F.3d at 1200 n.8. At the heart of this three-part test is the requirement that the plaintiff to prove "an 'affirmative' link . . . between the unconstitutional acts by the[] [supervisor's] subordinates and the[] [supervisor's] 'adoption of any plan or policy . . . -- express or otherwise -- showing their

authorization or approval of such misconduct.'"   614 F.3d at 1200-01 (quoting Rizzo v. Goode, 423 U.S. 362, 371 (1976)).   See Gallagher v. Shelton, 587 F.3d at 1069 (noting that supervisors are not liable under 42 U.S.C. § 1983 unless there is "an affirmative link between the constitutional deprivation and either the supervisor's personal participation, [] exercise of control or direction, or [] failure to supervise")(quoting Green v. Branson, 108 F.3d at 1302)(internal alterations omitted). Because supervisors can be held liable only for their own constitutional or illegal policies, and not for the torts that their employees commit, supervisory liability requires a showing that such policies were a "deliberate or conscious choice."   Barney v. Pulsipher, 143 F.3d at 1307-08.   Cf. Bd. of Cnty. Comm'rs v. Brown, 502 U.S. at 404 ("[I]t is not enough for a § 1983 plaintiff merely to identify conduct properly attributable to the municipality.   The plaintiff must also demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged." (emphasis in original)).   At the motion to dismiss stage, therefore, the question is whether the factual allegations contained in the pleading, taken as true, can plausibly link Greffet's unconstitutional acts, and CCA's and/or Hickson's alleged deliberate or conscious adoption of any plan or policy -- express or otherwise.

The Tenth Circuit in Dodds v. Richardson gave as an example to illustrate this principle Rizzo v. Goode, where the plaintiff sought to hold a mayor, police commissioner, and other city officials liable under 42 U.S.C. § 1983 for constitutional violations that unnamed individual police officers committed.   See Dodds v. Richardson, 614 F.3d at 1200.   The Tenth Circuit noted that the Supreme Court in that case found a sufficient link between the police misconduct and the city officials' conduct, because there was a deliberate plan by some of the named defendants to "crush the nascent labor organizations."   Dodds v. Richardson, 614 F.3d at 1200 (quoting Rizzo v. Goode, 423 U.S. at 371).   In a scenario with allegations strikingly similar to Peña's, the

Honorable Duross Fitzpatrick, United States District Court Senior Judge for the Middle District of

Georgia, in Brown v. Smith, 5:05-CV-475 (DF), 2006 WL 1890192 (M.D. Ga. July 10, 2006),

concluded that the inmate's allegations that the defendant "improperly and inadequately trained

and supervised his staff, [and] failed to investigate incidents of alleged sexual assaults . . . ,"

sufficiently pleaded facts that would establish violation of clearly established law to overcome the

defendant's assertion of qualified immunity under § 1983 for the inmate's alleged sexual assault

by a prison guard.   2006 WL 1890192, at *7.   Judge Fitzpatrick relied on the Eleventh Circuit's

decision in LaMarca v. Turner, 995 F.2d 1526 (11th Cir. 1993), to reason that

> any reasonable prison or jail supervisor would conclude that his failure to
> implement training and supervisory measures to prevent sexual assaults by his own
> employees . . . . [and] a prison supervisor's failure to respond to numerous reports
> signaling an atmosphere within the prison that subjected inmates to the continuous
> threat of violence, including sexual assault, was unlawful, and could subject him to
> supervisory liability under § 1983.

2006 WL 1890192, at *7.   Similarly, within the Tenth Circuit, the Honorable Terrence C. Kern,

United States District Judge for the Northern District of Oklahoma concluded that a

plaintiff-inmate's allegations that the defendant sheriff "has a custom of maintaining inadequate

supervision and safety precautions with respect to known areas that are not monitored via

surveillance equipment, or blind spots, within the jail," were sufficient to state a claim for § 1983

liability for the inmate's rape in prison.   Henderson v. Glanz, 12-CV-68-TCK-FHM, 2012 WL

5931546, at *4 (N.D. Okla. Nov. 27, 2012).   Judge Kern reasoned that the plaintiff-inmate's

allegations established that the "custom is affirmatively linked to her harm," because the sexual

assault took place in a blind spot, and because she alleged that the defendant "was aware of prior

sexual assaults and sexual encounters occurring in these 'blind spots' within the Jail . . . . [and]

maintained a policy of understaffing these blind spots, despite his awareness of frequent sexual

assaults or encounters . . . ."   2012 WL 5931546, at *4.   Judge Kern concluded that these

- 84 -

allegations "adequately [pled] facts relevant to causation and [the defendant's required] mental state, i.e., his deliberate indifference to a known serious risk of improper sexual conduct occurring in blind spots such as the tub room."   2012 WL 5931546, at *4.

Peña's allegations, taken as true and reasonably construed in a light most favorable to her, plead sufficient facts from which the Court can plausibly infer that both CCA and Hickson deliberately "engaged" in a custom of suppressing reporting of and disregarding incidents of prison rape that caused the constitutional violations of which she complains.   Peña alleges that CCA and Hickson engaged in the practices of placing inmates who reported sexual abuse in segregation or otherwise retaliating against them, violating its own and NMCD's written policies by failing to report allegations of prison rape to outside law enforcement, failing to conduct adequate internal investigations regarding rape allegations, and offering financial incentives to CCA employees for non-reporting of rape allegations.   See Complaint ¶ 72, at 11.   Judge Kern in Henderson v. Glanz noted that the plaintiff alleged that the defendant was aware of past sexual assaults and continued to understaff the alleged spots where they took place, and Judge Fitzpatrick reasoned in Brown v. Smith that allegations of the defendant's failure to train employees and to adequately investigate allegations of past sexual assaults was sufficient to make plausible the defendant's liability; both cases exhibit the defendants' failure to use past incidences of sexual assault to implement policies or to train their staff to prevent the same instances from occurring in the future.   Here, although Peña does not specifically allege that there were past instances of sexual assaults at the NMCWF, her allegations imply the existence of past instances of sexual assault by alleging the defendants' response to past reports of such conduct.   Whereas the defendants' failures to address such situations in Henderson v. Glanz and Brown v. Smith were sufficient to make a claim for supervisory liability for the plaintiffs' sexual assaults, Peña goes

beyond alleging that CCA and Hickson merely failed to train the staff to prevent further sexual assault or implement policies for the same; Peña's allegations contend that CCA and Hickson affirmatively did the opposite.   Her allegations of retaliation against the inmates for sexual assault reports, and that it is a practice or custom not to report such alleged instances to outside law enforcement, in violation of CCA's and NMCD policies, make plausible that CCA's and Hickson's policies and customs not only failed to address the prevention of further sexual assaults, but created an environment that likely led to an environment in which sexual assaults of inmates increased.   Whereas Judge Kern concluded that the defendant's failure to affirmatively place more staff on duty "despite his awareness of frequent sexual assaults . . . occurring in [known] spots," Henderson v. Glanz, 2012 WL 5931546, at *4, was sufficient to make a plausible claim for § 1983 liability for the plaintiff's alleged sexual assault, Peña's allegations make plausible that CCA and Hickson not only failed to take action to prevent further sexual assaults despite alleged awareness of past instances, but that they "engaged in" policies suppressing reporting of the instances by inmates and staff alike.   Complaint ¶ 72, at 11.   While Peña probably should have pled some specific facts about particular past instances, the Court concludes that these allegations nudge her claim across the line to plausible.

Although Peña's Complaint may be criticized as lacking in specific factual allegations connecting CCA's or Hickson's personal involvement to these practices or policies, Peña's allegation that a practice was to place inmates in segregation for reporting sexual assault, combined with her allegation that she was placed in segregation "following her reporting of Defendant Greffet's rapes," Complaint ¶ 77, at 12, gives sufficient specific factual background to nudge such a claim against Hickson from speculative to plausible.   Moreover, the allegation that there was in place a policy or custom of providing incentives for non-reporting of sexual assaults is

troubling for CCA particularly.   That there was a policy in place in which CCA employees were given bonuses or other financial incentives for their attempt to suppress the amount of sexual assault reports leads to the inference that both the CCA, as the employer, and Hickson, as the Warden in charge of the NMWCF, engaged in the provision of such bonuses.   While Peña fails to differentiate and refer specifically in her allegations to CCA's conduct versus Hickson's conduct, the allegation that incentives were provided for non-reporting supports the conclusion that CCA not only knew about the practice and custom of suppressing reports of sexual assaults at NMWCF, but affirmatively encouraged and engaged in the custom.   CCA's and Hickson's custom and practice of suppressing inmates' and staff members' reporting of sexual assaults leads to the conclusion that sexual assaults at NMCWF, such as Greffet's sexual assault of Peña in July/August, 2009, were more prevalent and occurred more frequently than they would have without CCA's and Hickson's engaging in these practices.   Peña's allegations are thus sufficient to make plausible that CCA and Hickson engaging in the alleged practices and thereby suppressing sexual assault reports created an environment, without which, Peña's alleged sexual assault by Greffet at NMWCF would not have occurred.   Because Peña alleges sufficient factual allegations to state a plausible claim for CCA's and Hickson's liability for violation of her constitutional rights in violation of § 1983, the Court will deny CCA's and Hickson's request to dismiss Count III.

**III.    PEÑA PLEADS SUFFICIENT FACTUAL ALLEGATIONS TO MAKE PLAUSIBLE HER 42 U.S.C. § 1983 CLAIM IN COUNT IV AGAINST CCA AND HICKSON FOR RETALIATING AGAINST HER FOR EXERCISING HER FIRST AMENDMENT RIGHTS.**

"Official reprisal for protected speech 'offends the Constitution [because] it threatens to inhibit exercise of the protected right.'"   Hartman v. Moore, 547 U.S. at 256 (2006)(quoting Crawford-El v. Britton, 523 U.S. at 588 n.10).   It is therefore "settled that as a general matter, the First Amendment prohibits government officials from subjecting an individual to retaliatory

actions . . . for speaking out." Hartman v. Moore, 547 U.S. at 256 (citation omitted). To establish a claim of retaliation for exercising rights guaranteed under the First Amendment, the Tenth Circuit requires a plaintiff to establish three elements: (i) the plaintiff was engaged in constitutionally protected activity; (ii) the defendant's actions caused the plaintiff to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity; and (iii) the plaintiff's exercise of the constitutionally protected activity substantially motivated the defendant's adverse action. See Klen v. City of Loveland, Colo., 661 F.3d 498, 508 (10th Cir. 2011); Perez v. Ellington, 421 F.3d at 1131-32; Gee v. Pacheco, 627 F.3d at 1189.

It is well-settled that prison officials may not retaliate against or harass an inmate because of the exercise of the inmate's First Amendment rights. See Gee v. Pacheco, 627 F.3d at 1189 ("It is well-settled that '[p]rison officials may not retaliate against or harass an inmate because of the inmate's exercise of his right of access to the courts.'")(quoting Smith v. Maschner, 899 F.2 at 947. Further, "federal courts must take cognizance of the valid constitutional claims of prison inmates." Turner v. Safley, 482 U.S. at 84. Nevertheless, the Supreme Court has recognized that "prisoners' rights may be restricted in ways that would raise grave First Amendment concerns outside the prison context. In particular, when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." Gee v. Pacheco, 627 F.3d at 1187 (internal quotations and citations omitted)(quoting Thornburgh v. Abbott, 490 U.S. at 407; Turner v. Safley, 482 U.S. at 89).

In Gee v. Pacheco, the Tenth Circuit held that an inmate's retaliation claim was sufficient to state a plausible claim, reasoning that his allegations pled sufficient facts to plausibly establish the three required elements:

[T]he allegations . . . (1) identify constitutionally protected activity in which Mr. Gee engaged (filing specific grievances against Defendants and filing a particular

habeas petition with the court); (2) describe a responsive action that would "chill a person of ordinary firmness from continuing to engage in that activity" (transfer to an out-of-state supermax prison); and (3) recite facts indicating that the action "was substantially motivated as a response to [his] exercise of constitutionally protected conduct" (that Defendants were aware of his protected activity, that his protected activity complained of Defendants' actions, and that the transfer was in close temporal proximity to the protected activity).

627 F.3d at 1189 (quoting Shero v. City of Grove, 510 F.3d at 1203).  Here, the similarity of Peña's allegations to the allegations that the Tenth Circuit found sufficient to state a retaliation claim in Gee v. Pacheco counsel in favor of finding that her allegations, taken as true, state a cause of action against CCA and Hickson for retaliating against her for exercising her First Amendment rights in reporting either Greffet's rape or Vallejos' assault.   Although CCA and Hickson point out that Peña does not plead that her being placed in segregation was unrelated to any penal interest of CCA or Hickson, she alleges that CCA and Hickson placed her in segregation "because she reported Defendant Greffet's rape and/or Carlos Vallejos' assault." Complaint ¶ 78, at 13. Peña in paragraph 78 thus states the constitutionally protected activity for which she alleges CCA Defendants retaliated against her: exercising her free speech rights by reporting Greffet's rape and Vallejos' use of excessive force.    Regardless whether either of the factual assertions within her statements is true, exercising her First Amendment right in reporting them, even if false, is protected.   See United States v. Alvarez, 132 S. Ct. 2537, 2547 (2012)(holding that false statements are constitutionally protected)("The Government has not demonstrated that false statements generally should constitute a new category of unprotected speech . . . .").[7]   Whereas

---

[7] Although Peña alleges that CCA and Hickson retaliated against her "because she reported [] Greffet's rape and/or [] Vallejos' assault," Complaint ¶ 78, at 13, because the Court dismisses in Section IV infra Peña's § 1983 and intentional tort causes of action against Vallejos, allowing Peña's alleged reporting of the incident to be the basis for a § 1983 retaliation claim might appear inconsistent at first blush.   A statement is entitled to First Amendment protection, however, regardless whether the statement is true at the time it is made.   See United States v. Alvarez, 132 S. Ct. at 2547.   Peña's activity in reporting Vallejos' assault, which is the basis of

the Tenth Circuit concluded that the plaintiff's allegations that he was transferred to an out-of-state super-maximum prison was sufficient to meet the second prong of the retaliation test -- a responsive action that would chill a person of ordinary firmness from continuing to engage in that activity -- Peña's allegation that CCA and Hickson placed her in segregation for such speech would chill such speech from a person of ordinary firmness at least to the same extent, if not to a greater extent.   In regards to the third prong of the test, Peña's allegations, like those found sufficient in Gee v. Pacheco, allege that CCA Defendants were aware of her protected activity, that her protected activity complained of Greffet's and Vallejos' actions, and that CCA Defendants' placing her in segregation "was in close temporal proximity to the protected activity."   627 F.3d at 1189.

The CCA and Hickson point out, and Peña concedes, however, that her Complaint is inconsistent regarding the timing when she was placed in segregation in relation to her reporting Greffet's alleged rape, and Vallejos' alleged assault and battery.   Peña alleges that, "[i]n response to th[e] incident [involving Vallejos' alleged assault and battery of her], the [CCA] and Defendant Hickson placed Plaintiff in isolated/segregated confinement."   Complaint ¶ 43, at 6.   In ruling on a motion to dismiss, the Court is required to accept as true only all well-pled factual allegations. See, e.g., Smith v. United States, 561 F.3d at 1098("[F]or purposes of resolving a Rule 12(b)(6)

_____

the CCA's and Hickson's alleged retaliation, is constitutionally protected regardless whether Vallejos committed a battery against Peña or violated her constitutional rights as a matter of law. That Peña fails to plead sufficient factual allegations to make plausible her allegation that Vallejos violated her constitutional rights or is liable for civil battery thus does not invalidate her basing the § 1983 claim for retaliation on her reporting the incident to CCA prison officials.   See Zarska v. Higgins, 171 F. App'x 255, 259-60 (10th Cir. 2006)(unpublished)(holding that a prisoner's allegations that a corrections officer retaliated against the prisoner for the prisoner's report charging the officer with misconduct properly stated a claim for retaliation, noting that an allegation of retaliation "should not be ignored simply because the charge was later dismissed . . . .").

motion, we accept as true all well-pleaded factual allegations in a complaint and view these allegations in the light most favorable to the plaintiff.")(quoting Moore v. Guthrie, 438 F.3d at 1039).   In light of the conflicting timing at which Peña alleges she was placed in segregation, it is difficult for the Court to find that her being placed in segregation was in close proximity to the protected activity.   Notably, to find that placing Peña in segregation was retaliation requires the Court to find that "'but for' the retaliatory motive, the incidents to which [Peña] refers [as retaliation] . . . would not have taken place." Smith v. Maschner, 899 F.2d at 949-50. Nevertheless, Peña alleges that, in addition to being placed in segregation, she was "kept [] in varying levels of segregated confinement for a period of approximately eight months in violation of the [CCA's] and NMCD's policies pertaining to such placement."   Complaint ¶ 45, at 7.   This allegation, combined with the allegation in Count IV that CCA and Hickson "violated CCA and/or NMCD policies on the classification of inmates into segregated confinement . . . following her reporting of Defendant Greffet's rapes and Carlos Vallejos' assault," Complaint ¶ 77, at 12, construed in the light most favorable to Peña, sufficiently alleges that, regardless when and for what reason she was placed in confinement initially, her placement there and being kept there for longer than was allegedly proper was in sufficient temporal proximity to her protected activity for the Court to conclude that it was an act of retaliation.   Peña's Complaint as a whole, therefore, provides sufficient factual allegations to state a plausible claim against CCA and Hickson for retaliation.

As with Peña's § 1983 claims against CCA and Hickson for their alleged unconstitutional practices and customs, the CCA and Hickson point out her failure to affirmatively plead that their placing Peña in segregation was unrelated to any legitimate penological interest.   See Motion to Dismiss at 16 ("Most importantly, Plaintiff's Complaint lacks the facts necessary to determine

whether Plaintiff's placement in segregation was appropriate under Turner v. Saf[ley].")(citing Al-Owhali v. Holder, 687 F.3d at 1236).   The Court again does not agree.   In paragraph 43 Peña alleges that she was placed in segregation after Vallejos' alleged assault.   Such an allegation, as CCA Defendants point out, shows that her being placed there likely was related to the legitimate penological interest of penalizing her after an altercation with a corrections officer.   However, whereas Al-Owhali v. Holder notes that, to meet the penological interest burden, the plaintiff "simply needed to plead some plausible facts supporting his claim that the ban on communicating with his nieces and nephews did not serve the [government's asserted] purpose . . . ," 687 F.3d at 1241, Peña's allegation that she was kept in segregation in violation of CCA's and the NMCD's policies, taken as true, leads to the reasonable inference that CCA's and Hickson's segregation of her went beyond any reasonable furtherance of their asserted penological interest in originally segregating her.   Whether the segregation furthered a legitimate penological interest at its conception, as it appears it might have, construing Peña's allegations in the light most favorable to her, as the Court must do at the motion-to-dismiss stage, her factual allegations are sufficient for the Court to conclude that her eight-month segregation was retaliatory and unrelated to any legitimate penological interest.

## IV.   PEÑA'S COMPLAINT DOES NOT PROVIDE SUFFICIENT FACTUAL ASSERTIONS TO MAKE PLAUSIBLE HER § 1983 CLAIM OR HER CAUSE OF ACTION FOR THE INTENTIONAL TORT OF BATTERY AGAINST VALLEJOS.

Peña alleges two causes of action against Vallejos based on the same underlying conduct: his grabbing her and slamming her against the wall in NMWCF hallway, causing "bruising to her arms, and triggering sever symptoms" when she failed to respond to Vallejos' question. Complaint ¶ 41, at 6.   CCA Defendants assert that, with regard to Peña's § 1983 claim against Vallejos, she provides the Court with insufficient facts to show that Vallejos' actions did not

further a legitimate penological interest or to show that Vallejos acted with the required to intent. In regard to her state law cause of action for the intentional tort of battery, CCA Defendants assert that her Complaint lacks sufficient factual allegations to state a claim, as the only facts Peña provides show that he refused to answer a question and not what her actions were in refusing to answer the question.   The Court agrees.

> ### A.   BECAUSE THE ALLEGATIONS IN PEÑA'S § 1983 CLAIM AGAINST VALLEJOS FOR HIS CONDUCT IN RESPONSE TO HER FAILURE TO ANSWER HIS QUESTION ARE THREADBARE RECITALS OF THE LEGAL ELEMENTS OF THE CLAIM, THE COURT WILL DISMISS THE CLAIM.

Although a complaint need not set forth detailed factual allegations, a "pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action" is insufficient. Ashcroft v. Iqbal, 556 U.S. at 678 (2009).   The only factual allegations that Peña provides regarding any provocation for Vallejos' alleged unconstitutional excessive use of force and commission of a state-law battery is that he threw her against a wall when she "failed to respond to a question by . . . Vallejos . . . ."   Complaint ¶ 41, at 6.   The rest of the allegations for both Count II -- the § 1983 action for violation of her Eighth Amendment right to be free from cruel and unusual punishment -- and Count VI -- the alleged intentional tort of battery -- regard Vallejos' use of force and "recitals of the elements of [the] cause[s] of action."   Ashcroft v. Iqbal, 556 U.S. at 678.   For example, Peña admits in her response to CCA Defendants' Motion to Dismiss that an element in establishing an Eighth Amendment violation by a prison official includes proving "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm."   MTD Response at 13.   She contends that her allegations are sufficient to state a claim, asserting that, "[i]f Mr. Vallejos' grabbing and slamming of Plaintiff into the wall was, as Plaintiff alleges, malicious, her claim of excessive force is plausible."   MTD

Response at 13.   Although the allegation may make her claim plausible in the way that term is used colloquially in society, the allegation does not make a plausible claim as that term is used legally in the rule 12(b)(6) setting.   It is elementary that, in federal court, in the wake of Ashcroft v. Iqbal and Bell Atl. Corp v. Twombly, a "pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action" is insufficient; "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Ashcroft v. Iqbal, 556 U.S. at 678.

    While the Court has noted many times in the past that it "must accept as true all well-pleaded factual allegations in the complaint, view those allegations in the light most favorable to the non-moving party, and draw all reasonable inferences in the plaintiff's favor," Heyward v. Credit Union Times, No. CIV 12-0258 JB/LFG, 2012 WL 6632764, at *15 (D.N.M. Dec. 17, 2012)(citing Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. at 322), Peña's conclusory recitations of the elements of a § 1983 claim for excessive force are not well-pleaded factual allegations.   In light of Peña's factual allegation that she failed to answer Vallejos' question, it is just as possible that Vallejos interpreted her failure, however that failure played out factually, as requiring a response from him to maintain or restore discipline.   If such a possibility is true, Vallejos' conduct would have been constitutional.   The Tenth Circuit has held that allegations that sweep up such constitutional conduct fail as a matter of law: "'[P]lausibility' . . . must refer to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs 'have not nudged their claims across the line from conceivable to plausible.'"   Robbins v. Oklahoma, 519 F.3d at 1247 (quoting Bell Atl. Corp v. Twombly, 550 U.S. at 555).   Peña does not provide any factual allegations regarding her "failure" to answer his questions from which the Court might reasonably infer that

Vallejos' actions were other than done in a good-faith effort to maintain or restore discipline. Because Peña's factual allegations surrounding Vallejos' alleged unconstitutional conduct are mere recitations of the elements of a § 1983 claim, the allegations are inadequate to state a plausible claim for relief as a matter of law.   The Court will thus dismiss her § 1983 claim against Vallejos without prejudice to her amending her pleadings to provide pled factual content that will allow the court to draw the reasonable inference that Vallejos is liable.   See Ashcroft v. Iqbal, 556 U.S. at 678 ("A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.").

**B.      BECAUSE THE ALLEGATIONS IN PEÑA'S CAUSE OF ACTION AGAINST VALLEJOS FOR HIS ALLEGED BATTERY OF HER ARE CONCLUSORY RECITATIONS OF THE ELEMENTS OF A BATTERY CLAIM, THE COURT WILL DISMISS THE CLAIM AS IMPLAUSIBLE.**

Peña's factual assertions underlying her state law claim of battery against Vallejos also fail to plead sufficient facts from which the Court can reasonably infer that Vallejos is plausibly liable for the tort.   Although the New Mexico Uniform Jury Instructions note that there is "insufficient New Mexico law on assault and battery to guide the committee on this subject . . ." see Civ. U.J.I. 13-1624 N.M.R.A., Committee Commentary, at the very least a battery is an intentional offensive touching for which the defendant does not have a privilege or the plaintiff's consent.   See Dodds, supra, § 29, at 55 ("The gist of battery is that the plaintiff has been touched, intentionally, in a way that she has not even apparently consented to and that is not justified by some generally recognized privilege.").   Consent to an officers' use of force is often implied by law, and thus courts analyze whether an officer can be liable for battery based on whether the use of force was reasonable under the circumstances.   Cf. Jonas v. Bd. of Comm'rs of Luna Cnty., 699 F. Supp. 2d 1284, 1298 (D.N.M. 2010)(Browning, J.)("An officer in making an arrest is privileged by statute to use only

that force which is necessary to restrain the arrested person. Police officers are not liable for battery if they acted in good faith and did not use more force than reasonably necessary to preserve the peace or effect an arrest." (internal citations omitted))(citing <u>New Mexico v. Kraul</u>, 90 N.M. 314, 318, 563 P.2d 108, 112 (Ct. App. 1977); <u>Realivasquez v. City of Albuquerque</u>, No. CIV 03-0015 MCA/KBM, slip op., *9(D.N.M. Jan. 28, 2004)(Armijo, J.)).   See <u>Adegbuji v. Middlesex Cnty.</u>, 2006 WL 2806289, at *12 ("An 'officer can be held liable for assault and battery if he uses excessive force.'")(quoting <u>Mantz v. Chain</u>, 239 F. Supp. 2d at 498).   The Tenth Circuit, moreover, has recognized that an inmate may consent to a corrections officer's battery.   <u>See</u> <u>Giron v. Corr. Corp. of Am.</u>, 191 F.3d 1281, 1288 (10th Cir. 1999)(concluding that jury instruction on the plaintiff's possible consent to the correction's officer's battery was proper, noting that New Mexico law provides: "For there to a be a battery, there must be an unpermitted contact . . . . The gist of the action for battery is not the hostile intent of the defendant, but rather the absence of consent to the contact on the part of the plaintiff.").

Here, just as the Court reasoned that Peña fails to plead factual allegations regarding Vallejos' use of force from which the Court could plausibly conclude that it was unreasonable, so here Peña's allegations surrounding her battery claim are mere threadbare recitals of the elements. <u>See</u> Complaint ¶ 88, at 14 ("Vallejos caused an offensive touching to Plaintiff by violently grabbing her and slamming her against the wall."); <u>id.</u> ¶ 88, at 14 ("This offensive touching constituted a battery of Plaintiff that was neither justified nor excusable.").   To rebut any possibility of Vallejos' use of force being reasonable -- <u>i.e.</u>, being consented to or justified because Peña was an inmate at the time -- Peña gives only a conclusory allegation that "[t]his offensive touching constituted a battery of Plaintiff that was neither justified nor excusable."   Complaint ¶ 89, at 14.   To impose liability upon Vallejos, acting in his official role as a corrections officer, for

"caus[ing] bruising to appear on [her] arms," Complaint ¶ 90, at 14, without any factual allegations regarding the circumstances of the Peña's resisting his authority in not complying with Vallejos' direction to answer his questions, would be close to imposing strict liability upon corrections officers dealing with inmates.   Regardless whether the use of force may have been justified, because Peña does not provide a factual assertion on which the Court can plausibly conclude that it was not, she fails to state a plausible claim that Vallejos is liable for battery of her.   The Court will therefore dismiss her state law claim for the intentional tort of battery against Vallejos without prejudice to her providing more factual allegations.

## V.   PEÑA'S ALLEGATIONS FAIL TO STATE A CLAIM THAT CCA IS LIABLE FOR GREFFET'S ALLEGED INTENTIONAL TORTS IN ALAMOGORDO AND ALBUQUERQUE.

The CCA Defendants move to dismiss Peña's claim that CCA is liable for Greffet's alleged sexual abuse, asserting that, because Greffet was off-duty over Labor Day weekend for the alleged Alamogordo incident, and no longer a CCA employee during the alleged Albuquerque incident, CCA cannot be liable for Greffet's intentional torts in Alamogordo or Albuquerque as a matter of law.   Peña, in her MTD Response, asserts that, "if the Court accepts as true Plaintiff's specific allegation that Mr. Greffet's sexual abuse commenced while he was supervising Plaintiff in the segregation unit," then CCA is plausibly liable.   At the hearing, Peña stated that she "believe[s] that [she] made a claim of respondeat superior against CCA for the entire course of the rapes . . . ." Tr. at 50:11-13 (Fine).   She asserted that she "certainly is arguing . . . that CCA is liable under a theory of respondeat superior for [] the sexual abuse that occurred within its facility . . . ."   Tr. at 50:13-16 (Fine).   Peña's contentions at the hearing are insufficient to overcome the reality that the Complaint's allegations fail to sufficiently allege that she seeks to hold CCA liable for Greffet's alleged sexual assault at NMWCF.   The Court also finds that Peña's Complaint fails to make

-97-

plausible a cause of action against CCA under a theory of respondeat superior for Greffet's alleged sexual assault of Peña in Alamogordo.

> **A.   ALTHOUGH PEÑA CLARIFIED AT THE HEARING THAT SHE SEEKS TO HOLD CCA LIABLE UNDER RESPONDEAT SUPERIOR FOR GREFFET'S ALLEGED SEXUAL ASSAULT OF PEÑA AT NMWCF, BECAUSE THE COMPLAINT DOES NOT SUFFICIENTLY ALLEGE THE BASIS OF THE CLAIM, THE COURT WILL DISMISS THE CLAIM WITHOUT PREJUDICE FOR THAT ALLEGED ASSAULT.**

Rule 8 of the Federal Rules of Civil Procedure provides:

A pleading that states a claim for relief must contain:

> **(1)** a short and plain statement of the grounds for the court's jurisdiction, unless the court already has jurisdiction and the claim needs no new jurisdictional support;
>
> **(2)** a short and plain statement of the claim showing that the pleader is entitled to relief; and
>
> **(3)** a demand for the relief sought, which may include relief in the alternative or different types of relief.

Fed. R. Civ. P. 8(a).   The Supreme Court has noted that the substance of rule 8 is to ensure that the plaintiff's statement of the claim provides the defendant adequate notice of the grounds on which the plaintiff's claim rests.   See Bell Atl. Corp. v. Twombly, 550 U.S. at 555 ("Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the claim is and the grounds upon which it rests.'")(quoting Fed. R. Civ. P. 8(a)(2); Conley v. Gibson, 355 U.S. 41, 47 (1957)); Taylor v. Zavaras, 469 F. App'x 688, 688 (10th Cir. 2012)(unpublished)("Rule 8 requires that pleadings contain 'a short and plain statement of the claim showing that the pleader is entitled to relief.'   This is to allow courts to understand the nature of the complaint and basis of jurisdiction and permit those sued to prepare an answer.").   The United States Court of Appeals

for the First Circuit has stated that a complaint "is adequate so long as it gives the defendant sufficient notice to file a responsive pleading." Langadinos v. Am. Airlines, Inc., 199 F.3d 68, 73 (1st Cir. 2000).

In Robbins v. Oklahoma, the Tenth Circuit dismissed as inadequate the plaintiff's § 1983 allegations against certain defendants for "failure to provide fair notice . . . . [as the complaint] fails to isolate the allegedly unconstitutional acts of each defendant, and thereby does not provide adequate notice as to the nature of the claims against each." 519 F.3d at 1249-50. Robbins v. Oklahoma involved a complaint in the § 1983 context against multiple defendants, and the Tenth Circuit noted that "complaints in § 1983 cases against individual government actors pose a greater likelihood of failures in notice and plausibility because they typically include complex claims against multiple defendants." 519 F.3d at 1249. The Tenth Circuit also noted that "[t]he Twombly standard may have greater bite in such contexts, appropriately reflecting the special interest in resolving the affirmative defense of qualified immunity at the earliest possible stage of a litigation." 519 F.3d at 1249. The Tenth Circuit also noted, however, that even in qualified immunity cases, the same federal pleadings standard of notice is what ultimately governs. See 519 F.3d at 1249 ("[W]e apply 'the same standard in evaluating dismissals in qualified immunity cases as to dismissals generally . . . .'")(quoting Shero v. City of Grove, Okla., 510 F.3d at 1200). Thus, the Tenth Circuit dismissed the claims, as the complaint did not plead sufficient allegations to "make clear exactly who is alleged to have done what to whom, to provide each individual with fair notice as to the basis of the claims against him or her, as distinguished from collective allegations against the state." 519 F.3d at 1250.

The title of Count V in Peña's Complaint, in which she alleges that CCA is liable for Greffet's intentional torts, alleges that she seeks to hold CCA liable for only the Albuquerque and

Alamogordo rapes: "Count V -- Intentional Tort (Battery) Against Defendant Greffet for the Albuquerque and Alamogordo Rapes."   Complaint at 13.   Although the first paragraph in Count V incorporates all of the above paragraphs in the Complaint, including those allegations providing the circumstances of the alleged NMWCF sexual assault, even construing the complaint in the light most favorable to Peña, the reasonable inference is that, for some unknown reason, Peña seeks to impose vicarious liability on CCA for only the Albuquerque and Alamogordo rapes. Moreover, the specific allegations within Count V refer only to the alleged incidents in Albuquerque and Alamogordo, and fail to mention Greffet's alleged sexual assault of Peña inside NMWCF.   See Complaint ¶ 82, at 13 ("Greffet repeatedly had sex with Plaintiff . . . in Alamogordo and Albuquerque . . ."); id. ¶ 83, at 13 ("Greffet's rapes . . . in Alamogordo and Albuquerque constituted the intentional torts of battery and rape"); id. ¶ 86, at 14 ("Under the doctrine of 'respondeat superior,' the Corporation is legally liable for the tortious conduct of . . . Greffet").   Although Robbins v. Oklahoma dismissed a § 1983 claim, it specifically pointed out that it was relying on the same general standard of dismissals.   See 519 F.3d at 1249 ("[W]e apply 'the same standard in evaluating dismissals in qualified immunity cases as to dismissals generally . . . .'")(quoting Shero v. City of Grove, Okla., 510 F.3d at 1200).   Moreover, even if the dismissal standard articulated in Ashcroft v. Iqbal and Bell Atl. Corp. v. Twombly has more "bite" in qualified immunity cases than in general cases, 519 F.3d at 1249, Robbins v. Oklahoma's policy for requiring more specific pleadings so that each defendant may know the "isolate[d] . . . allegedly unconstitutional act" for which he or she is being sued, 519 F.3d at 1250, appears equally relevant in Peña's case, where she is suing multiple defendants and here is seeking to hold CCA liable for another defendant's acts.   While Peña's Complaint in Count V alleges who did what to whom in regards to Greffet's alleged Albuquerque and Alamogordo assaults, it fails to allege any such

-100-

factual allegations in Count V as to the alleged NMWCF sexual assault.   Thus, like the complaint in Robbins v. Oklahoma, Count V, asserting that CCA is liable under *respondeat superior*, fails to isolate the alleged unconstitutional acts at NMWCF on which it seeks to hold CCA liable and "thereby does not provide adequate notice as to the nature of the claims against" CCA.   519 F.3d at 1250.   Without allegations about the events in the NMWCF, Count V does not provide adequate notice on what grounds Peña seeks to hold CCA liable.

Peña provides, however, factual allegations regarding Greffet's allege sexual assault of her at NMWCF elsewhere in her Complaint and incorporates by reference those allegations in Count V.   She also asks the Court in her MTD Response for leave to amend her Complaint should the Court find it insufficient.   In light of Count V incorporating by reference the factual allegations elsewhere in her Complaint, that the title of Count V leads to the reasonable inference that she is seeking to hold CCA liable for Greffet's conduct in Alamogordo and Albuquerque only, the Court believes that Count V's failures are likely more technical error than substantive.   The Court thus believes she may be able to articulate a theory of liability and, while the Court does not know whether such a theory is meritorious, the Court does not find it fair to dismiss with prejudice Peña's theory at this point.   Cf. Curley v. Perry, 246 F.3d at 1284 ("[T]he district court should allow a plaintiff an opportunity to cure technical errors or otherwise amend the complaint when doing so would yield a meritorious claim.").   The Court, therefore, will dismiss Count V against CCA to the extent that it relies on Greffet's alleged sexual abuse of Peña at NMWCF without prejudice and grant Peña leave to amend her Complaint to articulate this basis for CCA's liability under respondeat superior.

**B.     THE COURT WILL DISMISS PEÑA'S ALLEGATIONS AGAINST CCA UNDER RESPONDEAT SUPERIOR TO THE EXTENT THAT THEY ARE BASED ON THE ALLEGED ALOMOGORDO AND ALBUQUEQRUE**

RAPES.

CCA asserts that, because Greffet was off-duty over Labor Day weekend, 2009, and not an employee at the time of the alleged sexual assault in Albuquerque, and because Peña was not an inmate at either of those times, CCA cannot, as a matter of law, be liable for Greffet's conduct. Peña, in her MTD Response, argues that, because "Greffet's sexual abuse commenced while he was supervising [Peña] in the segregation unit, and was thus furthering the Corporation's business, it is plausible that the Corporation would be liable for the pattern of intentional torts that arose at that time." MTD Response at 16. At the hearing, however, Peña conceded that she cannot seek to hold CCA liable under *respondeat superior* based on Greffet's allege sexual assault of her in Albuquerque. See Tr. at 50:4-7 (Fine).[8]

_____

[8] None of the parties raised the issue whether the New Mexico Tort Claims Act, N.M.S.A. 1978, §§ 41-4-1 to -30 ("NMTCA"), applies to potentially shield the CCA from liability for its employees' torts. The Tenth Circuit has noted the asymmetry in cases in which CCA operates a prison facility rather than the state in a case appealed from the United States District Court for the District of Colorado:

> The line separating a State-operated prison from one operated by a private corporation is not just cosmetic. There are important differences, creating a material and significant asymmetry. Thus, for instance, whereas the State and its CDOC employees enjoy Eleventh Amendment immunity from damages suits under § 1983 for their official actions, and CDOC employees in their individual capacities enjoy qualified immunity in § 1983 damages actions, CCA and its private prison employees enjoy neither. They are fully exposed to the numerous civil rights suits brought by inmates. See, Richardson[ v. McKnight], 521 U.S. [399 ,] 412 [(1997)] ("[P]rivate prison guards, unlike those who work directly for the government, do not enjoy immunity from suit in a § 1983 case.").

Phillips v. Tiona, No. 12-1055, 2013 WL 239891, at *13 (10th Cir. Jan. 23, 2013)(unpublished) (internal footnote omitted). Similarly, in New Mexico, state corrections officers employed by the New Mexico Department of Corrections are entitled to immunity, see Lymon v. Aramark Corp., 728 F. Supp. 2d at 1265 (noting that New Mexico Department of Corrections corrections officers sued for alleged torts while on-duty "are public employees acting within the scope of their duties, and thus 'consent to be sued may not be implied but must come within one of the exceptions to immunity under the Tort Claims Act.'")(quoting Begay v. State of New Mexico, 104 N.M. 483,

### 1.    Greffet's Alleged Sexual Assault of Peña on Labor Day Weekend, 2009, was Not Committed Within the Scope of His Employment.

"Generally, whether an employee is acting in the course and scope of employment is a question of fact."   Rivera v. New Mexico Highway and Transp. Dept., 115 N.M. 562, 564, 855 P.2d 136, 138 (Ct. App. 1993)(citing Narney v. Daniels, 115 N.M. 41, 48, 846 P.2d 347, 354 (Ct. App. 1992)).   "However, when no reasonable trier of fact could conclude that an employee is acting in the course and scope of employment," the conduct was not in the scope of employment as a matter of law.   Rivera v. New Mexico Highway and Transp. Dept., 115 N.M. at 564, 855 P.2d at

---

486, 723 P.2d 252, 255 (Ct. App. 1986), rev'd on other grounds, Smialek v. Begay, 104 N.M. 375, 721 P.2d 1306 (1986)).   The legislature appears to have intentionally excluded the corrections officers of private companies that operate correctional facilities, however, from the immunity afforded to state corrections officers in the execution of their duties as corrections officers. Section 33-1-17 of the New Mexico Statutes Annotated, which allows for corrections facilities to be owned and operated by private contractors, provides that a private contractor's "employees preforming the functions of correctional officers shall be deemed correctional officers for the purposes of Sections 33-1-10 and 33-1-11 NMSA 1978 but for no other purpose of state law, unless specifically stated."  N.M.S.A. 1978, § 33-1-17(E).   Notably, multiple courts have held that corrections officers' primary duties are provided in N.M.S.A. 1978, § 33-2-15, and that § 33-1-10 provides only a supplemental power to arrest certain persons in the interest of the public. See Callaway v. N. M. Dept. of Corr., 117 N.M. 637, 641, 875 P.2d 393, 397 (Ct. App. 1994)("NMSA 1978, Section 33–1–10(A) . . . empowers corrections officers under certain situations to act as peace officers to make arrests . . . ."); Lymon v. Aramark Corp., 728 F. Supp. 2d at 1268-69 ("[A]lthough prison guards may have the supplemental power to arrest pursuant to the guidelines of § 33-1-10, their principal statutory duties are those set forth in § 33-2-15.")(citing Callaway v. N. M. Dept. of Corr., 117 N.M. at 641, 875 P.2d at 397) .   Thus, "§ 33-1-17(E) indicates that the legislature did not intend for the corrections officers employed by private prison operators to have the same tort immunities as those possessed by corrections officers employed directly by the state."  Giron v. Corr. Corp. of Am., 14 F. Supp. 2d 1245, 1251-52 (D.N.M. 1998)(Hansen, J.).   CCA does not contend that it is entitled to sovereign immunity as a state actor may be and thus does not assert that the NMTCA applies to Peña's state law causes of action. Peña, similarly, has not sought to invoke any waiver of immunity under the NMTCA to allow her to hold CCA liable for the actions of its corrections officers at a New Mexico prison facility, because no exception to the NMTCA is apparently needed.   In light of N.M.S.A. 1978, § 33-1-14(E) and Giron v. Corr. Corp. of Am., it appears that CCA is not entitled to the NMTCA's protections from tort liability under the circumstances of this case, and that New Mexico's general tort principles and privileges, including related to *respondeat superior*, apply to Peña's state law claims.

138 (citing <u>Narney v. Daniels</u>, 115 N.M. at 49-50, 846 P.2d at 355-56).   "Under basic respondeat

superior principles, an employer is liable for an employee's torts committed within the scope of his

or her employment."   <u>Lymon v. Aramark Corp.</u>, 728 F. Supp. 2d at 1271 (quoting <u>Ocana v. Am.</u>

<u>Furniture Co.</u>, 2004-NMSC-018, ¶ 29, 135 N.M. 539, 91 P.3d 58).   New Mexico uses a four-part

test to determine whether an employee's acts were performed within the scope of employment:

> An employee's action, although unauthorized, is considered to be in the scope of
> employment if the action (1) is the kind the employee is employed to perform; (2)
> occurs during a period reasonably connected to the authorized employment period;
> (3) occurs in an area reasonably close to the authorized area; and (4) is actuated, at
> least in part, by a purpose to serve the employer.

<u>Lessard v. Coronado Paint & Decorating Ctr., Inc.</u>, 2007-NMCA-122, ¶ 12, 142 N.M. 583, 168

P.3d 155 (citing <u>Narney v. Daniels</u>, 115 N.M. at 49, 846 P.2d at 355; <u>Restatement (Third) of</u>

<u>Agency</u> § 7.07(2) (2006)).   The New Mexico Civil Uniform Jury Instruction on the scope of

employment provides:

> An act of an employee is within the scope of employment if:
>
> **1.**   It was something fairly and naturally incidental to the employer's business
> assigned to the employee, and
>
> **2.**   It was done while the employee was engaged in the employer's business with
> the view of furthering the employer's interest and did not arise entirely from some
> external, independent and personal motive on the part of the employee.

Civ. U.J.I. 13-407 N.M.R.A.   See <u>Childers v. S. Pac. Co.</u>, 20 N.M. 366, 372-73, 149 P. 307, 308,

(1915)(same).

CCA refers the Court to <u>Rivera v. New Mexico Highway and Transp. Dept.</u> and <u>Los</u>

<u>Ranchitos v. Tierra Grande, Inc.</u>, 116 N.M. 222, 861 P.2d 263 (Ct. App. 1993), in support of their

argument that Greffet's alleged sexual assault of Peña in Alamogordo was outside the scope of

employment. In <u>Rivera v. New Mexico Highway and Transp. Dept.</u>, the Court of Appeals of New

Mexico held that a highway construction company's employee acted outside the scope of his employment when he threw a container of water on the plaintiff, another employee, during "a lull in the work[day]," while they were working on a highway, causing the plaintiff to fall into oncoming traffic where he was struck by a vehicle, because the conduct did not further the employer's business. 115 N.M. at 563-64, 855 P.2d at 137-38. The Court of Appeals of New Mexico noted that, under general principles of agency law, "[i]f the servant does a mischievous act merely to frighten or perpetrate a joke on a third person, and the act is entirely disconnected from the purpose of employment, the master generally is not liable therefor." 115 N.M. at 564, 855 P.2d at 138. The Court of Appeals of New Mexico agreed, concluding that the employer could not be vicariously liable as there were "no facts . . . tending to show that the Defendant's business was being served by its employee's throwing water on Plaintiff." 115 N.M. 565, 855 P.2d at 139.

In Los Ranchitos v. Tierra Grande, Inc., the Court of Appeals of New Mexico held that the defendant employer could not be liable for the embezzlement of Gerber, its employee, hired out to the plaintiff's business to perform bookkeeping and accounting for the plaintiff, because "as a matter of law, Gerber's acts of embezzlement from Plaintiff were activated by her personal motives." 116 N.M. at 227, 861 P.2d at 268. Gerber embezzled from the plaintiff from the defendant employer's office, during the normal business hours, and was under the authority and pay of the defendant.

> [T]he bookkeeping and accounting work performed for Defendant was conducted at Defendant's office; that Defendant determined the date, time, place and work to be performed, and the employees performing the work were paid for their services by Defendant; that Plaintiff did not have the authority to direct Defendant to hire or fire its employees or to direct the time, place or manner in which services were provided; that Defendant hired Gerber, designated the work she was to perform, and provided her with access to Plaintiff's financial books and records, and checking account; and Defendant supervised and monitored the work and activities of Gerber on a daily basis. It is undisputed that Gerber's salary checks were written

on Defendant's account and that it furnished her with her office and materials
necessary to perform her duties.

116 N.M. at 225, 861 P.2d at 266.   The Court of Appeals of New Mexico noted that the facts

presented by the defendant employer proved that the "acts of embezzlement were in furtherance of

her own personal motives and not in pursuit of Defendant's business, and that none of the funds

allegedly embezzled by her were received by or accrued to the benefit of Defendant."   116 N.M.

at 227, 861 P.2d at 268.

The factors in New Mexico's four-part test whether Greffet's alleged sexual assault of

Peña in Alamogordo on Labor Day weekend, 2009, was committed within the scope of

employment, as well as New Mexico court precedent, counsel in favor of finding that the alleged

incident was not committed in the scope of Greffet's employment.   First, Greffet's alleged sexual

assault of Peña on Labor Day weekend, 2009, like the highway construction employee throwing

the water bottle in Rivera v. New Mexico Highway and Transp. Dept., is not the kind of action for

work for which CCA employs Greffet.   In regard to the second factor, the embezzlement in Los

Ranchitos v. Tierra Grande, Inc., occurred during work hours while she was being paid to be

performing legitimate work for the plaintiff, and, although the highway employee threw the water

bottle at the plaintiff during a "lull" in day, it happened sometime during the work day while he

was on-duty at work.   Thus, in both cases the alleged act for which the plaintiffs sought to hold the

defendants vicariously liable "occur[ed] during a period reasonably connected to the authorized

employment period."   Lessard v. Coronado Paint & Decorating Ctr., Inc., 2007-NMCA-122, ¶

12, 142 N.M. 583, 168 P.3d 155.   Here, on the other hand, Greffet's alleged sexual assault of Peña

on Labor Day weekend, 2009, occurred neither while he was doing work for which the CCA paid

him nor during hours at which he was at work, but rather over a holiday weekend while he was

off-duty.   As to the third factor, whether the alleged action "occurs in an area reasonably close to the authorized area," <u>Lessard v. Coronado Paint & Decorating Ctr., Inc.</u>, 2007-NMCA-122, ¶ 12, 142 N.M. 583, 168 P.3d 155, whereas both of the employees in <u>Rivera v. New Mexico Highway and Transp. Dept.</u>, and <u>Los Ranchitos v. Tierra Grande, Inc.</u> were at their work site when the action occurred, Greffet's alleged sexual assault in Alamogordo was over 250 miles from his work site at the CCA.   Finally, with regard to the fourth factor -- whether the action is actuated, at least in part, by a purpose to serve the employer -- the alleged conduct in <u>Rivera v. New Mexico Highway and Transp. Dept.</u> and <u>Los Ranchitos v. Tierra Grande, Inc.</u> was held insufficient, as it did not further the employers' business interests or benefit the employers.   Importantly, even though this appears to be the only one of the four factors weighing against finding the employer liable in <u>Los Ranchitos v. Tierra Grande, Inc.</u>, the Court of Appeals of New Mexico nevertheless held that this factor was sufficient to find the act was outside of the scope of employment.   Here, Greffet's alleged sexual assault of Peña could not likely further CCA's business interests, nor benefit CCA.   Like the embezzlement in <u>Los Ranchitos v. Tierra Grande, Inc.</u>, while Greffet's duties as a CCA employee gave him access to Peña, the act of sexually assaulting her almost certainly arose from an "external, independent and personal motive on [Greffet's] part . . . ." Civ. U.J.I. 13-407 N.M.R.A. Greffet's alleged sexual abuse of Peña in Alamogordo on Labor Day weekend, 2009, was therefore committed outside the scope of his employment.

>    **2.    <u>Peña Has Not Adequately Alleged Facts from Which the Court Can Infer that the Aided-In-Agency Theory of Vicarious Liability Applies to Greffet's Alleged Sexual Assault of Her on Labor Day Weekend, 2009.</u>**

The Supreme Court of New Mexico has also recognized that New Mexico courts' adoption of the "aided-in-agency theory of vicarious liability . . . . would [not] be a radical departure."

Ocana v. Am. Furniture Co., 2004-NMSC-018, ¶¶ 30-31, 135 N.M. 539, 91 P.3d 58.   The Supreme Court of New Mexico stated that, under the aided-in-agency theory, "an employer may be held liable for the intentional torts of an employee acting outside the scope of his or her employment if the employee 'was aided in accomplishing the tort by the existence of the agency relation [between the employer and employee].'"   Ocana v. Am. Furniture Co., 2004-NMSC-018, ¶ 30, 135 N.M. 539, 91 P.3d 58 (quoting Restatement (Second) of Agency § 219(2)(d)).

The aided-in agency theory provides that the principal or master is not subject to liability for the agent's torts when the agent is acting outside the scope of the agent's employment, unless "the [agent] purported to act or speak on behalf of the principal and there was reliance upon apparent authority, or [the agent] was aided in accomplishing the tort by the existence of the agency."   Restatement (Second) of Agency § 219(2)(d).   The Committee Commentary to this section provides that liability is imposed pursuant to subsection (2) in "situations in which a master may be liable for torts of servants acting solely for their own purposes and hence not in the scope of employment."   Restatement (Second) of Agency § 219 cmt.e.   The United States Court of Appeals for the District of Columbia Circuit has noted that "[t]he commentary to the Restatement suggests that this [approach] embraces a narrower concept that holds the employer liable only if the tort was 'accomplished by an instrumentality, or through conduct associated with the agency status.'"   Gary v. Long, 59 F.3d 1391 (D.C. Cir. 1995)(quoting Barnes v. Costle, 561 F.2d 983, 996 (D.C. Cir. 1977)(MacKinnon, J., concurring)).

Although the Court could not find a New Mexico case or case from within the Tenth Circuit having analyzed the aided-in-agency theory as set forth in Restatement (Second) of Agency § 219(2)(d), the Honorable James E. Boasberg, United States District Court Judge for the District of Columbia, in Doe v. Sipper, 821 F. Supp. 2d 384 (D.D.C. 2011), provided an analysis

under the theory whether an employer could be liable for the alleged rape of an employee by the company's chief operating officer while on business travel.   See 821 F. Supp. 2d at 390-93.   The plaintiff, a new part-time employee of the company, alleged that, while on business travel at a trade show in Washington, D.C., the company's COO invited her up to his hotel room after they left the bar so that he could book her travel to the next trade show, and, soon after she fell asleep as he was booking the travel, she awoke to him raping her.   See 821 F. Supp. 2d at 386.   Judge Boasberg first noted that "[t]he District of Columbia [] does not subscribe to the blanket proposition that sexual assaults never come within the scope of employment," but he concluded that the alleged rape was outside the scope of the COO's employment as it was not an outgrowth of the company's business and she did not provide any factual support for her assertion that the COO "was motivated, even in part, by a desire to further [the company]'s interests by raping her."   821 F. Supp. 2d at 390.

Judge Boasberg refused to dismiss the employee's claim that the company was liable for the COO's intentional tort in allegedly raping the employee, however, concluding that, under the aided-in-agency theory, the COO's position as the employee's manager and his "summoning Plaintiff to his hotel room for business," could plausibly impose vicarious liability on the employer.   821 F. Supp. 2d at 393.   In reaching this conclusion, Judge Boasberg noted that the first clause of the aided-in-agency theory in Restatement (Second) of Agency § 219(2)(d) "essentially describes the doctrine of apparent authority," 821 F. Supp. 2d at 391, but relied on the second prong to find that it is possible that the COO "rel[ied] on his authority as an instrumentality in summoning her to his hotel room for company business . . . ," 821 F. Supp. 2d at 392.   Notable for purposes of Peña's claim, Judge Boasberg also contrasted the facts in Doe v. Sipper from those of the D.C. Circuit's case in Gary v. Long.   Judge Boasberg noted that the D.C. Circuit in Gary v.

Long concluded that the plaintiff could not establish vicarious liability through Restatement (Second) of Agency § 219(2)(d) for the plaintiff's claim of sexual harassment, because the defendant employer established that, in light of the company's policies against sexual harassment, the plaintiff could not have reasonably believed that the manager harassing her was acting pursuant to his authority. See Gary v. Long, 59 F.3d at 1397-98 (citing Restatement (Second) of Agency § 166 cmt. a. ("If a person has information which would lead a reasonable man to believe that the agent is violating the orders of the principal or that the principal would not wish the agent to act under the circumstances known to the agent, he cannot subject the principal to liability.")). Because at issue in Doe v. Sipper was only one incident of alleged sexual assault, however, Judge Boasberg concluded that there was no similar such notice in Doe v. Sipper to overcome the applied-in-agency liability.

Analogous to the Court's conclusion that Greffet's alleged sexual abuse of Peña in Alamogordo on Labor Day weekend, 2009, was not done under color of state law, the Court concludes that Peña's allegations cannot state a plausible claim for holding CCA liable for Greffet's alleged sexual assaults of her in Alamogordo or Albuquerque.  While Peña was an inmate at NMWCF and Greffet was a corrections officer there, as Judge Boasberg concluded in Doe v. Sipper, Greffet could have plausibly used his authority as an officer as an instrumentality to force Peña to come to the corrections office in the guise of furthering CCA's or NMWCF's business, and allegedly sexual assaulting her there.  As Peña seeks to hold CCA liable under respondeat superior for Greffet's "pattern of intentional torts" that "commenced" while she was at NMCWF, however, Peña's claim is analogous to that in Gary v. Long, which held that the plaintiff lacked a reasonable belief that the conduct of continuing sexual harassment could be pursuant to implied authority of the harasser, and which Judge Boasberg distinguished.   As in Gary v. Long,

Peña's factual allegations plead that Greffet's sexual assault was contrary to CCA's and NMCD's policies.  More problematic for Peña's asserted cause of action against CCA, however, is that Peña was not an inmate at the time of the alleged Albuquerque or the Alamogordo rapes, and that Greffet was off-duty.   In Alamogordo, while Greffet was at least still a CCA officer at NMWCF facility, as the Court concluded with regard to whether he was acting under color of state law, Peña does not plead sufficient facts to make plausible that Greffet used improperly his position as an instrumentality to his alleged sexual assault of Peña.  Even if there were such allegations, however, as the D.C. Circuit concluded in Gary v. Long, in light of Alamogordo being hundreds of miles from NMWCF, the alleged conduct having taken place over a holiday weekend while Greffet was off-duty, the conduct took place in a motel room, and she was no-longer an inmate subject to CCA's authority, Peña was likely on "notice of a limitation of [the] agent's authority . . . ." Restatement (Second) of Agency § 166.  Peña cannot reasonably assert that, at the time that she agreed to meet Greffet in a motel room in Alamogordo after being released from prison, she believed that he was meeting pursuant to the CCA's authority.  Similarly, because Peña does not dispute that she knew Greffet was no longer a CCA employee at the time of the alleged Albuquerque sexual assault in 2010, she could not, as a matter of law, have believed that he was acting pursuant to CCA's authority as his employer in meeting her for the incident.  Accordingly, the Court will dismiss with prejudice Peña's claims against CCA pursuant to respondeat superior to the extent that they are based on Greffet's alleged sexual assaults of Peña in Alamogordo or Albuquerque.

**IT IS ORDERED** that the CCA, Hickson and Vallejos' Motion to Dismiss, filed Sept. 24, 2012 (Doc. 10) is granted in part and denied in part.   The Court will dismiss: (i) Plaintiff Crystal Peña's § 1983 claim against Defendant Carlos Vallejos in Count II without prejudice to her

amending the claim; (ii) Peña's § 1983 claim against Defendants Corrections Corporation of America ("CCA") and Arlene Hickson in Count III to the extent that it is based on Greffet's alleged sexual assaults of Peña on Labor Day weekend, 2009, in Alamogordo, New Mexico, and in August, 2010, in Albuquerque, New Mexico without prejudice to her amending the claim as to the Alamogordo incident; (iii) Pena's allegations in Count V that CCA is vicariously liable for Greffet's alleged intentional torts of battery without prejudice to Peña's amending the claim to specify that she seeks to impose vicariously liability based on the alleged battery at the New Mexico Women's Correctional Facility ("NMWCF") in July/August, 2009; (iv) Count VI alleging that Vallejos committed the intentional tort of battery under New Mexico law against Peña at the NMWCF, including the allegations that CCA is vicariously liable for Vallejos' alleged battery, without prejudice to Peña's amending the claim to add more factual allegations.   The Court will grant Peña leave to amend her Complaint for Civil Rights Violations and Common Law Torts, filed June 29, 2012 (Doc. 1), to provide more factual allegations in support of her allegations that: (i) Greffet's alleged sexual assault of her in Alamogordo, New Mexico on Labor Day weekend, 2009, was under color of state law; (ii) Vallejos' conduct in the NMWCF hallway was unrelated to any legitimate penological interest and was not privileged; and (iii) CCA is liable under the theory of r*espondeat superior* for Greffet's alleged sexual assault of Peña at the NMWCF.


_____
UNITED STATES DISTRICT JUDGE


*Counsel:*

Zachary A. Ives
Garcia Ives Nowara
Albuquerque, New Mexico

-112-

--and --

Mark Fine
Charlotte Itoh
Fine Law Firm
Albuquerque, New Mexico

      *Attorneys for the Plaintiff*

Michael S. Jahner
Yenson, Lynn, Allen & Wosick, P.C.
Albuquerque, New Mexico

      *Attorneys for Defendant Dale Greffet*

Deborah D. Wells
Kennedy, Moulton & Wells, P.C
Albuquerque, New Mexico

--and--

Christina G. Retts
Struck Wieneke & Love
Chandler, Arizona

      *Attorneys for Defendants Carlos Vallejos, Arlene Hickson,*
       *and Corrections Corporation of America*