## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

CRYSTAL PEÑA,

       Plaintiff,

vs.                                 No. CIV 12-0710 JB/KBM

DALE GREFFET and CARLOS VALLEJOS,
in their individual capacities; ARLENE
HICKSON, in her individual and official
capacities; and CORRECTIONS
CORPORATION OF AMERICA,

       Defendants.

## AMENDED MEMORANDUM OPINION[1]

**THIS MATTER** comes before the Court on Vallejos' Motion to Dismiss Plaintiff's

Claims in the First Amended Complaint, filed March 18, 2013 (Doc. 32)("MTD").  The Court

held a hearing on June 20, 2013.  The primary issues are: (i) whether Plaintiff Crystal Peña has

alleged a plausible excessive force claim under the Eighth Amendment to the Constitution of the

United States of America, where she alleges that Defendant Carlos Vallejos, a correctional

officer in a facility in which she was an inmate, pushed her against a wall for refusing to answer

---

[1]The Court earlier entered an Order, filed March 31, 2014 (Doc. 73), granting Vallejos' Motion to Dismiss Plaintiff's Claims in the First Amended Complaint, filed March 18, 2013 (Doc. 32)("MTD").  The Court stated that it would, "at a later date issue a memorandum opinion more fully detailing its rationale for th[e] decision."  Order at 1 n.1.  The Memorandum Opinion and Amended Order, filed May 7, 2015 (Doc. 137), was the promised opinion, which, in addition to explaining the rationale for the Order, amended the Order.  Whereas the Order granted the MTD and dismissed both of Plaintiff Crystal Peña's claims against Defendant Carlos Vallejos, the Memorandum Opinion and Amended Order granted the MTD in part and denied it in part, dismissing Peña's claim against Vallejos under the Eighth Amendment to the Constitution of the United States of America with prejudice but leaving her battery claim against Vallejos intact.  The Court withdrew the Memorandum Opinion portion of the Memorandum Opinion and Amended Order six days after filing it, see Order Withdrawing Memorandum Opinion, filed May 13, 2015 (Doc. 142), for the purpose of fleshing out its analysis and making the changes now included in this Amended Memorandum Opinion.

his questions and for walking away from him; and (ii) whether these same allegations state a plausible claim for battery.  The Court will dismiss the Eighth Amendment claim but leave the battery claim intact.  The Eighth Amendment does not require officers to use the minimum force necessary or even reasonably proportional force, but, rather, it requires only that they refrain from "malicious and sadistic" violence, and that they direct their efforts to achieving a sincere penological end.  Hudson v. McMillian, 503 U.S. 1, 7 (1992).  There are legitimate reasons -- or at least reasons less invidious than "malic[e] and sadis[m]" -- for a prison guard to push an inmate against a wall when she refuses to answer his questions and walks away from him.  Peña's allegations are consistent with cruelty, malice, and sadism, but they do not suggest those motives, i.e., the allegations are also perfectly consistent with prison disciplinary measures that are not only legal, but normal, as well.  Peña has thus failed to nudge her allegations over the line from conceivable to plausible, and the Court will, accordingly, dismiss her claim.  Because Peña has already had one opportunity to amend her claim to add additional facts tending to show plausibility, the Court concludes that further opportunity to amend would be futile, and the Court will therefore dismiss the claims with prejudice.  As to the battery claim, however, the standard to which officers are held is more rigorous: the officer must not use any more force than he or she reasonably believes to be necessary.  Peña has alleged facts that, if combined with reasonable inferences in her favor -- e.g., that Vallejos gave Peña no advance warning or additional opportunity to stop, and that Vallejos' "slamming" was violent and severe -- give rise to a plausible inference that Vallejos used more force than he reasonably believed necessary to respond to Peña's obstinance.  The Court will therefore decline to dismiss the battery claim.

## FACTUAL BACKGROUND

The Court takes its facts from the Amended Complaint for Civil Rights Violations and Common Law Torts, filed February 28, 2013 (Doc. 30)("Complaint"), as it must at the motion-to-dismiss stage, see Smith v. United States, 561 F.3d 1090, 1098 (10th Cir. 2009)("[F]or purposes of resolving a Rule 12(b)(6) motion, we accept as true all well-pled factual allegations in a complaint and view these allegations in the light most favorable to the plaintiff." (citing Moore v. Guthrie, 438 F.3d 1036, 1039 (10th Cir. 2006))).  In July, 2009, Peña was a post-conviction prisoner at the New Mexico Women's Correctional Facility ("NMWCF").  See Complaint ¶ 3, at 1-2.  At all times material to Peña's allegations, Defendant Corrections Corporation of America ("CCA") operated and maintained the NMWCF pursuant to a contract with the State of New Mexico, and was bound to comply with certain New Mexico Corrections Department ("NMCD") policies.  Complaint ¶ 4, at 2.  CCA employed Defendant Arlene Hickson as the NMWCF's warden, and, as such, she was the head supervisor of the facility.  See Complaint ¶ 5, at 2.  During the time period throughout which the underlying conduct took place, CCA employed Vallejos and Defendant Dale Greffet as corrections officers at the NMWCF.  See Complaint ¶ 6, at 2.

The boyfriend of Peña's mother raped Peña when she was a young child on two separate occasions.  See Complaint ¶ 7, at 2.  Before the events in the Complaint, Peña had been diagnosed with debilitating mental illnesses.  See Complaint ¶ 8, at 2.  In the spring of 2009, while Peña was isolated in the NMWCF's segregation unit, Greffet befriended her and initiated, cultivated, and encouraged an intimate relationship with her contrary to CCA's and NMCD's policies and procedures.  See Complaint ¶ 9, at 2.  The claims alleged in the Complaint arise from five distinct incidences: (i) Greffet's alleged sexual abuse at the NMWCF in July/August,

2009; (ii) Greffet's alleged sexual abuse in Alamogordo, New Mexico, around Labor Day weekend, 2009; (iii) Greffet's alleged sexual abuse in Albuquerque, New Mexico, around August, 2010; (iv) Vallejos' alleged assault and battery in a hallway at the NMWCF in June, 2011; and (v) Peña's being placed and kept in segregation following her sexual abuse report in 2011.

   1.   **The July/August, 2009, Alleged Sexual Abuse at the NMWCF.**

Beginning in July of 2009, Greffet began to make advances and sexual comments to Peña about her physical appearance, which, for a period of time, Peña resisted.  See Complaint ¶¶ 10-11, at 2.  In July and August of 2009, Greffet began to sexually fondle[2] Peña.  See Complaint ¶ 12, at 3.  During the same time frame, Greffet made numerous false statements to Peña, including expressing his intent to enter into a committed relationship with her and his desire that they raise children together after her release from custody.  See Complaint ¶ 13, at 3.  Peña, relying on these statements, came to believe that Greffet was committed to a monogamous relationship with her in which the two of them would raise children.  See Complaint ¶ 14, at 3.  Peña was particularly susceptible to these advances, because of her history of sexual victimization, her diagnosed mental illnesses, and her aspiration to live a life of love and normalcy.  See Complaint ¶ 15, at 3.  At some point during late July or early August of 2009, Greffet called Peña into the commanding officer's office in front of the master control area of the NMWCF, and, sitting at the desk, revealed his erect penis to Peña, and told her to look and see

---

[2]Throughout the factual allegations in her Complaint, Peña uses terms related to sexual abuse as the Prison Rape Elimination Act of 2003, 42 U.S.C. §§ 15601-15609 ("PREA"), defines them.  Peña is not, however, contending that the PREA applies to her claims in this case.  Section 15609(11) of Title 42 of the United States Code provides: "The term 'sexual fondling' means the touching of the private body parts of another person (including the genitalia, anus, groin, breast, inner thigh, or buttocks) for the purpose of sexual gratification."  42 U.S.C. § 15609(11).

the effect that she had on him.  <u>See</u> Complaint ¶¶ 16-17, at 3.  With Peña under the desk, Greffet

orally sodomized her.  <u>See</u> Complaint ¶ 18, at 3.

      2.      **<u>The Labor Day Weekend, 2009, Alleged Sexual Abuse in Alamogordo</u>.**

On or about late August of 2009, Peña paroled to Ruidoso, New Mexico, from the

NMWCF.  <u>See</u> Complaint ¶ 19, at 4.  After Peña paroled, Greffet obtained Peña's telephone

number from Peña's aunt, who was incarcerated at the NMWCF.  <u>See</u> Complaint ¶ 20, at 3.

Greffet contacted Peña and pressured her to meet him.  <u>See</u> Complaint ¶ 20, at 3.  On Labor Day

weekend of 2009, just before Peña entered into an in-patient treatment program in Alamogordo

as a condition of her probation, Greffet rented a motel room for the two of them.  <u>See</u> Complaint

¶ 21, at 4.  During their stay in the motel room, Greffet raped[3] Peña on four occasions.  <u>See</u>

Complaint ¶ 22, at 4.  In the motel room, Peña resisted Greffet's efforts to orally and anally

sodomize her, but relented when Greffet persisted.  <u>See</u> Complaint ¶ 23, at 4.

On or about October of 2009, Peña's parole was revoked, and she returned to the

NMWCF, where Greffet continued to work.  <u>See</u> Complaint ¶ 24, at 4.  After returning from

parole, Greffet continued to falsely state his commitment to Peña and his intent to raise children

---

[3]The PREA defines rape as:

    **(A)**    the carnal knowledge, oral sodomy, sexual assault with an object, or sexual fondling of a person, forcibly or against that person's will;

    **(B)**    the carnal knowledge, oral sodomy, sexual assault with an object, or sexual fondling of a person not forcibly or against the person's will, where the victim is incapable of giving consent because of his or her youth or his or her temporary or permanent mental or physical incapacity; or

    **(C)**    the carnal knowledge, oral sodomy, sexual assault with an object, or sexual fondling of a person achieved through the exploitation of the fear or threat of physical violence or bodily injury.

42 U.S.C. § 15609(9).

with her, to make sexual advances toward her, and to sexually fondle her.  See Complaint ¶ 25, at 4.  On or around April of 2010, Greffet left his position at the NMWCF.  Before he left, however, Greffet again expressed his plans to live with Peña and to raise children with her.  See Complaint ¶ 26, at 4.

### 3. The August, 2010, Alleged Sexual Abuse in Albuquerque.

On or about August of 2010, the NMWCF again released Peña on probation.  A condition of her probation was that she enroll in an in-patient treatment program for her mental health.  See Complaint ¶ 27, at 4.  Peña reported to and tried to qualify for the Maya's Place treatment program in Albuquerque.  See Complaint ¶ 28, at 4.  During this time frame, Greffet raped Peña on three occasions, again notwithstanding her resistance to anal sodomy.  See Complaint ¶ 29, at 4.  Greffet conceived a child with Peña during this time frame.  See Complaint ¶ 29, at 4.  Eventually, Maya's Place rejected Peña because, as she suffered from mental illness rather than drug dependence, she did not fit the program's criteria for admittance.  See Complaint ¶ 30, at 5.

Because she was unable to enter a treatment program and thereby satisfy her condition of probation, Peña turned herself into law enforcement in September of 2010.  See Complaint ¶ 31, at 5.  As she was surrendering to authorities, Peña fainted, was taken to the emergency room, and learned for the first time that she was pregnant.  See Complaint ¶ 33, at 5.  Greffet promised to bond her out from Doña Ana County Detention Center in Las Cruces, New Mexico, where she would be held, but never did so.  See Complaint ¶¶ 32, 36, at 5.  The next day, from jail, Peña told Greffet that she was pregnant.  See Complaint ¶ 34, at 5.  Greffet thought that aborting the baby was the best option, and, accordingly, Peña and the Doña Ana County Detention Center made arrangements for the abortion.  See Complaint ¶¶ 34-35, at 5.  Peña could not go through with the abortion, however, and returned to jail with the baby still in utero.  See Complaint

¶¶ 34-35, at 5.  Eventually, Peña realized that Greffet was not going to bond her and that she was going to have to deliver the child in jail.  See Complaint ¶ 36, at 5.  She discussed with Greffet how to care for the child during the child's first months of life, when she would still be incarcerated.  See Complaint ¶ 36, at 5.  Greffet said he would not care for the baby and that adoption was the best option.  See Complaint ¶ 37, at 5.  Before giving birth, and in large part because of her inability to find someone to care for the baby while she remained in prison, Peña felt compelled to relinquish her parental rights.  See Complaint ¶ 38, at 6.  She gave birth to her son on May 2, 2011, while incarcerated at the NMWCF.  See Complaint ¶ 39, at 6.

4.      **Vallejos' Alleged Assault and Battery.**

On or around early June of 2011, Peña was suffering from postpartum depression, in addition to her other mental illnesses, and was grieving her estrangement from her son in the NMWCF's hallway.  See Complaint ¶ 40, at 6.  Vallejos verbally engaged Peña in the hallway, asking her what was wrong.  See Complaint ¶ 41, at 6.  Peña was despondent and traumatized, and did not have the will or the desire to explain to Vallejos her predicament or her feelings; she continued to walk toward her unit, where she intended to contact mental health for immediate mental health treatment.  See Complaint ¶ 42, at 6.  When Peña failed to respond to Vallejos' questioning, he pursued her down the hallway, grabbed her from behind and slammed her against the wall of the hallway, causing bruising to her arms and triggering severe symptoms of chronic post-traumatic stress disorder.  See Complaint ¶ 43-44, at 6.  Because of Vallejos' battery of Peña and his mistreatment of other inmates at the facility, CCA removed him from his position at the NMWCF.  See Complaint ¶ 42, at 6.

5. **The Alleged Retaliation Against Peña.**

CCA and Hickson placed Peña in isolated/segregated confinement in response to the incident with Vallejos. See Complaint ¶ 47, at 7. While Peña was in segregation at the NMWCF, CCA and Hickson learned that she was accusing Greffet of raping her; they pressured her to provide them with a statement about the incident. See Complaint ¶ 48, at 7. When Peña refused to provide them with a statement about Greffet, and when it became clear that she was also accusing Vallejos of assault and battery, CCA and Hickson kept her in varying levels of segregated confinement for a period of approximately eight months, in violation of CCA's and NMCD's policies. See Complaint ¶ 49, at 7. Her placement in segregated confinement severely aggravated her fragile mental condition, prevented her from contacting the outside world, including her mother and her son's adoptive parents, and caused her to lose good time and to remain incarcerated for a longer period of time, resulting in severe mental and emotional distress. See Complaint ¶ 50, at 7.

## PROCEDURAL BACKGROUND

The Court will first describe Peña's claims. It will then outline the relevant prior procedural history in this case. Last, the Court will summarize the parties' arguments in their briefing and at the hearing on the MTD.

1. **Peña's Claims.**

Peña brings this action against Greffet and Vallejos in their individual capacities, against Hickson in her individual and official capacity, and against CCA pursuant to 42 U.S.C. § 1983, for their alleged violation of her civil rights arising under the Fourth, Eighth, and Fourteenth Amendments to Constitution. See Complaint at 1. In Count I, Peña alleges that Greffet sexually fondled her while she was incarcerated in the NMWCF, and orally sodomized her in the

NMWCF, in violation of her Eighth Amendment right to be free from cruel and unusual punishment, "including the right to be secure in her bodily integrity and free from sexual advances, sexual fondling, sexual intercourse, anal sodomy, and oral sodomy by prison personnel." Complaint ¶ 52, at 7-8. Peña alleges that Greffet's sexual fondling, sodomy, and rapes proximately caused her damages and injuries, and she requests the Court grant "compensatory and punitive damages against Defendant Greffet, together with all costs and attorney's fees." Complaint ¶ 57, at 8.

In Count II, Peña alleges that Vallejos' conduct in "grabbing Plaintiff and slamming her against a wall" violated her Eighth Amendment right to be free from cruel and unusual punishment, and to be free from "unreasonable, unnecessary, and excessive force . . . ." Complaint ¶ 60, at 9. Peña asserts that Vallejos' use of "unreasonable, unnecessary, and excessive force against Plaintiff was intentional, malicious, sadistic, willful, wanton, obdurate, and in gross and reckless disregard for Plaintiff's constitutional rights." Complaint ¶ 61, at 9. She requests the same relief in Count II that she does in Count I. See Complaint ¶ 64, at 9.

In Count III, Peña alleges that CCA and Hickson violated her Eighth and Fourteenth Amendment rights to be free from exposure to "unreasonable risks of harm or from exercising deliberate indifference toward her safety, security, and constitutional rights," because CCA and Hickson "engaged in a custom of suppressing, denying or disregarding incidents of prison rape . . . ." Complaint ¶¶ 66-67, at 10. The incidents of rape are alleged to include: (i) placing inmates who reported sexual or other staff misconduct in segregation, or otherwise retaliating against them; (ii) violating internal and NMCD policies by failing to report allegations of prison rape to outside law enforcement; (iii) failing to conduct adequate internal investigations of rape allegations; and (iv) offering financial incentives for non-reporting. See Complaint ¶ 67, at 10.

She requests the same relief in Count III that she does in Counts I and II.  See Complaint ¶ 69, at 10.

In Count IV, Peña alleges that CCA and Hickson violated her First Amendment right to be free from retaliation for reporting sexual or physical assaults by prison officers, her Eighth Amendment right to be free from cruel and unusual punishment, her Fourteenth Amendment right to procedural due process, and CCA and NMCD policies, when they placed and kept Peña in "segregated confinement following her reporting of Defendant Greffet's rapes and Carlos Vallejos' assault."  Complaint ¶¶ 71-72, at 11.  She requests the same relief in Count IV that she does in the other Counts.  See Complaint ¶ 75, at 11.

In Count V, Peña alleges that Greffet is liable for the intentional torts of battery and rape for his rapes of Peña in Alamogordo and in Albuquerque when she "lacked the capacity to consent thereto[, and i]n any case, . . . did not consent to the sex."  Complaint ¶¶ 77, at 12.  Peña alleges that CCA is legally liable under New Mexico law for Greffet's tortious conduct under the doctrine of respondeat superior, as Peña "was directly informed and/or had reason to believe that Defendant Greffet was an agent and employee of" CCA.  Complaint ¶¶ 80-81, at 12.  She seeks the same relief in Count V as in the other Counts.  See Complaint ¶ 81, at 12.

In Count VI, Peña alleges that Vallejos, in "violently grabbing [her] and slamming her against the wall," committed an intentional offensive touching to Peña's person, and Vallejos is thus liable for the intentional tort of battery.  Complaint ¶¶ 83, at 13.  Peña alleges that CCA is also liable for this intentional tort of Vallejos under the respondeat superior theory, as he was acting as CCA's agent and employee at all material times.  See Complaint ¶¶ 87-88, at 13.  She seeks the same relief in Count VI as in the other claims.  See Complaint ¶ 88, at 13.

2.      **The Court's Prior Dismissals and Peña's Subsequent Amendments to Her Original Complaint.**

The presently operative Complaint is not the original complaint, but, rather, the first amended complaint.   The original Complaint for Civil Rights Violations and Common Law Torts, filed June 29, 2012 (Doc. 1)("Original Complaint"), alleged the same basic story and all the same claims, but contained fewer factual allegations regarding Vallejos' alleged misconduct. Compare Original Complaint ¶¶ 40-42, at 6 (setting forth the facts of the Peña-Vallejos hallway encounter, and alleging only that "[w]hen [Peña] failed to respond to a question by the . . . Vallejos, he grabbed her and slammed her against the wall of the hallway"), with Complaint ¶¶ 40-46, at 6-7 (alleging those facts, and additionally specifying that Vallejos' question regarded "what was wrong" -- i.e., why she seemed sad -- and that the reason Peña did not respond was because she "was despondent and traumatized").   The Defendants -- other than Greffet -- moved to dismiss, see CCA, Hickson and Vallejos' Motion to Dismiss, filed September 24, 2012 (Doc. 10)("Earlier MTD"), and the Court granted the Earlier MTD in part and dismissed several claims without prejudice, see Memorandum Opinion and Order at 111-12, filed January 28, 2013 (Doc. 22)("MOO").   Most relevant here, the Court dismissed both claims against Vallejos -- Counts II and VI -- because Peña failed to plead them with the requisite specificity.  See MOO at 62, 94, 97, 111-12.

The Original Complaint had alleged only the following facts regarding the hallway encounter between Peña and Vallejos:

40.      On or around early June of 2011, Plaintiff was suffering from postpartum depression, in addition to her other mental illnesses, and was grieving her estrangement from her son in the the hallway of the NMWCF.

41.      When Plaintiff failed to respond to a question by the Corporation's Chief of Security, Defendant Carlos Vallejos, he grabbed her and slammed her

- 11 -

> against the wall of the hallway, causing bruising to her arms, and triggering
> severe symptoms of Plaintiff's chronic PTSD.
>
>         42.     Upon information and belief, because of Mr. Vallejos' battery of
> Plaintiff and his mistreatment of other inmates at the facility, the Corporation
> removed him from his position at the NMWCF.

Original Complaint ¶¶ 40-42, at 6.  The Court ruled that Peña failed "to provide the Court with

sufficient, non-conclusory, factual allegations to support the reasonable inference that Vallejos

violated her civil rights and committed a civil battery against her," MOO at 62, and that

"conclusory recitations of the elements of a § 1983 claim for excessive force are not-well

pleaded factual allegations," MOO at 94.  The Court stated:

> In light of Pena's factual allegation that she failed to answer Vallejos' question, it
> is just as possible that Vallejos interpreted her failure, however that failure played
> out factually, as requiring a response from him to maintain or restore discipline.
> If such a possibility is true, Vallejos' conduct would have been constitutional.

MOO at 94.  The Court ruled that, "[t]o impose liability . . . without any factual allegations

regarding the circumstances of . . . Peña's resist[ance to] . . . complying with Vallejos' direction

to answer his questions, would be close to imposing strict liability upon corrections officers

dealing with inmates."  MOO at 97.  The Court, thus, dismissed the two claims against Vallejos

without prejudice to Peña amending the Original Complaint to flesh out the allegations.  See

MOO at 111-12.

        In response to the MOO, Peña filed[4] her current Complaint, which now contains the

following allegations relating the hallway incident between her and Vallejos:

---

[4]It does not appear that Peña's filing of the Complaint was entirely proper.  More than
twenty-one days passed between the Earlier MTD's filing and the Complaint's filing, and,
because the Earlier MTD is "a motion under Rule 12(b)" attacking the Original Complaint, Peña
was required to obtain either "the opposing party's written consent or the court's leave" to file
her new Complaint.  Fed. R. Civ. P. 15(a)(1)-(2).  A dismissal without prejudice does not entail
automatic leave from the Court to file an amended complaint -- unless the court's opinion
specifically grants such leave.  See Callen v. Wyo. Dep't of Corr., No. CIV 14-8057, 2015 WL

40.     On or around early June of 2011, Plaintiff was suffering from postpartum depression, in addition to her other mental illnesses, and was grieving her estrangement from her son as she walked down a hallway of the NMWCF. She was visibly upset.

---

1404254, at *3 (10th Cir. Mar. 30, 2015)(unpublished)(Briscoe, C.J.)(modifying a district court's dismissal with prejudice to one without prejudice and noting that the change would "allow [the plaintiff] an opportunity to seek leave to amend with regard to those claims that were dismissed").  If the plaintiff cannot obtain the defendant's consent, then he or she must generally file a separate motion seeking leave the Court's leave; the plaintiff must attach a copy of the proposed amended complaint to this motion.  See D.N.M.LR-Civ. 15.1 ("A proposed amendment to a pleading must accompany the motion to amend.").  If the rule were otherwise, and the plaintiff could amend his or her complaint as a matter of right after a dismissal without prejudice, then the plaintiff could effectively skirt rule 15(a)(2)'s procedural protections -- for example, by adding entirely new claims whose late inclusion prejudices the defendant -- whenever the Court dismisses one of his or her claims without prejudice.  See Fed. R. Civ. P. 15(a)(1) (restricting amendment as a matter of right to specific situations, not including the plaintiff's attempt to rectify a claim dismissed without prejudice).  Furthermore, when the Court has dismissed a claim without prejudice and the plaintiff wishes to reassert it, the general procedure is to screen the claim at the point at which it is reasserted -- i.e., when the plaintiff files a motion requesting leave to amend -- and deny leave to amend on the grounds of futility if the claim still fails to satisfy rule 12(b)(6).  See Attakora v. Dist. of Columbia, 951 F. Supp. 2d 179, 184-86 (D.D.C. 2013).  This procedure is preferable to uncritically permitting the amendment and then analyzing only upon motion to dismiss, because it avoids the situation where a plaintiff ends up filing multiple iterations of his or her complaint trying to correctly plead a claim, and the defendant has to answer or move to dismiss each successive pleading.

Peña never obtained leave from the Court to amend her Original Complaint, which was required despite the Court's implicit indication -- which it gave by dismissing the claims without prejudice -- that it would be willing to consider a motion for leave to amend.  See MOO at 111-12.  Basically, the battle that the Defendants are now fighting by way of the MTD should have been fought by way of a motion to amend from Peña.  All the same arguments that the Defendants make in the MTD would go towards establishing futility -- i.e., that the amendment, if granted, would still fail to state a claim under rule 12(b)(6) -- and the Defendants would, additionally, be able to make arguments on the grounds of timeliness, bad faith, or prejudice. See Duran v. Woolever, No. CIV 13-0390 JB/LAM, 2014 WL 6634088, at *5-6 (D.N.M. Nov. 11, 2014)(Browning, J.); McDaniel v. Loya, No. CIV 14-0511 JB/SCY, 2015 WL 1323506, at *16 (D.N.M. Mar. 6, 2015)(Browning, J.)("'A determination that a proposed [amendment] is futile is made under the same standards that govern a motion to dismiss under Rule 12(b)(6).'" (quoting Ganthier v. N. Shore-Long Island Jewish Health Sys., 298 F. Supp. 2d 342, 349 (E.D.N.Y. 2004))).  The Defendants have waived this argument, however, by failing to call the Court's attention to it and filing both a responsive pleading, see Defendant Hickson and CCA's Answer to Plaintiff's Complaint, filed March 18, 2013 (Doc. 33), and a motion, see MTD, relating to the new Complaint.  The MTD even incorrectly states that Peña "was given leave to amend her [Earlier] Complaint to cure the deficiencies." MTD at 1.

41.    Defendant Carlos Vallejos verbally engaged Plaintiff in the hallway, asking her what was wrong.

42.    Plaintiff was despondent and traumatized and did not have the will or the desire to explain to Defendant Vallejos her predicament or her feelings; she continued to walk toward her unit, where she intended to contact mental health for immediate mental health treatment.

43.    After Plaintiff failed to respond his questioning, Defendant Carlos Vallejos pursued her down the hallway, grabbed her from behind and slammed her against the wall of the hallway, causing bruising to her arms, and triggering severe symptoms of Plaintiff's chronic PTSD.

44.    Before Defendant Vallejos grabbed Plaintiff and slammed her against the wall, Plaintiff had not said anything to Defendant Vallejos and had not physically challenged or threatened him or anyone else.  She was simply walking away from him, on the path to her unit, where she hoped to obtain immediate mental health treatment.

45.    Defendant Vallejos' use of force against Plaintiff did not serve any penological interest, and violated the Corporation's and the New Mexico Corrections Department's policies on use of force.

46.    Upon information and belief, because of Mr. Vallejos' battery of Plaintiff and his mistreatment of other inmates at the facility, the Corporation removed him from his position at the NMWCF.

Complaint ¶¶ 40-46, at 6-7.

**3.    The Briefing and Hearing on the MTD.**

Vallejos moves the Court to dismiss Counts II and VI -- the same claims that the Court

dismissed without prejudice in its MOO.  See MTD at 3-6.  As to Count II, the Eighth

Amendment claim, Vallejos argues:

The Eighth Amendment prohibits unnecessary and wanton infliction of pain against prisoners.  Hudson v. McMillian, 503 U.S. 1, 5 (1992); Whitley v. Albers, 475 U.S. 312 (1986).  Whether conduct involves an unnecessary and wanton infliction of pain depends on "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm."  Hudson v. McMillian, 503 U.S. at 7.  Relevant factors include the need for application of force, the relationship between the need for force and the amount used, and the extent of any resulting injury.  Whitley v. Albers, 475 U.S.

at 321.  Although the harm need not be significant, the level of force used must be more than *de minimus* [sic].  Hudson v. McMillian, 503 U.S. at 9-10.

The "new" abbreviated "facts" added by Plaintiff do not support an Eighth Amendment claim against Vallejos.  As with the first Complaint, the "facts" are still largely recitations of the causes of actions.  What new facts that are added relate to the subjective thoughts of Plaintiff, which were unknown and not verbalized to Vallejos.  An Eighth Amendment claim does not turn upon the mental state of the inmate who claims that force was used against them, nor could it as Vallejos cannot be a mind-reader.  There are no new facts set forth in Plaintiff's Complaint related to an improper motive on behalf of Vallejos.  Plaintiff's "facts" do not establish that Vallejos acted maliciously or sadistically.  Instead, as with the first Complaint, they still establish that she initially failed to respond to a question, apparently continued to not respond to "questioning", and walked away from Vallejos when he was questioning her in a manner that required her to stop.  The elements of this claim require a finding that the force was used in a good-faith effort to maintain or restore discipline and Plaintiff must provide facts sufficient to overcome this.  Instead of doing so, Plaintiff's new "facts" still show that she was subverting prison regulations and order.  They still lead to the conclusion that her failures to respond, and subsequent actions, lead Vallejos to conclude that he was required to act to maintain prison discipline and order.

MTD at 4-5.  Vallejos also argues that Peña's injuries are *de minimis* for Eighth Amendment purposes.  See MTD at 5.  Vallejos also moves the Court to dismiss Count VI -- the battery claim -- arguing that the "'new' facts related to her mental state and unexpressed intentions are irrelevant," and that her allegations amount to legal conclusions, rather than facts.  MTD at 6.

Peña responded to the MTD roughly three weeks later.  See Plaintiff's Response to Defendant's Second Motion to Dismiss, filed April 8, 2013 (Doc. 41)("Response").  She states that, in the new Complaint, she "describes all that was knowable to her about Vallejos' use of force against her."  Response at 1.  Peña argues that the Court can draw the following inferential chain from the Complaint's new allegations:

[a]     that prior to using force against her, Vallejos could see that Plaintiff was upset;

[b]     Vallejos repeatedly asked Plaintiff "what was wrong" as she walked past him in the hallway;

- 15 -

> [c]     no person in Plaintiff's position would have felt comfortable sharing the honest answer to Vallejos' "what's wrong" question at that time; what was "wrong" with Ms. Peña as she walked down the hall on that was that she suffered from debilitating mental illnesses and a history of being violently raped as a child, had been impregnated by one of Vallejos' former co-workers, who she thought loved her, but who refused to take care of their child after birth, thus forcing Plaintiff to relinquish her parental rights;
>
> [d]     moreover, an honest answer to Vallejos' question would have exposed Plaintiff to the very retaliation that she alleges was later exacted against her by agents of the Corporation;
>
> [e]     because Plaintiff walked past him without answering his personal question, and not because of any perceived penological need, Vallejos grabbed Plaintiff from behind and slammed her against the wall of the hallway;
>
> [f]     Vallejos' use of force violated the policies of Corrections Corporation of America and the New Mexico Corrections Department; and
>
> [g]     Corrections Corporation of America fired Vallejos from his job at the prison in part because of his misuse of force in this instance.

Response at 4-5 (citations to the Complaint omitted).

Peña further argues that the Supreme Court has rejected any *de minimis* injury requirement in Eighth Amendment excessive force cases, <u>see</u> Response at 5-6, instead setting forth a *de minimis* force requirement, <u>see</u> Response at 6.  Peña then covers her bases by stating that, even if it were necessary for her to demonstrate non-*de minimis* injury, the Tenth Circuit has explicitly held that post-traumatic stress disorder is a more-than-*de minimis* injury.  <u>See</u> Response at 7-8 (citing <u>Fuerschbach v. Sw. Airlines Co.</u>, 439 F.3d 1197, 1206 (10th Cir. 2006)).  Last, Peña requests that, if the Court dismisses her claim, it do so without prejudice to her seeking the Court's leave to amend her Complaint once more.  <u>See</u> Response at 8.

Vallejos replied to the Response three days later.  <u>See</u> Vallejos' Reply in Support of Motion to Dismiss Plaintiff's Claims in the First Amended Complaint, filed April 11, 2013

(Doc. 45)("Reply").  He argues that "[t]he focus of an excessive force and battery claim is not on the facts known to the Plaintiff, but on the facts known to Vallejos."  Reply at 2.  He states:

> Stripping away the new information that was not known to Vallejos, Plaintiff's allegations set forth the following sequence: that Plaintiff was "visibly upset" (no further details), that Vallejos verbally engaged her, that she did not respond, that she kept walking, and that Vallejos used physical force to stop her, and she sustained a bruise to her arm.  She then alleges, in conclusory fashion, that Vallejos' actions were against CCA and NMCD's policies and procedures on use of force and were not in furtherance of legitimate penological interests.  None of the content of the policies or procedures is cited, and even if they were, purported violations of policy are not necessarily equivalent to violation of constitutional rights.

Reply at 2-3.  Vallejos contends that "[t]he crux of [Peña's] argument seems to be that inmates should be allowed a 'pass,' when they are upset, to disregard what correctional officers do or say, in favor of what the inmate thinks is best and regardless of the inmate's prior institutional history."  Reply at 3.  Vallejos argues that "[s]uch a proposition does not further [a] legitimate penological interest, or further the goal of maintenance of the security and orderly operation of the facility," but that, "[t]o the contrary, it encourages dysfunction, disorder, and a subjective standard whereby the inmate's state of mind dictates how a correctional officer can respond to an overt act of failure to follow prison rules and regulations."  Reply at 3.  Vallejos further states that Peña mischaracterizes his arguments vis-à-vis *de minimis* injury: he acknowledges that *de minimis* injury can still make out an Eighth Amendment claim, but contends that the force used must be more than *de minimis*; he further asserts that "allegations of a psychological nature are unhelpful in evaluating the level of force[,] . . . because purported psychological distress does not necessarily bear any relationship to the amount and extent of force used."  Reply at 4-5.

The Court held a hearing on the MTD on June 20, 2013.  See Transcript of Hearing (taken June 20, 2013)("Tr.").[5]  In defending her claims against Vallejos, Peña focused heavily on the language she added to the Complaint specifying that she was "visibly upset."  Tr. at 12:3-8 (Court, Fine).  She noted that Vallejos might have some justification for using the force that he did if she was walking down the hall with an object that could be mistaken for a weapon in her hand, but that merely looking sad does not warrant violence.  See Tr. at 12:12-22 (Fine).  The Court asked whether Vallejos was entitled to check on an upset prisoner, and Peña responded that, while Vallejos may have that right in some circumstances, this case is "not a situation where she's screaming or throwing her arm[s] up . . . or . . . making violent ge[stures].  She's very upset because she has some very difficult things that she's going through at the time."  Tr. at 14:14-18 (Fine).  The Court tried to pin Peña down on exactly what a prison guard should be allowed to do to a prisoner who appears agitated and upset, and ignores verbal commands or questions, and Peña relied on the MTD's legal posture -- i.e., that she should get all reasonable inferences in her favor at this stage -- rather than staking out a definite position.  See Tr. at 16:8-24 (Court, Fine)("THE COURT:  You can't use excessive for[ce] maybe, but you probably can grab them and you probably can put them up against a wall.  MR. FINE:  I would disagree with that, and I would again argue that that would be an inference [to which Peña is entitled] at this stage.").  Peña also pointed out that Vallejos was fired for mistreating inmates, in part stemming from this incident.  See Tr. at 17:16-18:9 (Fine).  Last, she stated that "there are a lot of things that [Vallejos] could have . . . done" short of slamming Peña against a wall, like "physically go[ing] around and g[etting] in front of her and try[ing] to stop[] her."  Tr. at 22:14-19 (Fine).

---

[5]The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version.  Any final version may contain slightly different page and/or line numbers.

Vallejos talked very little at the hearing; he generally agreed with the analysis that the Court set forth in its questions to Peña -- adding only that, to the extent that state of mind is important to the analysis, the focus is on Vallejos' state of mind, and not on Peña's -- and otherwise limited his argument to encouraging the Court to deny Peña leave to amend her Complaint.  See Tr. at 29:11-31:22 (Retts).  He did not argue that Peña had plead all relevant facts and that opportunity to amend would be futile, but, rather, he argued the opposite:

> Your Honor, as to additional information that the plaintiff could have included, I think there's a lot of additional information that would -- that is in her possession and that would go to Vallejos' subjective state of mind.  Not getting into his head but providing circumstantial evidence that could relate to the claim. Examples what size of bruise did Ms. Pena receive?  You know was it the size of a pencil eraser.  What level inmate was she at the time?  Was she level one was she a level two level three.  If she has a level three she has more restrictions placed upon her. . . .  There are different penal logical interests involved with n an inmate that's refuse to follow directives during a closed movements as opposed to an open movement.  What was her prior disciplinary history.  This is certainly something that is within her possession.  Was this disciplinary history . . . unknown to Vallejos?  Those are things that can be considered, I believe, in l[ooking] at the . . . excessive force claim.  Did she receive disciplinary sanctions as a result of this incident?  Did she plead guilty?  Was she found guilty after a hearing?  All facts that relate to this within the . . . possession of the plaintiff, bu[t] not included within the Complaint.

Tr. at 29:24-30:20 (Retts).  Before adjourning the hearing, the Court indicated that it was inclined to dismiss the two claims, see Tr. at 32:1-5 (Court), and, a little over eight months later, it entered an Order, filed March 31, 2014 (Doc. 73), granting the MTD and dismissing both claims.

## LAW REGARDING RULE 12(b)(6)

Rule 12(b)(6) authorizes a court to dismiss a complaint for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  "The nature of a Rule 12(b)(6) motion tests the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true."  Mobley v. McCormick, 40 F.3d 337, 340 (10th Cir. 1994).  The sufficiency

- 19 -

of a complaint is a question of law, and when considering a rule 12(b)(6) motion, a court must accept as true all well-pled factual allegations in the complaint, view those allegations in the light most favorable to the non-moving party, and draw all reasonable inferences in the plaintiff's favor.  See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007)("[O]nly if a reasonable person could not draw . . . an inference [of plausibility] from the alleged facts would the defendant prevail on a motion to dismiss."); Smith v. United States, 561 F.3d 1090, 1098 (10th Cir. 2009)("[F]or purposes of resolving a Rule 12(b)(6) motion, we accept as true all well-pled factual allegations in a complaint and view these allegations in the light most favorable to the plaintiff."  (citing Moore v. Guthrie, 438 F.3d 1036, 1039 (10th Cir. 2006))).

A complaint need not set forth detailed factual allegations, yet a "pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action" is insufficient.  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)(citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  Ashcroft v. Iqbal, 556 U.S. at 678.  "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."  Bell Atl. Corp v. Twombly, 550 U.S. at 555 (citation omitted).

To survive a motion to dismiss, a plaintiff's complaint must contain sufficient facts that, if assumed to be true, state a claim to relief that is plausible on its face.  See Bell Atl. Corp. v. Twombly, 550 U.S. at 570; Mink v. Knox, 613 F.3d 995, 1000 (10th Cir. 2010).  "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Ashcroft v. Iqbal, 556 U.S. at 678 (citing Bell Atl. Corp. v. Twombly, 550 U.S. at 556).  "Thus, the mere metaphysical

possibility that some plaintiff could prove some set of facts in support of the pleaded claims is insufficient; the complainant must give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual support for these claims."  Ridge at Red Hawk, LLC v. Schneider, 493 F.3d 1174, 1177 (10th Cir. 2007)(emphasis omitted).  The Tenth Circuit has stated:

> "[P]lausibility" in this context must refer to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs "have not nudged their claims across the line from conceivable to plausible."  The allegations must be enough that, if assumed to be true, the plaintiff plausibly (not just speculatively) has a claim for relief.

Robbins v. Oklahoma, 519 F.3d 1242, 1247 (10th Cir. 2008)(quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 570)(citations omitted).

Although affirmative defenses must generally be pled in the defendant's answer, not argued on a motion to dismiss, see Fed. R. Civ. P. 8(c), there are exceptions where: (i) the defendant asserts an immunity defense -- the courts handle these cases differently than other motions to dismiss, see Glover v. Gartman, 899 F. Supp. 2d 1115, 1137-39, 1141 (D.N.M. 2012)(Browning, J.)(citing Pearson v. Callahan, 555 U.S. 223 (2009); Robbins v. Oklahoma, 519 F.3d 1242 (10th Cir. 2008)); and (ii) where the facts establishing the affirmative defense are apparent on the face of the complaint, see Miller v. Shell Oil Co., 345 F.2d 891, 893 (10th Cir. 1965)("Under Rule 12(b), a defendant may raise an affirmative defense by a motion to dismiss for the failure to state a claim.  If the defense appears plainly on the face of the complaint itself, the motion may be disposed of under this rule.").  The defense of limitations is the affirmative defense most likely to be established by the uncontroverted facts in the complaint.  See 5 Charles Alan Wright, Arthur R. Miller, Mary Kay Kane, Richard L. Marcus & Adam N. Steinman, Federal Practice & Procedure: Civil § 1277 (3d ed. 2014).  If the complaint sets forth dates that

appear, in the first instance, to fall outside of the statutory limitations period, then the defendant may move for dismissal under rule 12(b)(6).  See Rohner v. Union Pac. R.R. Co., 225 F.2d 272, 273-75 (10th Cir. 1955); Gossard v. Gossard, 149 F.2d 111, 113 (10th Cir. 1945); Andrew v. Schlumberger Tech. Co., 808 F. Supp. 2d 1288, 1292 (D.N.M. 2011)(Browning, J.).  The plaintiff may counter this motion with an assertion that a different statute of limitations or an equitable tolling doctrine applies to bring the suit within the statute; the Tenth Circuit has not clarified whether this assertion must be pled with supporting facts in the complaint or may be merely argued in response to the motion.  Cf. Kincheloe v. Farmer, 214 F.2d 604 (7th Cir. 1954)(holding that, once a plaintiff has pled facts in the complaint indicating that the statute of limitations is a complete or partial bar to an action, it is incumbent upon the plaintiff to plead, either in the complaint or in amendments to it, facts establishing an exception to the affirmative defense).  It appears, from case law in several circuits, that the plaintiff may avoid this problem altogether -- at least at the motion-to-dismiss stage -- by simply refraining from pleading specific or identifiable dates, see Goodman v. Praxair, Inc., 494 F.3d 458, 465-66 (4th Cir. 2007); Hollander v. Brown, 457 F.3d 688, 691 n.1 (7th Cir. 2006); Harris v. New York, 186 F.3d 243, 251 (2d Cir. 1999); Honeycutt v. Mitchell, No. CIV 08-0140 W, 2008 WL 3833472 (W.D. Okla. Aug. 15, 2008)(West, J.), and, although the Tenth Circuit has not squarely addressed this practice, the Court has permitted it, see Anderson Living Trust v. WPX Energy Prod., LLC, 27 F. Supp. 3d 1188, 1235-36 (D.N.M. 2014)(Browning, J.).

## LAW REGARDING THE EIGHTH AMENDMENT

When a prisoner is incarcerated after being indicted, the Eighth Amendment protects him from "a prison official's 'deliberate indifference' to a substantial risk of serious harm," as well as the intentional use of excessive force.  Farmer v. Brennan, 511 U.S. 825, 828 (1994).  "[N]either

prison officials nor municipalities can absolutely guarantee the safety of their prisoners," but "[t]hey are . . . responsible for taking reasonable measures to insure the safety of inmates." Lopez v. LeMaster, 172 F.3d 756, 759 (10th Cir. 1999).   An official violates the Eighth Amendment when two elements are met: (i) the official causes an injury that, objectively, is "sufficiently serious," i.e., an injury that equates to the "denial of the minimal civilized measure of life's necessities"; and (ii) the official has a "sufficiently culpable state of mind."   Farmer v. Brennan, 511 U.S. at 834 (internal quotation marks omitted).   The second condition represents the functional application of the deliberate indifference standard.   See Smith v. Cummings, 445 F.3d 1254, 1258 (10th Cir. 2006)("To establish a cognizable Eighth Amendment claim for failure to protect [an inmate from harm], the plaintiff must show that he is incarcerated under conditions posing a substantial risk of serious harm[,] the objective component, and that the prison official was deliberately indifferent to his safety, the subjective component."   (quoting Verdecia v. Adams, 327 F.3d 1171, 1175 (10th Cir. 2003))).

Analyzing whether the plaintiff has satisfied the first element, the objective element, "requires more than a scientific and statistical inquiry into the seriousness of the potential harm and the likelihood that such an injury to health will actually be caused."   Helling v. McKinney, 509 U.S. 25, 36 (1993).   Courts should also consider "whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose anyone unwillingly to such a risk."   Helling v. McKinney, 509 U.S. at 36 (emphasis in original). "In other words, the prisoner must show that the risk of which he complains is not one that today's society chooses to tolerate."   Helling v. McKinney, 509 U.S. at 36.   The Eighth Amendment does not protect against "de minimis uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind."   Hudson v. McMillian, 503 U.S.

1, 9-10 (1992)(internal quotation marks omitted)("That is not to say that every malevolent touch by a prison guard gives rise to a federal cause of action.").  The Tenth Circuit has noted that, "in Hudson, the Supreme Court evidenced its 'commit[ment] to an Eighth Amendment which protects against cruel and unusual force, not merely cruel and unusual force that results in sufficient injury.'"  United States v. LaVallee, 439 F.3d 670, 688 (10th Cir. 2006).  Were it otherwise, the Tenth Circuit reasoned, "a prisoner could constitutionally be attacked for the sole purpose of causing pain as long as the blows were inflicted in a manner that resulted in visible (or palpable or diagnosable) injuries that were de minimis."  United States v. LaVallee, 439 F.3d at 688.  See also Hudson v. McMillian, 503 U.S. at 13 (Blackmun, J., concurring)("The Court today appropriately puts to rest a seriously misguided view that pain inflicted by an excessive use of force is actionable under the Eighth Amendment only when coupled with 'significant injury,' e.g., injury that requires medical attention or leaves permanent marks.").  Thus, to establish excessive force in violation of the Eight Amendment, the plaintiff need not establish that he or she "suffered a certain level or type of injury."  United States v. LaVallee, 439 F.3d at 688.

Where a security measure involving the use of force is undertaken to resolve a prison disturbance, the Supreme Court has held that "the question whether the measure taken inflicted unnecessary and wanton pain and suffering [in violation of the Eighth Amendment] ultimately turns on 'whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.'"  Whitley v. Albers, 475 U.S. 312, 320-21 (1986)(quoting Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir. 1973)).  In a court's inquiry whether the use of force to resolve the disturbance violates the Eighth Amendment under this standard, "such factors as the need for the application of force, the relationship between the

need and the amount of force that was used, and the extent of injury inflicted, are relevant to that ultimate determination." Whitley v. Albers, 475 U.S. at 321 (alterations omitted)(internal quotation marks omitted)(quoting Albers v. Whitley, 546 F. Supp. 726, 733 (D. Or. 1982)). These factors may be used to draw inferences whether the use of force "could plausibly have been thought necessary, or instead evinced such wantonness with respect to unjustified infliction of harm as is tantamount to a knowing willingness that it occur." Whitley v. Albers, 475 U.S. at 321.

The second element regarding the government official's state of mind is a subjective inquiry. See Wilson v. Seiter, 501 U.S. 294, 298 (1991). Courts apply this subjective inquiry whether the allegations are that a "short-term" or "one-time" violation occurred, or that "continuing" or "systemic" violations occurred. Wilson v. Seiter, 501 U.S. at 299. The Supreme Court has stated: "With deliberate indifference lying somewhere between the poles of negligence at one end and purpose or knowledge at the other, the Courts of Appeals have routinely equated deliberate indifference with recklessness." Farmer v. Brennan, 511 U.S. at 836. The Supreme Court provided the following test for determining when this subjective element is met:

> [A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

Farmer v. Brennan, 511 U.S. at 837. For Eighth Amendment purposes, the Tenth Circuit has equated deliberate indifference with recklessness. See Belcher v. United States, 216 F. App'x 821, 823-24 (10th Cir. 2007)(unpublished)(quoting Smith v. Cummings, 445 F.3d at 1258).

In Graham v. Connor, the Supreme Court addressed whether a plaintiff could assert both Eighth Amendment violations and substantive due-process violations in the same suit against

government officials alleging that they engaged in physically abusive conduct.  See Graham v. Connor, 490 U.S. at 394-95.  More specifically, it held that, when a specific constitutional amendment provides "an explicit textual source of constitutional protection against this sort of physically intrusive governmental conduct," courts should analyze all constitutional claims under that amendment's standards rather than under "the more generalized notion of 'substantive due process.'"  Graham v. Connor, 490 U.S. at 395.  The Supreme Court gave as an example for this principle "the Eighth Amendment's ban on cruel and unusual punishments," because it is one of the "two primary sources of constitutional protection against physically abusive governmental conduct."  Graham v. Connor, 490 U.S. at 395.  The Supreme Court later clarified that its holding in Graham v. Connor "simply requires that if a constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process."  United States v. Lanier, 520 U.S. 259, 272 n.7 (1997).  To illustrate this point, the Supreme Court has recognized that, if a search or seizure did not occur, the Fourth Amendment does not cover the situation, and the plaintiff may proceed on a substantive due-process theory.   See Cnty. of Sacramento v. Lewis, 523 U.S. at 842-844 ("The Fourth Amendment covers only 'searches and seizures,' neither of which took place here. . . .  Graham's more-specific-provision rule is therefore no bar to respondents' suit.").

In Riddle v. Mondragon, 83 F.3d 1197 (10th Cir. 1996), the Tenth Circuit addressed a case where the plaintiff asserted claims that they were "denied necessary medical care [in prison] in violation of their rights under the Eighth and Fourteenth Amendments."  83 F.3d at 1202.  In determining whether to apply Eighth Amendment standards or substantive due-process standards when reviewing the plaintiffs' claims in Riddle v. Mondragon, the Tenth Circuit noted that,

"where constitutional protection is afforded under specific constitutional provisions, alleged violations of the protection should be analyzed under those provisions and not under the more generalized provisions of substantive due process."   83 F.3d at 1202 (citing Berry v. City of Muskogee, 900 F.2d 1489, 1493 (10th Cir. 1990).   Thus, the Tenth Circuit reviewed the plaintiffs' claims for denial of medical care in prison under the Eighth Amendment and did not consider the plaintiffs' substantive due-process theory. See Riddle v. Monragon, 83 F.3d at 1202 ("Accordingly, we will review plaintiffs' claims under the Eighth Amendment as made applicable to the states through the Fourteenth Amendment.").

### LAW REGARDING THE TORT OF BATTERY UNDER NEW MEXICO LAW

New Mexico courts have stated that "the elements of civil and criminal assault and battery are essentially identical." New Mexico v. Ortega, 1992-NMCA-003, ¶ 12, 827 P.2d 152, 155 (N.M. Ct. App. 1992).   A tortfeasor is liable for battery if: "(a) he acts intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact, and (b) an offensive contact with the person of the other directly or indirectly results." New Mexico v. Ortega, 1992-NMCA-003, ¶ 12, 827 P.2d at 155 (quoting Restatement (Second) of Torts § 18(1)(a)-(b) (1965)). See N.M. Stat. Ann. § 30-3-4 ("Battery is the unlawful, intentional touching or application of force to the person of another, when done in a rude, insolent or angry manner.")(defining the elements of criminal battery).

As to the intent required to commit a battery, the Restatement (Second) of Torts is ambiguous whether intent means showing merely an intent to touch that person -- and that the touching turns out to be offensive or harmful need not be intended -- or if the plaintiff must also show that the harm or offense was intended.   It is clear, however, that an intent to touch in a way that the defendant understands is not consented to is sufficient, as is an actual intent to harm.   As

for the severity of contact required, because the intentional tort of battery rose out of the common-law action of trespass, no harm is required.  Accord Selmeczki v. N.M. Dep't of Corr., 2006-NMCA-024, ¶ 29, 129 P.3d 158 ("It is black-letter law that causing an offensive touching, even indirectly to another's clothing and not resulting in injury, is the tort of battery.").

"An 'officer can be held liable for assault and battery if he uses excessive force.'" Adegbuji v. Middlesex Cnty., No. CIV A 03CV-1757 PGS, 2006 WL 2806289, at *12 (D.N.J. Sept. 28, 2006)(quoting Mantz v. Chain, 239 F. Supp. 2d 486, 498 (D.N.J. 2002)).   When analyzing whether an officer's actions create liability for tort claims, the officer's perspective is the central focus; the reasonableness of an officer's use of force is measured "from the perspective of the officer on the scene, with the understanding that officers must often make split-second decisions in difficult situations."  Archuleta v. Lacuesta, 1999-NMCA-113, ¶ 8, 988 P.2d 883, 885.  In Selmeczki v. New Mexico Department of Corrections, the Court of Appeals of New Mexico held that a disgruntled corrections department officer committed the tort of battery when the officer hit visitors to his office with a stack of coins.  See 2006-NMCA-024, ¶ 29, 129 P.3d 158.  The visitors' testimony was that the officer "rose up part way from a seated position behind a desk and forcefully slapped a stack of five to ten coins toward both visitors, which resulted in the coins striking them both on the legs."  2006-NMCA-024, ¶ 6, 129 P.3d 158.  The officer's version was different; he "denied slapping or striking the coins at [the visitors] but claimed that he only 'nudged or dropped' them off the desk, a gesture he admitted was probably 'not prudent.'  He denied any advance planning, claiming it was a 'spur of the moment' act." 2006-NMCA-024, ¶ 7, 129 P.3d 158.  The testimony elicited at trial was that "no injury or harm was likely from the coins being launched at [the visitors]."  2006-NMCA-024, ¶ 29, 129 P.3d 158.  The Court of Appeals of New Mexico concluded that, regardless whether "he did not

'meaningfully' commit a civil battery," he was liable, as "[i]t is black-letter law that causing an offensive touching, even indirectly to another's clothing and not resulting in injury, is the tort of battery."  2006-NMCA-024, ¶ 29, 129 P.3d 158.

## ANALYSIS

The Court will dismiss Peña's Eighth Amendment excessive force claim against Vallejos -- this time with prejudice -- because she has not plausibly alleged that he used physical force "maliciously and sadistically to cause harm," rather than "in a good-faith effort to maintain or restore discipline."  Hudson v. McMillian, 503 U.S. at 7.  She has alleged a serious injury -- the onset of post-traumatic stress disorder symptoms -- but it is an injury of the kind that modest, or even nonexistent, physical force can cause, and it is Vallejos' force, rather than Peña's injury, which is the focus of the Court's analysis.  The prison setting is one in which authority figures' use of reasonable, proportional physical force is expected and acceptable, and Peña has not plausibly alleged that Vallejos did anything beyond that.  Because further opportunity to amend would be futile, the Court will dismiss that claim with prejudice.

The Court will not, however, dismiss Peña's battery claim.  The Eighth Amendment's "constitutional protection is nowhere nearly so extensive as that afforded by the common law tort action for battery."  Johnson v. Glick, 481 F.2d at 1033.  Under New Mexico's standard, Vallejos' privilege to use physical force against Peña extends only as far as he "reasonably believes to be necessary" in the pursuit of legitimate penological ends.  Restatement (Second) of Torts § 132.  Peña has alleged facts that -- if true, and if coupled with reasonable inferences in her favor -- plausibly suggest that Vajellos used more force than he reasonably believed to be necessary in subduing Peña.

I.    **THE COURT WILL DISMISS COUNT II -- THE EIGHTH AMENDMENT EXCESSIVE FORCE CLAIM -- BECAUSE PEÑA HAS NOT ALLEGED FACTS THAT PLAUSIBLY SUGGEST VALLEJOS ACTED OUT OF MALICE OR SADISM.**

The Eighth Amendment sets a very high bar for excessive force claims, and the allegations in the Complaint do not clear it.   "The 'core judicial inquiry' [in an Eighth Amendment excessive force claim is] not whether a certain quantum of injury was sustained, but rather 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.'"   Wilkins v. Gaddy, 559 U.S. 34, 37 (2010)(quoting Hudson v. McMillian, 503 U.S. at 7).   The nature and extent of the plaintiff's injuries are relevant to this inquiry -- these factors are, of course, directly relevant to damages, and they are also often highly probative evidence whether a constitutional violation occurred -- but they are not, themselves, either necessary or sufficient ingredients in an Eighth Amendment claim.   See Hudson v. McMillian, 503 U.S. at 7 ("The absence of serious injury is . . . relevant to the Eighth Amendment inquiry, but does not end it.").   The Supreme Court moved the focus of the Eighth Amendment excessive force analysis from the plaintiff's injuries to the officer's force in 1992 in Hudson v. McMillian, and reaffirmed this focus in 2009:

> This is not to say that the "absence of serious injury" is irrelevant to the Eighth Amendment inquiry.   503 U.S. at 7.   "[T]he extent of injury suffered by an inmate is one factor that may suggest 'whether the use of force could plausibly have been thought necessary' in a particular situation."   503 U.S. at 7.   The extent of injury may also provide some indication of the amount of force applied.   As we stated in Hudson, not "every malevolent touch by a prison guard gives rise to a federal cause of action."   503 U.S. at 9.   "The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition de minimis uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind."   503 U.S. at 9.   An inmate who complains of a "push or shove" that causes no discernible injury almost certainly fails to state a valid excessive force claim.   503 U.S. at 9.
>
> Injury and force, however, are only imperfectly correlated, and it is the latter that ultimately counts.   An inmate who is gratuitously beaten by guards does

not lose his ability to pursue an excessive force claim merely because he has the good fortune to escape without serious injury.  Accordingly, the Court concluded in Hudson that the supposedly "minor" nature of the injuries "provide[d] no basis for dismissal of [Hudson's] § 1983 claim" because "the blows directed at Hudson, which caused bruises, swelling, loosened teeth, and a cracked dental plate, are not *de minimis* for Eighth Amendment purposes."  503 U.S. at 10.

Wilkins v. Gaddy, 559 U.S. at 37-38 (citations omitted).

In determining whether the use of force was wanton and unnecessary, it may also be proper to evaluate the need for application of force, the relationship between that need and the amount of force used, the threat "reasonably perceived by the responsible officials," and "any efforts made to temper the severity of a forceful response."

Hudson v. McMillian, 503 U.S. at 7 (quoting Whitley v. Albers, 475 U.S. at 321).

Interestingly, the Supreme Court's intent -- or at least the primary result it anticipated -- in shifting the focus of the excessive force analysis from the injury sustained to the force used was to make it easier for plaintiffs to prevail, but, in this case, it has the opposite effect.  See Wilkins v. Gaddy, 559 U.S. at 37 (holding that a plaintiff need not demonstrate "significant injury" or even "'non-*de minimis*'" injury to make out an Eighth Amendment claim, because "[o]therwise, the Eighth Amendment would permit any physical punishment, no matter how diabolic or inhuman, inflicting less than some arbitrary quantity of injury").  Here, the injury that Peña alleges she sustained as a result of Vallejos' actions -- the "triggering [of] severe symptoms of . . . chronic PTSD" -- would meet the threshold to be considered a significant or non-*de minimis* injury, were that the important question.[6]  Complaint ¶ 43, at 6.  She has not, however, plausibly alleged that Vallejos' level of force was excessive.

_____

[6]Peña quotes selected portions of the following footnote in Fuerschbach v. Southwest Airlines Co. in her Response:

The officers claim that any injury Fuerschbach suffered was de minimis. They have pointed to no authority, however, establishing that injuries arising from Fourth Amendment violations must be more than de minimis to permit recovery

Important to the outcome in this case is the legal standard by which the Court analyzes the MTD; it is a somewhat unusual one, in which the Twombly/Iqbal standard is elevated -- not as a matter of procedure, but as a result of the applicable substantive law and its practical implications.   Vallejos is a prison guard; he is in a perpetually dangerous environment, surrounded constantly by criminal offenders and tasked with protecting the outside world from them and them from each other.  His role in society is perhaps second only to military personnel in the degree of latitude vested in the position to use extemporaneous physical force to effectuate order, discipline, and safety.  See Johnson v. Glick, 481 F.2d at 1033 ("The management by a few guards of large numbers of prisoners, not usually the most gentle or tractable of men and women, may require and justify the occasional use of a degree of intentional force.").  He is entitled to use force "in a good-faith effort to maintain or restore discipline."  Hudson v. McMillian, 503 U.S. at 7.  Unlike traditional prison guards, however, Vallejos is not entitled to qualified immunity, because he works for CCA -- a non-governmental entity -- and "private prison guards, unlike those who work directly for the government, do not enjoy immunity from suit in a § 1983 case."  Richardson v. McKnight, 521 U.S. 399, 412 (1997).  As a formal,

---

under § 1983.  Nor have the officers persuaded us that suffering PTSD is a de minimis injury.  Referring to Fuerschbach's reaction as "histrionic," "overwrought," and "hysterical" does not aid the officers in that regard, but does constitute a lack of decorum by counsel.  Because Fuerschbach has presented uncontroverted evidence that she has been diagnosed with PTSD, she has demonstrated for summary judgment purposes that her injuries are more than de minimis.  We therefore need not decide whether de minimis injuries resulting from unreasonable seizures are compensable under § 1983.

Fuerschbach v. Southwest Airlines Co., 439 F.3d at 1206 n.5.  See Response at 7 (quoting the third through fifth sentences of the footnote).  The Court notes that this case involved Fourth Amendment unreasonable-seizure claim, rather than an Eighth Amendment excessive force claim.  The Court also notes that Fuerschbach alleged that the defendants' tortious conduct was the root cause of her post-traumatic stress disorder, whereas Peña alleges only that Vallejos' conduct "trigger[ed] severe symptoms of [pre-existing] chronic PTSD."  Complaint ¶ 43, at 6.

procedural matter, therefore, claims against Vallejos are subject to the same notice-pleading standard that governs private-citizen defendants and not the heightened standard that applies in qualified-immunity cases.  See Copar Pumice Co., Inc. v. Morris, No. CIV 07-0079 JB/ACT, 2009 WL 1563515, at *7 (D.N.M. May 11, 2009)(Browning, J.).

As a practical matter, however, allegations that a prisoner makes against a prison guard are treated differently than same allegations that one free citizen makes against another.  If an un-incarcerated plaintiff alleged that another private citizen "pursued her down [a] hallway, grabbed her from behind and slammed her against the wall" -- as Peña alleges that Vallejos did to her -- this allegation would suffice to make out a tort claim, but more is required in the guard-prisoner context.  Complaint ¶ 43, at 6.  This disparate treatment has nothing to do with the Court doubting Peña's story, but, rather, is an application of the usual rule that factual allegations are evaluated in light of (i) the controlling substantive law; and (ii) the contextual backdrop that the plaintiff's other factual allegations provide.  Similarly, in the non-prison example of a plaintiff filing suit against a defendant for chasing her down an alley and slamming her against a wall, if the plaintiff had just stolen the defendant's purse, then the defendant's actions might be legally justified, and the plaintiff's allegations would fail to plausibly state a claim.  This outcome would depend, however, on the plaintiff pleading her own commission of theft in the complaint.  The plaintiff could omit the theft from the story entirely, and the Court would not be entitled to consider the defendant's self-help/recovery-of-stolen-property defense at the motion-to-dismiss stage, regardless of any extrinsic evidence that the defendant had to support it.

Here, the relevant substantive law gives Vallejos numerous broad justifications to commit acts against Peña that would otherwise constitute a tort -- if he and Peña were both free, private citizens on the street, instead of prison guard and prisoner, respectively.  These justifications are

- 33 -

known, collectively, as "privilege."   Restatement (Second) of Torts § 10 ("The word 'privilege' . . . denote[s] the fact that conduct which, under ordinary circumstances, would subject the actor to liability, under particular circumstances does not subject him to such liability.").  Peña has not pled any of these justifications in her Complaint, but it is not necessary for her to do so.  She has pled that she is a prisoner and that Vallejos is a prison guard; the Court can fill in the remainder of the context as a matter of law.  Unlike the example of the purse-snatching plaintiff -- who need not plead around the defendant's self-help/recovery-of-stolen-property defense if she declines to plead the theft -- in this case, the institutional roles of the parties triggers the need to plead around the myriad justifications for the defendant's use of physical force.

To be clear, putting Peña's allegations in their proper context does not undermine the Supreme Court's rule that private prison guards are not entitled to qualified immunity.  Qualified immunity absolves defendants of liability for unconstitutional conduct that was not clearly established to be unconstitutional at the time the defendant committed it; the Court's approach merely evaluates whether Peña has plausibly alleged that Vallejos has violated the applicable constitutional standards, regardless whether those standards are clearly established.  Qualified immunity protects the defendant who steps into the murky grey waters of constitutional law and discovers, only upon his foot hitting the bottom, that he has trod across the boundary line between legal and illegal.  Vallejos, on the other hand, is responsible for where his foot lands, regardless whether the water was clear.

Having outlined the relevant pleading standard, the Court will examine Peña's factual allegations, and "evaluate the need for application of force, the relationship between that need and the amount of force used, the threat 'reasonably perceived by the responsible officials,' and

'any efforts made to temper the severity of a forceful response.'" <u>Hudson v. McMillian</u>, 503

U.S. at 7 (quoting <u>Whitley v. Albers</u>, 475 U.S. at 321).  Peña alleges the following facts in

support of her Eighth Amendment claim against Vallejos:

> 40.    On or around early June of 2011, Plaintiff was suffering from postpartum depression, in addition to her other mental illnesses, and was grieving her estrangement from her son as she walked down a hallway of the NMWCF. She was visibly upset.

> 41.    Defendant Carlos Vallejos verbally engaged Plaintiff in the hallway, asking her what was wrong.

> 42.    Plaintiff was despondent and traumatized and did not have the will or the desire to explain to Defendant Vallejos her predicament or her feelings; she continued to walk toward her unit, where she intended to contact mental health for immediate mental health treatment.

> 43.    After Plaintiff failed to respond his questioning, Defendant Carlos Vallejos pursued her down the hallway, grabbed her from behind and slammed her against the wall of the hallway, causing bruising to her arms, and triggering severe symptoms of Plaintiff's chronic PTSD.

> 44.    Before Defendant Vallejos grabbed Plaintiff and slammed her against the wall, Plaintiff had not said anything to Defendant Vallejos and had not physically challenged or threatened him or anyone else.  She was simply walking away from him, on the path to her unit, where she hoped to obtain immediate mental health treatment.

> 45.    Defendant Vallejos' use of force against Plaintiff did not serve any penological interest, and violated the Corporation's and the New Mexico Corrections Department's policies on use of force.

> 46.    Upon information and belief, because of Mr. Vallejos' battery of Plaintiff and his mistreatment of other inmates at the facility, the Corporation removed him from his position at the NMWCF.

Complaint ¶¶ 40-46, at 6-7.  In short, the sequence of events that constitute the cause of action

against Vallejos unfolded in four stages.  First, Peña was "suffering from . . . mental illness[],"

"grieving," "despondent," "traumatized," and in need of immediate mental-health treatment.

Complaint ¶¶ 40, 42, at 6.  These conditions are ones whose etiology, severity, and imminent

danger are not apparent from observation alone, i.e., Vallejos could not plausibly tell from looking at Peña why she was upset, how upset she was, or whether she was in need of immediate assistance.  For all Valljos knew, Peña could have been undergoing a medical or psychiatric emergency, or one of the other inmates could have just assaulted her; any of those circumstances would necessitate Vallejos' intervention, whether Peña desired it or not.

Second, Peña refused to answer a question that Vallejos directed to her regarding her well-being and emotional condition.  See Complaint ¶ 41, at 6.  The Complaint makes it clear that Peña did not simply fail to hear the question, but, rather, that she heard the question and chose to ignore it.  See Complaint ¶ 42, at 6 (stating that Peña "did not have the will or the desire to explain").  Vallejos was entitled, at that point, to demand an answer -- regardless whether Peña wanted to respond.

Third, Vallejos "pursued her down the hallway" to get his question answered.  Complaint ¶ 43, at 6.  Given that the word "pursue" is not used to describe motion towards a stationary target, the Court takes this allegation to mean that Peña continued to move away from Vallejos even as he approached her.  It is unclear whether Vallejos, in addition to chasing after Peña, also continued to try to get her attention verbally.  The Complaint refers to Peña "fail[ing] to respond to [Vallejos'] questioning," implying that Vallejos asked her more questions than the single question she alleges in the Complaint, Complaint ¶ 43, at 6 (emphasis added), but, as the Court can find no dictionary defining "questioning" to refer exclusively to the asking of multiple questions, Peña is entitled to the inference that Vallejos asked only a single question before using physical force against Peña.

Fourth, upon catching Peña, Vallejos grabbed her from behind and slammed her against the wall sufficiently hard to cause arm bruising and "tigger[] severe symptoms of [her] PTSD."

Complaint ¶ 43, at 6.  At this point, what Peña does not allege is just as important as what she

alleges: Peña's description of the encounter ends here, even though it seems clear her interaction

with Vallejos extended for at least long enough for him to get his questions answered; this abrupt

cutoff implies that Vallejos' conduct for the remainder of the encounter was, if not

unobjectionable, then at least within constitutional bounds.  Equally important, Peña alleges only

this one incident, and there is no suggestion that Vallejos' behavior is reflective of a larger

pattern of violent or abusive behavior by Vallejos against Peña -- or against anyone, for that

matter.[7]  Last, although the Eighth Amendment's focus is on the officer's force, rather than on

the plaintiff's injuries, Peña's injuries fail to contribute to pushing her excessive force allegation

---

[7]The closest Peña comes to alleging a plausible claim is in her allegation that, "because of
Mr. Vallejos' battery of Plaintiff and his mistreatment of other inmates at the facility, [CCA]
removed him from his position at the NMWCF."  Complaint ¶ 46, at 7.  This allegation fails to
state a plausible claim, however, for two reasons.  First, even Peña acknowledges that Vallejos
was fired for "violat[ing] the [CCA's] and the New Mexico Corrections Department's policies
on use of force," which is not the same thing as violating the Eighth Amendment.  Complaint
¶ 45, at 6.  Peña does not specify what these policies are or which policies, specifically, Vallejos
was terminated for violating.  Even if CCA determined that Vallejos committed "battery,"
Complaint ¶ 46, at 7, "the constitutional protection is nowhere nearly so extensive as that
afforded by the common law tort action for battery," Johnson v. Glick, 481 F.2d at 1033.
Second, even if Vallejos' superiors had analyzed his conduct under the Tenth Circuit's Eighth
Amendment jurisprudence, the federal judicial system has its own process for adjudicating cases,
and this process does not include blindly incorporating private entities' employment
adjudications into the courts' work.

Getting fired is not an element of an excessive force claim; it is indirect evidence of one.
Even if CCA had concluded that Vallejos violated the Eighth Amendment, the Court would not
be required to adopt that legal conclusion as its own.  When a plaintiff alleges that a third
party -- i.e., someone other than the plaintiff -- has made a legal conclusion about the case's
facts, the Court may consider the legal conclusion at the pleading stage, i.e., the third party's
legal conclusion is, itself, a fact, which the Court should weigh into the plausibility calculus.
The Court should not, however, uncritically accept that the legal conclusion is correct -- or even
plausible.  The Court's job is to adjudicate facts directly using the procedural framework that the
Federal Rules outline; overreliance on private adjudicative bodies' decisionmaking -- to which
the Court owes no factual or legal deference -- can undermine this task.  On the other hand, if
CCA had made the determination that Vallejos had violated the Eighth Amendment, and Peña
had alleged as much, then this allegation might have sufficed to overcome a rule 12(b)(6)
motion.  Peña did not, however, make such an allegation.

over the line from conceivable to plausible.  If she had alleged that she sustained, e.g., a fractured skull or a broken spine, then the Court could infer that Vallejos' force may have been so far in excess of what was needed that Vallejos plausibly may have acted out of malice or sadism.  See Hudson v. McMillian, 503 U.S. at 7 (stating that the existence "of serious injury is . . . relevant to the Eighth Amendment inquiry, but does not end it").  Instead, Peña alleges that she sustained some arm bruising, which indicates that (i) Peña contacted the wall arms-first, rather than, say, headfirst; and (ii) Vallejos' shove was not forceful enough to cause broken bones or anything more serious than bruising.[8]

Peña's allegations are insufficient to plausibly suggest that Vallejos pushed her against the wall "maliciously and sadistically to cause harm," rather than "in a good-faith effort to maintain or restore discipline."  Hudson v. McMillian, 503 U.S. at 7.  This standard sets a very high bar for plaintiffs to clear, and it seems to assume a false dichotomy -- certainly there would seem to be situations where prison guards use force in a way that is too invidious to be called a "good-faith effort" but falls short of being "malicious[] and sadistic[]" -- but the Supreme Court

---

[8]To be clear, the Court is not saying that, if an officer's use of force causes only arm bruising, then it can never give rise to an Eighth Amendment claim.  Rather, the Court is simply pointing out that, if Peña had alleged more serious injuries, those allegations might render her claim plausible.

The Court's ruling is based on the assumption that, in prison, the vast majority of non-consensual physical force that correctional officers use is justified -- or, if not entirely justified, at least not in violation of the Eight Amendment.  Thus, unlike plaintiffs in free, civilian world, prisoner-plaintiffs who allege only than an incident involving non-consensual physical force happened have not alleged a plausible cause of action.  The plaintiff must allege something else to nudge her claims across the line from conceivable to plausible, which could include: (i) a pattern of repeated behavior by the officer; (ii) the factual circumstances leading up to the officer's use of force, which can demonstrate an absence of any need to use force to effectuate legitimate penological goals; (iii) serious injuries, which could suggest that the officer's force was excessive, and, thus, might plausibly have been malicious or sadistic; or (iv) statements that the officer made after or contemporaneous with the use of force, e.g., racial slurs or expressions of personal animus.

has reaffirmed the standard's vitality on numerous occasions.  See, e.g., Whitley v. Albers, 475 U.S. at 320-21 (citation omitted); Hudson v. McMillian, 503 U.S. at 7; Wilkins v. Gaddy, 559 U.S. at 37 (citation omitted).  "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights."  Johnson v. Glick, 481 F.2d at 1033.  See Hudson v. McMillian, 503 U.S. at 9 ("That is not to say that every malevolent touch by a prison guard gives rise to a federal cause of action. . . .  [There is no] constitutional recognition [of] de minimis uses of physical force, provided that the use of force is not of a sort 'repugnant to the conscience of mankind.'"  (citations omitted)).  Without more, Peña's allegations are analogous to allegations of parallel conduct in a price-fixing case: they set forth facts that are "consistent with" malice and sadism, but do not "suggest" them; her allegations are "just as much in line with" Vallejos' legitimate pursuit of penological goals as they are with his desire to harm or humiliate her.  See Bell Atl. Corp. v. Twombly, 550 U.S. at 554.[9]  Peña has thus failed to state a plausible claim for relief.

---

[9]The Supreme Court used the quoted terms to describe insufficient pleading:

> The inadequacy of showing parallel conduct or interdependence, without more, mirrors the ambiguity of the behavior: consistent with conspiracy, but just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market.

> . . . .

> The need at the pleading stage for allegations plausibly suggesting (not merely consistent with) agreement reflects the threshold requirement of Rule 8(a)(2) that the "plain statement" possess enough heft to "sho[w] that the pleader is entitled to relief."  A statement of parallel conduct, even conduct consciously undertaken, needs some setting suggesting the agreement necessary to make out a § 1 claim; without that further circumstance pointing toward a meeting of the minds, an account of a defendant's commercial efforts stays in neutral territory. An allegation of parallel conduct is thus much like a naked assertion of conspiracy in a § 1 complaint: it gets the complaint close to stating a claim, but

Last, although Eighth Amendment excessive force claims are necessarily fact-intensive, the Court notes that the Tenth Circuit and several district courts therein have dismissed claims very similar to this one at the motion-to-dismiss stage.  In Rhoten v. Werholtz, 243 F. App'x 364 (10th Cir. 2007)(unpublished), a prison guard, while conducting a pat-down search of his person, "'slammed [the plaintiff] against the wall[,] squeezed [his] nipples real hard[,] squeezed [his] buttocks, and pulled on [his] testicles real hard causing [him] a great deal of discomfort and pain.'"  243 F. App'x at 365 (alterations, except first, in case)(quoting the complaint).  The Tenth Circuit held that, "even accepting Rhoten's allegations as true, . . . [the defendant's] use of force does not state an Eighth Amendment violation.  Rather, it was de minimis."  243 F. App'x at 367.  The Tenth Circuit noted that, "although not dispositive, the medical evidence shows [the defendant's] use of force did not result in injury, further supporting our conclusion it was not excessive."  243 F. App'x at 367.  In Broadus v. Timme, No. CIV 11-0802 CMA/KMT, 2012 WL 639310 (D. Colo. Jan. 30, 2012), the Honorable Kathleen M. Tafoya, United States Magistrate Judge for the District of Colorado, dismissed an Eighth Amendment excessive force claim where the inmate-plaintiff alleged that the defendant guard "'slammed [him] up against walls.'"   2012 WL 639310, at *1, (quoting the complaint).  See id. at *8-9.  In Jarrett v. Schubert, No. CIV 97-2628 GTV, 1998 WL 471992 (D. Kan. July 31, 1998), the Honorable George T. Van Bebber, then-United States District Judge for the District of Kansas, dismissed an Eighth Amendment excessive force claim brought by a plaintiff who alleged that the defendant "'rammed' his elbow and firearm into her chest and 'slammed' and pinned her against the wall

---

without some further factual enhancement it stops short of the line between possibility and plausibility of "entitle[ment] to relief."

Bell Atl. Corp. v. Twombly, 550 U.S. at 554, 557 (citation omitted).

of the building, causing her to sustain bruising on her chest." 1998 WL 471992, at *1. Judge Van Bebber concluded that the force alleged was de minimis and was "not the type of malevolent touch that triggers a federal cause of action." 1998 WL 471992, at *4. Judge Van Bebber acknowledged that an Eighth Amendment claim could proceed even in the absence of any physical injury, but implied that these circumstances would be rare, and would be limited to treatment that strongly evinces a sadistic or malicious motive with no accompanying penological purpose, such as "exposing individuals to undue heat or cold, forcibly injecting them with mind-altering drugs, and inserting a gun in their mouth while threatening to pull the trigger." 1998 WL 471992, at *4 n.4.

The Court will thus dismiss Peña's Eighth Amendment claim, and the only remaining question is whether this dismissal should be with or without prejudice. Given that Peña has already had one opportunity to amend her claims against Vallejos, the Court concludes that the current Complaint contains every fact that Peña can allege -- consistent with rule 11's demands -- tending to show Vallejos' liability. Thus, leaving open the opportunity to amend at this point would be futile.[10] See Response at 1 ("In her . . . Complaint, Plaintiff describes all that was knowable to her about Valljos' use of force against her." (emphasis omitted)). The miniscule chance that Peña can develop information to properly allege claims against Vallejos is outweighed by Vallejos' interest in the finality of these dismissals, and the Court will, accordingly, dismiss Count II with prejudice.

---

[10]Furthermore, the time for amendments to the pleadings has passed, see Scheduling Order Setting Case Deadlines, filed September 19, 2014 (Doc. 81)(setting the deadline for motions other than discovery motions as April 3, 2015), and thus Peña would have to show "good cause" for why her amendment could not have been made before the deadline, Fed. R. Civ. P. 16(b)(4), in addition to the usual requirements of rule 15(a)(2).

## II.   THE COURT WILL NOT DISMISS COUNT VI -- THE STATE-LAW BATTERY CLAIM -- BECAUSE PEÑA HAS PLAUSIBLY ALLEGED THAT VALLEJOS USED MORE FORCE THAN HE REASONABLY BELIEVED TO BE NECESSARY UNDER THE CIRCUMSTANCES.

The Court will not dismiss Peña's battery claim, however, because the Eighth Amendment's

> constitutional protection is nowhere nearly so extensive as that afforded by the common law tort action for battery, which makes actionable any intentional and unpermitted contact with the plaintiff's person or anything attached to it and practically identified with it, still less is it as extensive as that afforded by the common law tort action for assault, redressing "Any act of such a nature as to excite an apprehension of battery."  Although "the least touching of another in anger is a battery," it is not a violation of a constitutional right actionable under 42 U.S.C. § 1983.   The management by a few guards of large numbers of prisoners, not usually the most gentle or tractable of men and women, may require and justify the occasional use of a degree of intentional force.  Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights.

Johnson v. Glick, 481 F.2d at 1033 (footnote omitted)(citation omitted).  This passage illustrates that the standard for what constitutes battery in the prison context is much lower than what constitutes a violation of the Eighth Amendment.

Under Erie Railroad Co. v. Tompkins, 304 U.S. 64 (1938)("Erie"), New Mexico law governs Peña's battery claim, but there is no New Mexico precedent spelling out how the tort of battery applies to physical contact between prison guards and inmates in New Mexico.   The Court was unable to find a New Mexico case in the same ballpark as this one, and the parties cited a total of zero battery cases in their briefing.[11]   The committee tasked with promulgating

---

[11]The parties seemingly lost interest in the battery half of the MTD.  The MTD separates its attacks on the Eighth Amendment claim and battery claim into different sections, but the latter contains only a single, citation-less, quarter-page paragraph.  See MTD at 6.   The Response limited its treatment of the battery claim to the following footnote: "Because Defendant Vallejos does not appear to make any cognizable arguments specific to his challenge to Plaintiffs' battery claim against him, Plaintiff has treated this challenge as being subsumed by his challenge to her excessive force claim."  Response at 1 n.1.  The Reply then follows the Response's suggested

the New Mexico Uniform Jury Instructions declined to create an instruction on battery -- at all,

let alone in the prison guard-inmate context -- because there is "insufficient New Mexico law on

assault and battery to guide the committee on this subject."   Civ. U.J.I. 13-1624 N.M.R.A.,

committee commentary.   That there is a paucity of law in this area is not entirely surprising.

New Mexico is a young, sparsely populated state, and many legal areas with robust case law at

the federal level have state-law analogues with virtually no legal authority to guide them.

Although the Court is no stranger to this situation, care must be taken when working in

areas with little controlling law.   The Court must steer between the extremes of judicial

activism -- which, here, means dismissing a state-law claim despite having no basis in law to do

so, either on policy grounds, or because other states' law or the federal common law would not

countenance the claim -- and judicial abdication -- sending a claim to trial merely to pass the

decisionmaking buck to the jury.   In doing so, the Court must delineate between, on one hand,

those shortcomings, gaps, and vagueness in the state case law that exist merely because the New

Mexico courts have not had the opportunity to speak directly to the question, and, on the other,

those deliberate omissions, exercises of restraint, and failures to specify a test or clarify a term

that reflect a conscious choice by the state courts to delegate to the jury, on a case-by-case basis,

the task of defining a substantive standard.   Some legal standards are left intentionally vague,

---

course, throwing the term "and battery" behind scattered references to the Eighth Amendment
throughout the Reply.   The Court suspects that the parties likely focused their energies on the
Eighth Amendment, because there was more to talk about there, i.e., the Eighth Amendment has
a sizable body of law around it, whereas prison guard-inmate battery does not.   Vallejos seems to
want the Court to treat the battery claim as essentially a derivative claim to the Eighth
Amendment claim, but the Court finds no support for the proposition that an officer cannot be
held liable for battery if he or she does not violate the Eighth Amendment.   See Johnson v. Glick,
481 F.2d at 1033 (2d Cir.)("[T]he constitutional protection is nowhere nearly so extensive as that
afforded by the common law tort action for battery.").

and that vagueness allows room for the jury to apply its own sense of justice to the facts of a

particular case.

> [T]he Court is of the opinion that when the application of a broad standard, like
> the reasonable-person standard, is left to the jury without further judicial
> refinement, that should be construed as a conscious choice by the state courts to
> incorporate jury fact-finding into the substance of the standard, and should not be
> viewed by the federal courts as a gap to be filled with persuasive authority.

Anderson Living Trust v. WPX Energy Prod., LLC, 27 F. Supp. 3d 1188, 1238 n.29 (D.N.M.

May 16, 2014)(Browning, J.).  When substantive vagueness is used as a stand-in for procedural

delegation of an issue to the jury, a federal court sitting in diversity must not artificially clarify

the vagueness, as doing so is tantamount to rewriting the state substantive law.  See Coplay

Cement Co., Inc. v. Willis & Paul Grp., 983 F.2d 1435, 1438 (7th Cir. 1993)(Posner, J.).

Although designating the fulfillment of a certain legal threshold a "jury question" may seem to

fall on the procedural side of Erie's procedure-substance divide, it often does not: if a legal

standard is clear -- or at least clear enough to determine whether the facts of the case at hand fit

within it -- then whether the standards application goes to judge or jury is a procedural question,

and federal practice governs it; if state practice is to submit the legal standard to the jury at a

certain level of abstraction or vagueness, then the federal court must submit the standard to the

jury with the same or greater vagueness.[12]   This result is justified under ordinary Erie

---

[12]Interestingly, this rule cuts in one direction only: in favor of juries.  When state law
assigns questions to the judge that federal procedure assigns to the jury, the federal court must
often apply federal procedure for Seventh Amendment reasons, see Gasperini v. Ctr. for
Humanities, Inc., 518 U.S. 415 (1996); Byrd v. Blue Ridge Rural Elec. Co-op., Inc., 356 U.S.
525 (1958), even though the same does not necessarily hold true in the other direction, i.e., the
Seventh Amendment's trial-by-jury clause is not implicated when state law prescribes that a
question goes to the jury and the federal court follows the state practice.

For example, in 1993, Judge Posner seemed to suggest that virtually all state-law
contract-interpretation procedures are substantive under Erie:

Whether there was one contract or two depends in the first instance on the terms of the contract(s), construed with the aid of Indiana's rules of contractual interpretation, such rules being considered substantive under the Erie doctrine, because, like the parol evidence rule and the Statute of Frauds, they are concerned primarily with "the channeling of behavior outside the courtroom," Barron v. Ford Motor Co., 965 F.2d 195, 199 (7th Cir. 1992), rather than with the allocation of responsibilities among judicial decision-makers (trial and appellate judges, and jurors).  The rule in Indiana as elsewhere is that if the meaning of a written contract can be inferred from its terms, the judicial inquiry stops there; extrinsic evidence (for example, testimony by the negotiators of the contract concerning their intentions) is inadmissible.  This is the "four corners" rule, which is related although not identical to the parol evidence rule.  If, however, the contract cannot be interpreted without recourse to other evidence besides its language, that is, extrinsic evidence, then such evidence is admissible.

Coplay Cement Co., Inc. v. Willis & Paul Grp., 983 F.2d 1435, 1438 (7th Cir. 1993)(Posner, J.) (citations omitted).  Two years later, however, Judge Posner was more reticent to apply state contract-interpretation procedures that allocate less decisionmaking authority to the jury than federal procedure normally would, essentially circumventing the issue by recasting federal procedure to match the state-law practice:

[W]hen one speaks in a diversity case of rules of contract law such as the parol evidence or "four corners" rules that erect procedural obstacles to a party's efforts to avoid being bound by the words of his contract, questions can arise concerning the seam between the doctrine of Erie and the dictates of the Seventh Amendment.  Are these "substantive" rules because of their effect on the behavior of contracting parties outside the courtroom -- on their decision how to structure their relations (whether even to have contractual relations), what forms of words to use in their written contracts (whether even to have a written contract), and so on?  Or are they "procedural" rules because they involve the relation between judge and jury, governed in federal courts by the Seventh Amendment?  If they were treated as procedural rules, a substantial wedge would be driven between state contract cases and federal diversity contract cases.  So it comes as no great surprise that rules of contract interpretation, such as the parol evidence and four-corners rules, are deemed substantive, because of their effect on the conduct of contracting parties outside the courtroom, even though the rules operate through limiting the kinds of evidence that are admissible.  No doubt suspicion of juries plays a role in the doctrines that limit the admissibility of evidence by which a party seeks to avoid the consequences of his written words; but the rules do not differentiate between judge and jury; they bind the former as much as the latter.

The rule that a claim of extrinsic ambiguity is to be "screened" by the judge before being submitted to the jury -- the rule of the two Illinois cases that we cited earlier -- is different.  That is a rule about the division of functions between judge and jury, and in federal court that division is governed by the

principles -- "clarifying vagueness" is just another way of saying "narrowing a definition" -- but it serves equally well to protect whatever importance the state courts place on juries in the decisionmaking process.[13]

---

Seventh Amendment rather than by state law.  So we held with specific reference to the division of functions between judge and jury in diversity contract cases in Coplay Cement Co. v. Willis & Paul Group and Mayer v. Gary Partners & Co., 29 F.3d 330 (7th Cir. 1994).  But these cases did not involve a state procedural rule limited to a particular field of law, such as contract law, and arguably motivated by substantive rather than procedural concerns, as in this case and Harbor Ins. Co. v. Continental Bank Corp., 922 F.2d 357, 364 (7th Cir. 1990).  There we left open the question whether the "mend the hold" doctrine, another procedural doctrine of contract law (it forbids a party to a contract to take inconsistent litigating positions concerning the contract's meaning), is substantive or procedural for purposes of the Erie doctrine.  We need not decide the like issue in the present case either.  The rule that the judge must be satisfied that extrinsic evidence creates a genuine ambiguity before he can submit the dispute over the contract's meaning to the jury is a sensible rule, and if not bound to follow it under Erie we can still adopt it as a rule of federal common law to guide procedure in diversity breach of contract suits.  We need not consider the extent to which it is already implicit in Rule 56 of the Federal Rules of Civil Procedure (summary judgment).  There is a sense in which a motion for summary judgment requires the judge to "screen" the evidence in advance of trial to make sure it creates a genuine issue of material fact.

AM Intern., Inc. v. Graphic Mgmt. Assocs., Inc., 44 F.3d 572, 576 (7th Cir. 1995)(Posner, C.J.).  Although the Court is not sure it agrees with Judge Posner's rationale in adopting Illinois contract-interpretation procedure as a part of the federal common law, the Court agrees with his Erie analysis.

The Tenth Circuit has not addressed this issue with the completeness that Judge Posner has, but it appears to routinely apply state-law contract-interpretation procedure in diversity cases.  See Trans-W. Petrol., Inc. v. U.S. Gypsum Co., 584 F.3d 988, 993 (10th Cir. 2009)(Holloway, J.)(applying Utah's "two-step process [for] answer[ing] the legal question of whether a contract is facially ambiguous"); King v. Utd. Ben. Fire Ins. Co., 377 F.2d 728, 732 (10th Cir. 1967).  It is not clear, however, whether this result is grounded in Erie or in the federal common law.  See In re Kahn, 133 F.3d 932, at *5 (10th Cir. 1998)(Anderson, J., joined by Ebel & Kelly, JJ.)(unpublished); W. Gas Processors, Ltd. v. Woods Petrol. Corp., 15 F.3d at 987.

[13]Juries are revered in the American justice system.  They apply the law as it is told to them by the judge, and they fill in any gaps in the instructions by tapping into their common sense, to determine what is "reasonable," and their conscience, to determine what is right.  They address only the case in front of them, in keeping with what was clearly intended to be a defining feature of, and constitutional limitation on, the American judiciary's power -- a fact of which

Sometimes, however, a gap is just a gap.  That there is a dearth of case law on point does not in itself mean that the Court should reflexively let the claim pass through the motion-to-dismiss stage untouched.  This approach is tempting, because, when the Court cannot point to solid authority showing that a claim should be dismissed, it is easier to let the claim through than it is to dismiss it on legally uncertain grounds.  Such an approach, however, conflates the state courts' lack of opportunity to flesh out their own law -- i.e., the relatively low number of opinions they write in any given area of law -- with their conscious division of responsibility between judge and jury, and their associated desire to define a legal standard either rigidly and formulaically, or loosely and vaguely.  Erie resolves the tension inherent in applying sparse state-court case law in a way that is conceptually clear, even if it is sometimes difficult to apply: a federal court sitting in diversity should apply whatever law the state's highest court would apply if faced with the same question.  See Comm'r v. Estate of Bosch, 387 U.S. 456, 465 (1967); Anderson Living Trust v. WPX Energy Prod., LLC, 27 F. Supp. 3d at 1247 n.30.

---

courts sometimes lose sight when writing opinions almost exclusively for their precedential value.  Because of this fact, juries need not compromise their judgment in the name of retrospective consistency or prospective workability -- i.e., whether the "rule" they announce will produce fair results in future, hypothetical cases.  They speak for the conscience of the community -- a constantly evolving set of norms and values that sometimes eludes plodding developments in case law.  They are, at once, the most directly democratic institution in American government, and the one from which there is the least to fear in terms of entrenchment, corruption, or tyranny.  Juries are independent and disinterested, and their verdicts thereby avoid the public cynicism that attaches to judicial decrees, executive action, and legislative enactments.  For these reasons, courts must be careful not to usurp the deliberate devolution of decisionmaking to the jury by assuming that a vague standard -- like the reasonable-person standard -- must be filled out by judicial fiat.  Federal judges must be particularly careful to avoid this pitfall in diversity cases, as, in addition to altering the balance of power between judge and juries, doing so alters the balance of power between the state and federal governments.

Turning to the case at hand, New Mexico's civil-battery law is modeled after the Restatement (Second) of Torts.[14]   See, e.g., State v. Santiago, 2009-NMSC-045, ¶ 25 n.3, 217 P.3d 89, 97 n.3; State v. Johnson, 1996-NMSC-075, ¶ 18 n.3, 930 P.2d 1148, 1154 n.3; Brown v. Martinez, 1961-NMSC-040, ¶¶ 33-34, 361 P.2d 152, 159-60; Yount v. Johnson, 1996-NMCA-046, ¶ 17, 915 P.2d 341, 346; State v. Ortega, 1992-NMCA-003, ¶ 12, 827 P.2d 152, 155; Jaramillo v. Smith, 1978-NMCA-004, ¶ 11, 574 P.2d 597, 599.  See also Sisneros v. Fisher, 685 F. Supp. 2d 1188, 1220-21 (D.N.M. 2010)(Browning, J.)("Under New Mexico law, wherein the Restatement of Torts reigns, one commits a battery when . . . .").  Normally, the severity-of-contact threshold for battery is so low as to be nearly nonexistent, requiring only a "harmful or offensive contact."  Restatement (Second) of Torts § 13.  See Selmeczki v. N.M. Dep't of Corr., 2006-NMCA-024, ¶ 29 ("It is black-letter law that causing an offensive touching, even indirectly to another's clothing and not resulting in injury, is the tort of battery."  (citing State v. Ortega, 1992-NMCA-003, ¶ 13, 827 P.2d 152, 155-56)).  Vallejos, however, by virtue of his job, has what the Restatement calls "privilege":

> (1)     The word "privilege" is used throughout the Restatement of this Subject to denote the fact that conduct which, under ordinary circumstances, would subject the actor to liability, under particular circumstances does not subject him to such liability.
>
> (2)     A privilege may be based upon

---

[14]The New Mexico courts often look to the law as stated in the Restatement (Second) of Torts.  See Montanez v. Cass, 1975-NMCA-142, ¶ 46, 546 P.2d 1189, 1195 ("It has long been the policy of our courts to follow in the footsteps of the Restatement of Torts, 2d."), rev'd on other grounds sub nom N.M. Elec. Serv. Co. v. Montanez, 1976-NMSC-028, 551 P.2d 634.  Accord Stark-Romero v. Nat'l R.R. Passenger Co. (AMTRAK), 805 F. Supp. 2d 1145, 1177 n.24 (D.N.M. 2011)(Browning, J.).  In Schmitz v. Smentowski, 1990-NMSC-002, 785 P.2d 726, the Supreme Court of New Mexico stated: "We have also been very willing to adopt the view of the Restatement of Torts to assist our development of new tort areas."  1990-NMSC-002, ¶ 49, 785 P.2d at 736.

> (a)    the consent of the other affected by the actor's conduct, or
>
> (b)    the fact that its exercise is necessary for the protection of some interest of the actor or of the public which is of such importance as to justify the harm caused or threatened by its exercise, or
>
> (c)    the fact that the actor is performing a function for the proper performance of which freedom of action is essential.

Restatement (Second) of Torts § 10.   Vallejos' specific privilege is outlined in § 134, titled

"Maintenance of a Custody Lawfully Taken":

> If the actor is privileged to take the custody of another, he is privileged, if necessary,
>
> (a)    to use, for the purpose of maintaining his custody, such force against the other or a third person as he would be privileged to use to effect the other's arrest, and
>
> (b)    to use, for the purpose of bringing the other before a court, body, or official, or otherwise securing the administration of the law, such force against the other or a third person, less than force intended or likely to cause death or serious bodily harm, as he would be privileged to use to effect the other's arrest.

Restatement (Second) of Torts § 134 (citing, e.g., Brady v. Dill, 187 F.3d 104, 123 (1st Cir.

1999); McConney v. City of Houston, 863 F.2d 1180, 1185 (5th Cir. 1989); Hatfield v. Gracen,

567 P.2d 546, 550 (Or. 1977)).   The Restatement circumscribes the amount of force that

someone in Vallejos' position can use against someone like Peña in a section titled, aptly,

"Amount of Force": "[t]he use of force against another for the purpose of effecting the arrest or

recapture of the other, or of maintaining the actor's custody of him, is not privileged if the means

employed are in excess of those which the actor reasonably believes to be necessary."

Restatement (Second) of Torts § 132.   See Bledsoe v. Garcia, 742 F.2d 1237, 1240 (10th Cir.

1984)(quoting this section of the Restatement as "[t]he general common law principle . . .

explicitly recognized by various courts").   In <u>State v. Johnson</u>, the Supreme Court of New

Mexico explicitly adopted § 132's standard, <u>see</u> 1996-NMSC-075, ¶ 18 n.3, 930 P.2d at 1154

n.3, and reaffirmed the section's adoption in <u>State v. Santiago</u>, <u>see</u> 2009-NMSC-045, ¶ 25 n.3,

217 P.3d at 97 n.3.   The term "reasonably believes to be necessary" means that Vallejos must

both (i) subjectively, honestly believe that his force was limited to that which is necessary; and

(ii) be objectively reasonable in that belief.   Failing either prong incurs liability under the

following conditions, described in yet another Restatement section, titled "Effect of Excessive

Force":

> If the means employed by the actor for the purpose of effecting the arrest or recapture of another, or of maintaining the actor's custody of him, are in excess of those which he is privileged to use,
>
> (a)    the actor is liable for only so much of the force as is excessive;
>
> (b)    the other's liability for the use of any unprivileged force against the actor is not thereby affected;
>
> (c)    the other has the privilege stated in §§ 63-75 to defend himself against such excessive force.

<u>Restatement (Second) of Torts</u> § 133 (citing, <u>e.g.</u>, <u>Nelson v. Jashurek</u>, 109 F.3d 142, 146 (3rd

Cir. 1997); <u>Munoz v. Olin</u>, 76 Cal. App. 3d 85 (1977); <u>City of Mason v. Banks</u>, 581 S.W.2d 621,

626 (Tenn. 1979)).

    The Court concludes that the New Mexico courts would likely adopt the <u>Restatement</u>'s[15]

"reasonably believes to be necessary" test for analyzing a prison guard's physical force against a

---

[15]Although the Court's citations have been to the <u>Restatement (Second) of Torts</u>, which is the <u>Restatement</u> edition to which the New Mexico courts usually cite, the <u>Restatement (First) of Torts</u> contains the same legal principles.   Sections 10, 132, 133, and 134 of the <u>Restatement (Second) of Torts</u> are all near carbon copies of the identically numbered sections of the <u>Restatement (First) of Torts</u>.   The most important section to this analysis, § 132, on "Amount of Force," states, in the first edition: "The use of force against another for the purpose of effecting

prisoner.  This test is, in the first instance, a jury-oriented standard, as are most tests that contain the word "reasonable" or one of its variants.  The Court can still "find[] that a reasonable jury would not have a legally sufficient evidentiary basis to find" that Vallejos acted under a reasonable belief of necessity.[16]  Fed. R. Civ. P. 50(a)(1).  The Court would have to find, however, both that (i) no jury could reasonably find the defendant's force to be reasonable; and (ii) no jury could reasonably find that the defendant subjectively believed that his level of physical force was in excess of what was necessary.

The New Mexico courts intended for juries, rather than judges, to define and apply this standard.  The Court cannot refine the standard further without conjuring up specifics out of thin air.  Even if the Court desired to refine the standard, such refinements would likely not cut in Vallejos' favor: virtually no exercise of force is ever strictly, perfectly limited to the exact level necessary.  For example, if a police officer returns fire on and kills a suspect after the suspect non-fatally shoots the officer, the officer could have possibly effectuated the same end -- neutralizing the threat of gunfire -- by tasing the suspect or by shooting him in the leg.  The reasonableness language, thus, works in the defendant's favor, as a jury with these facts in front of it would be unlikely to impose liability on a police officer.

---

the arrest or recapture of the other, or of maintaining the actor's custody of him, is not privileged if the means employed are in excess of those which the actor reasonably believes to be necessary."  Restatement (First) of Torts § 132 (1934).

The American Law Institute has not yet published its Restatement (Third) of Torts: Intentional Torts to Persons.  It circulated a draft of this Restatement in April, 2014.  The draft contains a section titled "Privilege to Arrest or Detain," but the section is presently blank, i.e., it is a placeholder.  Restatement (Third) of Torts: Intentional Torts to Persons § 121 (discussion draft)(April 3, 2014).

[16]This quote describes the JNOV/summary-judgment standard, but effectively the same standard applies at the motion-to-dismiss stage; the analysis is merely focused on the pleadings, rather than on the evidence.

In this case, the Court finds that it is implausible -- though not impossible -- that Vallejos did what he did out of malice or sadism.   The Court cannot find, however, that Vallejos reasonably and honestly -- i.e., objectively and subjectively -- used what he believed to be the minimum force necessary to resolve the situation.   It is plausible, from the facts alleged, that Vallejos could have gotten Peña's attention and compliance with words alone, with a tap on the shoulder, or by grabbing her but not pushing her against the wall.   It is plausible that Vallejos believed that these lesser alternative responses existed, and it is plausible that a jury would find that Vallejos was unreasonable for failing to try one of these alternatives before resorting to "slam[ing] her against the wall" with such force as to cause bruising.   Complaint ¶ 43, at 6.   For these reasons, Peña's battery claim is plausible, and the Court will not dismiss it.

**IT IS ORDERED** that: (i) Vallejos' Motion to Dismiss Plaintiff's Claims in the First Amended Complaint, filed March 18, 2013 (Doc. 32), is granted in part and denied in part; (ii) Count II of the Amended Complaint for Civil Rights Violations and Common Law Torts, filed February 28, 2013 (Doc. 30)("Complaint"), is dismissed with prejudice; (iii) the Court's Order, filed March 31, 2014 (Doc. 73), is amended to reinstate Count VI of the Complaint, and to reflect the rulings in the Court's Memorandum Opinion and Amended Order, filed May 7, 2015 (Doc. 137)("MOAO"); and (iv) the Memorandum Opinion portion of the MOAO is amended to reflect the additional analysis that this Amended Memorandum Opinion contains.

_____
UNITED STATES DISTRICT JUDGE

*Counsel*:

Zachary A. Ives
Garcia Ives Nowara
Albuquerque, New Mexico

--and--

Mark Fine
Charlotte Itoh
Fine Law Firm
Albuquerque, New Mexico

> *Attorneys for the Plaintiff*

Michael S. Jahner
Yenson, Lynn, Allen & Wosick, PC
Albuquerque, New Mexico

> *Attorneys for Defendant Dale Greffet*

Deborah D. Wells
Kennedy, Moulton & Wells, PC
Albuquerque, New Mexico

--and--

Christina G. Retts
Struck Wieneke & Love
Chandler, Arizona

> *Attorneys for Defendants Carlos Vallejos, Arlene Hickson, and Corrections Corporation of America*